**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLES D. FLORES,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CAUSE NO.: 3:07-CV-413-M** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director of Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

Comes now, Charles D. Flores, and files this his Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254. For reasons that follow, Flores respectfully requests that this

Court grant his Petition and overturn his conviction and sentence of death.

## I. <u>INTRODUCTION</u>

Following a trial where no direct evidence linked Flores to the killing of Betty Black,

Flores was condemned to die by a Texas jury. However, Charles Flores' conviction is

constitutionally deficient and in the face of habeas challenge should not be permitted to stand.

Flores did not receive effective assistance of counsel, as guaranteed by the Sixth Amendment of

TABLE OF CONTENTS

Page

CASE CHRONOLOGY .................................................... iv

INTRODUCTION ........................................................ 1

STATEMENT OF FACTS .................................................. 4

CLAIM I ............................................................... 7

**THE INDICTMENT AND THE TRIAL COURT'S INSTRUCTIONS ON THE THIRD SPECIAL ISSUE AT THE PUNISHMENT PHASE OF FLORES' TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

CLAIM II ............................................................. 32

**THE PROSECUTION VIOLATED ITS DUTY UNDER *BRADY V. MARYLAND* BY FAILING TO DISCLOSE KNOWN IMPEACHMENT EVIDENCE REGARDING THE HISTORY OF MENTAL ILLNESS AND RELATED EMPLOYMENT PROBLEMS OF THE STATE'S TRACE EVIDENCE ANALYST, CHARLES LINCH.**

CLAIM III ............................................................ 44

**FLORES WAS DEPRIVED OF DUE PROCESS OF LAW AND THE RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE TRIAL COURT ALLOWED THE STATE TO INTRODUCE AN EYEWITNESS IDENTIFICATION BY JILL BARGAINER WHEN HER RECOLLECTION HAD BEEN HYPNOTICALLY ENHANCED.**

CLAIM IV ............................................................ 48

**PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW ON HABEAS CORPUS REVIEW UNDER HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION.**

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

AFFIDAVIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

INMATE DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

## CASE CHRONOLOGY

| | |
|---|---|
| CHARGE | Capital Murder<br>Offense date: 1/29/1998 |
| | Indictment date: 09/30/1998 |
| PLEA | Not Guilty |
| TRIAL BY JURY | Jury Selection Commenced: 01/08/1999 |
| VERDICT | Guilty |
| VERDICT ON PUNISHMENT | Special Issue No. 1: Yes<br>Special Issue No. 2: Yes<br>Special Issue No. 3: No |
| SENTENCE | Death |
| JUDGMENT AND SENTENCE | 04/01/1999 |
| NOTICE OF APPEAL | 04/01/1999 |
| APPEAL AFFIRMED | 11/07/2001 |
| 11.071 APPLICATION FILED | 09/13/2000 |
| 11.071 APPLICATION DENIED | 09/20/2006 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES D. FLORES,                   §
                                     §
          Petitioner,                §
                                     §
vs.                                  §          CAUSE NO.: 3:07-CV-413-M
                                     §
NATHANIEL QUARTERMAN,                §
Director of Texas Department of      §
Criminal Justice, Correctional       §
Institutions Division,               §
                                     §
          Respondent.                §

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

BRUCE ANTON
Texas State Bar No. 01274700
**SORRELS, UDASHEN & ANTON**
2301 Cedar Springs, Suite 400
Dallas, Texas 75201
(214) 468-8100 - Telephone
(214) 468-8104 - Facsimile


MARY MARGARET PENROSE
Texas State Bar No. 00788179
**UNIVERSITY OF OKLAHOMA
COLLEGE OF LAW**
300 Timberdell Road
Norman, OK  73019
(405) 514-1811 – Telephone
(405) 325-0389 - Facsimile

1

the Constitution, in the guilt/innocence phase of his trial, the punishment phase of his trial, or in the appeal of his conviction.  Thereafter, exacerbating this initial injury, Flores received such incompetent representation in his state habeas application as to violate Texas Code of Criminal Procedure art. 11.071, which provides for effective assistance of competent counsel in capital state habeas proceedings.

Despite any legal precedent that firmly establishes such right, the judge presiding over Flores' habeas proceedings injected himself into Flores' state habeas proceedings in an attempt to ensure that competent counsel was afforded Flores.  Judge Nelms went so far as to threaten state habeas counsel with contempt of court for failing to retrieve the trial record as Judge Nelms had ordered.  Yet, the defiance continued and counsel wholly failed to present a habeas writ that preserved the numerous, viable claims that are obvious even to the nascent eye.  The judge could only order the record retrieved, but unfortunately, not reviewed.  This injustice must be remedied, not with the zealousness common to claims of procedural bar, but rather, with an eye toward justice, due process and the comfort of knowing that any system embracing capital punishment strives to ensure that those being executed have received the full panoply of rights afforded by our U.S. Constitution.

His trial counsel failed to investigate his claims of innocence.  Key witnesses were never interviewed before trial.  Physical evidence used against Mr. Flores by the State was never examined prior to trial and never independently tested.  Expert testimony from an independent expert hired by the defense would have provided a basis for excluding fingerprint evidence presented at trial, but no preliminary hearing was requested and no record was ever made of the expert's opinion as to the validity of the State's fingerprint testimony.

Mr. Flores' trial counsel failed to put a single witness on the stand during his entire trial, or to effectively elicit from the State's witnesses information that could have bolstered Mr. Flores' claim of innocence and could have been used to impeach certain state witnesses. Furthermore, the defense failed to investigate or put forth **any evidence** in the punishment phase of Mr. Flores' trial, a trial strategy that is universally seen as no strategy at all.

In addition, the State violated bedrock constitutional principles of due process when it deliberately misled the defense, the jury and the court in claiming that the State had made no offers to a key witness for the prosecution in exchange for his testimony and in withholding the identity of witnesses to whom the co-indictee[1] made statements which incriminated himself while exonerating Mr. Flores. By concealing this information, the State suppressed exculpatory information that could have completely changed the trial strategy and presentation of Mr. Flores' defense. Finally, the State presented the jury with a theory of the case that Mr. Flores was the sole actor when the State knew, and in fact tried the co-indictee, Mr. Childs on the theory that Mr. Childs actively participated in the murder.

Much of the State's case against Flores hinged on the hypnotically enhanced identification made by Jill Bargainer, a neighbor of Black's.

Flores' trial lacked the rudiments of fairness guaranteed by the United States Constitution. He was not provided the effective assistance of counsel – not at trial, not on appeal, and certainly not during the state habeas proceedings. He was not tried by a jury free from racial bias. He was only identified by a witness whose memory had been hypnotically

---

[1] The State indicted Ricky Childs on capital murder charges for the January 29, 1999, slaying of Betty Black. Mr. Childs plead guilty and received a sentence of 35 years' TDCJ on April 5, 2000. The State tried Mr. Flores for the crime in October 1999.

enhanced.  He was deprived of the opportunity to present the testimony of his parents at the

punishment phase of trial.  For these reasons and the reasons that follow, Flores is entitled to

relief pursuant to 28 U.S.C. § 2254 and respectfully requests that this Court grant this habeas

petition.

## II.  STATEMENT OF FACTS

Betty Black was killed early on the morning of January 29, 1998, while her husband was

at work.  (RR34.61-65)  The family dog had also been shot and killed.  (RR34.67)  No one saw

the murder.  There was no evidence of a struggle.  (RR35.212)  And no direct evidence regarding

this crime has ever been tied to Flores.  Instead, in a case involving drugs, money, greed and

family, Flores was implicated based solely on conduct preceding the murder and conduct that

occurred many weeks following the crime.  No gun – no bullet – no money – no fingerprints – no

DNA – no map – nothing, absolutely nothing directly links Flores to this crime.  (RR35.222-228,

273-274)

Instead, as the State presented its closing argument during the guilt/innocence phase of

this trial, its plea was that the State did not need to actually prove that Flores killed Black, only

that through the law of parties he was somehow connected.  The State clearly appreciated the

flimsy nature of any actual evidence linking Flores to this crime and relied upon his alleged

presence at the scene as sufficient basis of guilt.

Flores has consistently denied that he killed Betty Black.  Flores does not deny that he

bought, sold or used drugs.  Flores does not deny that he owned or, on occasion, carried a gun.

Flores also does not deny that after Betty Black was killed he engaged in conduct that is not

becoming of one claiming innocence.  But, this shadow of guilty behavior cannot be conflated

with evidence of actual guilt. Charles Flores did not kill Betty Black.

The evidence submitted at trial confirms that Ricky Childs was present at Betty Black's house the morning of January 29, 1998. Ricky Childs was directly identified by witnesses as being present that morning. Flores' identification, in contrast, is much more equivocal. The only witness that claims to have seen Flores at the Blacks' on January 29, 1998, recovered this information from a hypnotically enhanced memory. (RR36.290-292) All the other witnesses, neighbors and the children of neighbors who testified to various observations, were unable to make a positive identification of Flores.

The lack of identification cast doubt as to Flores' participation in the crime. Thus, when his own trial counsel admitted that Flores was present at the scene, counsel stripped Flores of any opportunity to challenge his guilt of murder based on the law of parties. Counsel unilaterally decided to implicate Flores in a manner that, undoubtedly, caused the jury to negatively interpret evidence of flight. While the usual inference is that a man runs because he is guilty, it is also a truism that men run out of fear, anxiety and numerous other reasons. Flight, standing alone, would not have been adequate to support a finding of guilt against Charles Flores. What was needed – something to connect the dots – was, ironically, provided by Flores' own trial counsel.

Without counsel's admission of Flores' presence at the crime scene, there was ample doubt about his participation. Ricky Childs had already confessed to the crime. Childs owned the Volkswagen that was seen at the Blacks' on the morning of the murder. Childs was convicted upon his plea, and sentenced to a lengthy prison sentence. His girlfriend at the time, Jackie Roberts, is Betty Black's daughter-in-law. Much like Flores, Roberts went into hiding after the murder.

Roberts' attempt to hide is easily understood.  One of her ex-husbands, Doug Roberts, was given, and later destroyed, a handwritten map to the Black's house.  (RR34.245-246, RR35.25-26, 29; RR38.54)  The map was found in Roberts' bag immediately following the murder.  (RR34.220)  Roberts knew the Blacks' schedule because Betty Black often babysat her children.  (RR38.153)  Roberts received a monthly stipend from Gary Black – Betty's son and Roberts' other ex-husband – to assist with raising their two children.  (RR34.70, 116; RR34.68-69)  Gary Black was serving a prison sentence at the time.  (RR34.52)

Roberts also knew that Gary Black had hidden large amounts of money in his parents' house.  (RR34.253-254, 256)  Evidence was admitted at trial that Jackie had reason to believe that Gary was going to have his parents cut off the financial support that he had been providing.  (RR34.71-72, 117; RR38.138-139)  Jackie Roberts had motive.

Jackie Roberts, like both Flores and Childs, also used illegal street drugs.  In fact, she was on probation for drugs at the time of the murder.  (RR34.106-107)  The evidence at trial confirmed that she was buying and using drugs the night preceding the murder.  (RR34.118-121)  Childs' purple Volkswagen, seen by several witnesses at the Blacks' on the morning of the murder, was parked at Jackie Roberts' home at 5:30 a.m. on January 29, 1998.  (RR34.237, 270)  Doug Roberts testified that he saw Childs get into the Volkswagen and drive off at 6:35 a.m.  (RR35.21)  Doug Roberts testified that Childs was alone at that time.  (RR34.238)

Jackie testified at trial that she told Childs that the Blacks had money hidden in the house.  (RR38.117-118)  Doug Roberts recalled her stating that she knew that the money was there and that she wanted it.  (RR34.263; RR38.25)  After the murder, Jackie went into hiding.  (RR34.246; RR38.41; RR35. 40; RR38.33-36; RR.38.73-80)  Initially, Doug Roberts lied to the

-6-

police regarding her whereabouts. (RR34.291-292; RR35.37, 47) Prior to being arrested, Jackie overdosed on pills and was taken to the hospital. It was at the hospital that she learned of Childs' arrest. Jackie's acts subsequent to the murder raise, at a minimum, a question of her complicity in the crime.

Yet, Flores remains the only individual convicted of capital murder for this crime. Neither Childs nor Roberts, both of whom had opportunity and motive for killing Betty Black, have faced the same punishment as Flores.

## CLAIM I

**THE INDICTMENT AND THE TRIAL COURT'S INSTRUCTIONS ON THE THIRD SPECIAL ISSUE AT THE PUNISHMENT PHASE OF FLORES' TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

### Preamble

As set out hereinafter, the mitigation issue construct resulted in a multitude of constitutional violations:

1.    The framing of the second issue  prevented the jurors from giving due consideration to mitigating evidence in violation of the United States Supreme Court decision in *Mills v. Maryland*;

2.    The instructions undermined the jury's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment and so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process;

3.    The State was relieved of the duty to prove beyond a reasonable doubt that Flores

merited a sentence of death, denying Flores due process; and

4.    The mitigation issue and accompanying explanations were excessively vague,

resulting in arbitrary and capricious sentencing patterns in violation of the Eighth

Amendment and the Due Process Clause of the Fourteenth Amendment.

## Overview

Because these errors all involve the third special issue, they are argued together.

## Constitutional Provisions

The Fourteenth Amendment to the United States Constitution proscribes any State from

"depriv[ing] a person of life, liberty, or property, without due process of law." U.S. CONST.

AMEND. XIV. The Eighth Amendment to the United States Constitution mandates that, "nor

[shall] cruel and unusual punishment [be] inflicted." U.S. CONST. AMEND. VIII. Flores submits

that the indictment and instructions submitted to the jurors at the punishment phase of his trial

violated these constraints.

## The Third Issue and Verdicts

Upon conclusion of the presentation of evidence at the punishment phase of Flores' trial, the

jury was instructed to answer Issue Three:

> Taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and
> background, and the personal moral culpability of the defendant, is
> there   a sufficient mitigating circumstance or circumstances to
> warrant that a sentence of life imprisonment rather than a death
> sentence be imposed?

(RR41.44)

The instruction is derived from TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2 (e)(1). The trial

court had previously instructed the jury on the procedure governing consideration of the issue:

-8-

> If the jury 's answers to Special issues 1 and 2 are both "yes," you will proceed to answer special issue number 3. There is no presumption regarding the answer to special issue number 3 and neither the State nor the defense has a burden of proof on it. In answering the this issue, the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.
>
> The jury shall answer special issue number 3 "yes" or "no." Only by unanimous verdict may the jury answer "no" to this special issue and it may not be answered "yes" unless ten (10) or more jurors agree. Jurors need not agree on what particular evidence supports a "yes" finding.

(RR41.40)

The trial court elsewhere instructed the jury to answer special Issue Number 1, which read as follows:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Charles Don Flores, would commit criminal acts of violence that would constitute a continuing threat to society?

(RR41.43)

The instruction is derived from TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2 (b)(1)

The trial court charged the jury on the procedure governing its response to issue one:

> In deliberating on the issues submitted in Special Issues 1 and 2, the Jury shall consider all evidence admitted at the guilt or innocence and punishment stages of the trial. The jury shall answer each special issue yes or no. The presumption is that the answer to both special issues is no, and the burden of proof is on the State to prove beyond a reasonable doubt that the answer to each should be yes.
>
> The jury may not answer either special issue yes unless the jury agrees unanimously on the answer to the issue and may not answer either special issue no unless ten or more jurors agree to the answer.
>
> If any juror has a reasonable doubt as to an issue, his or her answer to that issue should be no.

(RR41.39-40)

-9-

The trial court advised the veniremen of the effect of the answers: that "yes" answers to the first two issues and a "no" answer to the third issue would result in death. See, e.g. (RR31.24).

The trial court instructed the jury that, with regard to special issue no. 1, the State carried the burden of proof and described this burden of proof as "beyond a reasonable doubt":

> Regarding reasonable doubt, you are instructed that a reasonable doubt is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs. Proof beyond a reasonable doubt must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

(RR41.41)

With respect to special issue three, the trial court did not, however, instruct the jury on any burden of proof or on which party carried any burden of proof. All members of the jury answered issue one affirmatively. All members of the jury answered issue three negatively. Consequently, under the trial court's instructions and under the law of Texas, Flores was sentenced to death.

### Trial Objections

Flores' specific pre-trial objections, based on *Mills*, and the "10-12 rule" were overruled. (CR96-100)   Although this point of error was not raised on appellate review, Applicant made a claim as his second ground for relief in his 11.071 application. (Writ CR13-30)   In response, the State argued that the claim was procedurally barred because it was not raised on direct appeal. (Writ CR176-177)   The response noted that the Court of Criminal Appeals had routinely rejected similar claims. (Writ CR.178-179)   Finally, the State characterized the error, if any, as harmless because Applicant had failed to produce mitigation evidence at trial. (Writ CR180-181)   In its findings, the district court adopted all three of the State's reasons for denying relief: that no issue was raised on

direct appeal (Finding 31, Writ CR.68); that identical claims had routinely been rejected (Finding 40, Writ CR.700-701); and that the Applicant had presented no evidence at trial (Finding 50, 51 Writ CR.704).

As set out hereinafter, these legal conclusions are clearly an erroneous application of established federal precedent.

### The Mills Principle

**A.     The Instructions in the Charge at the Sentencing Phase Relating to the Mitigation Issue, that Unanimity Was Required for an Answer that Would Result in Death and Ten Votes Were Necessary for an Answer that Would Result in Life Imprisonment, Prevented the Jury from Giving Due Consideration to Mitigating Evidence in Violation of *Mills v. Maryland*.**

In *Mills v. Maryland*, 486 U.S. 367(1988), the Supreme Court reviewed a statute requiring imposition of a death sentence if the jury unanimously found an aggravating circumstance but could not agree unanimously regarding the existence of any particular mitigating circumstance.  The statute is substantially similar to the Texas procedure, which requires a death sentence if the jury unanimously fails to find that sufficient mitigating circumstances exist to warrant imposition of a sentence of life imprisonment but permits imposition of a life sentence only if ten jurors agree that sufficient mitigating circumstances exist.

This procedure was deemed to prevent the jurors from giving due consideration to mitigating evidence, in violation of the principles stated in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and reiterated in *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (stating that, "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating

evidence'" is equally "well established"). The *Mills* Court enunciated the following governing principle:

> It is beyond dispute that, in a capital case, the sentencer [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. The corollary that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence' is equally 'well established.'

*Mills*, 486 U.S. at 374-75 (citations omitted) (internal quotations omitted) (emphasis in original). Consistent with this principle in reviewing death sentences, the Court has demanded the highest certainty that the jury's conclusions rested on proper grounds. *See, e.g., Lockett v. Ohio*, 438 U.S. at 605 (stating, "The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"); *Andres v. United States*, 333 U.S. 740, 752 (1948) (stating "That reasonable men might derive a meaning from the instructions given other than the proper meaning of § 567 is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.") Unless a reviewing court can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, it must remand for re-sentencing. *Mills*, 486 U.S. at 377. This is the governing legal standard as set forth and developed by the United States Supreme Court.

### A Reasonable Interpretation

The Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory

scheme. *See California v. Brown*, 479 U.S. 538, 541 (1987); *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985). From these instructions, each juror knew that an affirmative answer on the first issue and a negative answer on the second issue resulted in a death sentence. Each juror further knew -- or reasonably deduced -- that the only means of avoiding a death sentence after answering the first special issue affirmatively was to convince nine others to answer the second issue affirmatively as well. Flores' jurors could not impose life imprisonment if a few – or even one – thought mitigating circumstances warranted that sentence. Under the deficient instructions the trial court submitted, the dissenting juror or jurors must garner 10 total votes to reach that verdict. Thus, the juror or jurors who may have believed the mitigating evidence, were coerced into joining with the majority to reach a verdict. These jurors, then, by virtue of the instructions submitted, were prevented from giving due consideration to mitigating evidence because, under the instructions proffered at the sentencing phase of Flores' trial, a reasonable juror could have believed -- in fact, most certainly would have believed -- that she had no ability to give effect to mitigating evidence unless nine other jurors joined in the vote. The Seventh Circuit so ruled when confronted with a capital murder sentencing scheme virtually identical to the one at issue:

> [Defendant's] jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, [defendant] would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of [defendant's] jurors might have been precluded from granting mercy to [defendant] because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989), *cert. denied sub nom Kubat v. Greer*, 493 U.S. 874(1989).

### Probable Effect

Certainly, no one can assert with absolute confidence that this is what transpired. Absolute certainty, however, is not the standard. The jury was instructed to return at least ten votes for life and repeatedly told, from *voir dire* through the process of the trial, through sentencing and in closing argument, of the gravity of their decision, implying, at the very least, the necessity of reaching a decision. The *Mills* Court recognized this element:

> We cannot say with any degree of confidence which interpretation Mills' jury adopted. But common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so.

*Mills*, 486 U.S. at 383.

"The risk that the death penalty will be imposed in spite of facts which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Mills*, 486 U.S. at 376-77. Because of the instructions advanced in Flores' case – instructions that inaccurately stated Texas law – combined with the jury's knowledge of the effect of its answers, that risk is readily apparent in this case. Accordingly, the Court must vacate Flores' sentence.

**B.    The Instruction in the Charge at the Sentencing Phase that Unanimity Was Required for a Negative Answer and Ten Votes Were Necessary for an Affirmative Answer Undermined the Jury's Sense of Responsibility for Imposing a Death Sentence, in Violation of the Eighth Amendment, and So Infected the Sentencing Proceeding with Unfairness as to Render the Jury's Imposition of the Death Penalty a Denial of Due Process.**

The instructions to the jury at the sentencing phase of Flores' trial effectively requiring ten jurors to agree to impose a life sentence inaccurately stated the governing law. In fact, the

holdout of only one juror would have resulted in imposition of a life sentence. By inaccurately stating the law and impressing upon the jurors that no single juror could have a determinative impact on the outcome of the sentencing phase of the trial, the instructions undermined the juror's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment, and so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. *See Mills v. Maryland*, 486 U.S. 367 (1988).

### Trial Objection

Flores' specific objection that the instructions provided misinformation was denied (CR.96-100)

### Heightened Assurance

Flores is well aware that the Court of Criminal Appeals has repeatedly denied this error, usually without elucidation. *Francois v. State,* 2006 WL 2615306, 1 (Tex. Crim. App. 2006); *Escamilla v. State,* 143 S.W.3d 814, 828 (Tex. Crim. App.2004), *cert. denied,* 544 U.S. 950; *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005) cert denied 126 S.C. 165, 989 L.Ed. 2d 2982 (2006).

Flores also notes that the Court of Criminal Appeals has ruled that a version of the Texas death penalty scheme that had the same 12/10 requirement was held to be constitutional by the United States Supreme Court in *Jurek v. Texas*, 428 U.S. 262 (1976). In *Jurek,* however, the Court never specifically addressed the constitutionality of the 12/10 requirement.

The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. State-sanctioned deprivation of

life is one of the most sobering and irreversible powers any State can exercise. The Supreme

Court has affirmed on numerous occasions that the penalty of death is qualitatively different from

a sentence of imprisonment. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 n. 15,(1981);

*Gardner v. Florida*, 430 U.S. 349, 357,(1977) (plurality opinion). *See also Furman v. Georgia*,

408 U.S. 238, 306,(1972) (Stewart, J., concurring). This qualitative difference engenders a

corresponding difference in the need for assurance in the determination that death is the

appropriate punishment in a specific case. *See Woodson v. North Carolina*, 428 U.S. 280 (1976)

(plurality opinion). In *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the Court stated that

"the qualitative difference of death from all other punishments requires a correspondingly greater

degree of scrutiny of the capital sentencing determination." *See id.* at 999 n. 9. *See also Sawyer

v. Smith,* 497 U.S. 227 (1990); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J.,

plurality opinion) (stating, "In capital proceedings generally, this Court has demanded that fact-

finding procedures aspire to a heightened standard of reliability. . . . This especial concern is a

natural consequence of the knowledge that execution is the most irremediable and unfathomable

of penalties; that death is different"); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C. J.,

concurring in judgment) (stating, "In capital cases the finality of the sentence imposed warrants

protections that may or may not be required in other cases."); *Barefoot v. Estelle*, 463 U.S. 880,

924 (1983) (Blackmun, J., dissenting) (stating that, *Woodson*'s concern for assuring heightened

reliability in the capital sentencing determination "is as firmly established as any in our Eighth

Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) (Burger, C.J.,

dissenting) (stating, "[I]n capital cases we must see to it that the jury has rendered its decision

with meticulous care"); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality

opinion) (stating, "From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

### Accurate Assessment of Individual Responsibility

The Supreme Court recognizes that the jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). *See Jones v. United States*, 527 U.S. 373 (1999). The Court applies a single standard for reviewing instructions, asking, "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyd v. California*, 494 U.S. 370, 380 (1990)).

The Eighth Amendment requires that the jury not be misled in the role it plays in the sentencing decision. *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985) (plurality opinion). Inaccurate information proffered to the jury renders the sentencing proceeding so unreliable that the proceeding violated the Eighth Amendment. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 305,(1976).

Further, a component of heightened reliability is the Eighth Amendment and Due Process command that the jury be capable of a reasoned moral judgment about whether death, rather than a lesser sentence, ought to be imposed. *See Simmons*, 512 U.S. at 172. Part and parcel of this requirement is the provision of "accurate sentencing information [as] an indispensable

-17-

prerequisite to a reasonable determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), and the invalidation of "procedural rules that tend to diminish the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).

In this case, that correspondingly high requirement of reliability dictates finding the Texas jury scheme as applied to Flores is unconstitutional. Under Texas law, the prosecution can secure the death penalty only if the jurors answer the future dangerousness issue in the affirmative and the mitigation issue unanimously in the negative. Thus, if even one juror determines to answer any of these issues differently, Flores would, as a matter of law, be sentenced to life imprisonment.

The instructions, however, do not inform the jury of this procedure and result. Instead, they affirmatively mislead the jurors by stating, *inaccurately*, that ten jurors must agree to an answer that will result in life imprisonment. The instructions effectively provide the jury with a false statement of Texas law.

The several instructions that informed the jury that ten votes were essential for imposition of life imprisonment inaccurately stated Texas law and affirmatively misled the jurors. Each individual juror knew, from the instructions, that his or her single vote could not determine the outcome. Rather, that juror must convince at least nine others to join the decision.

Consequently, each juror's responsibility for the ultimate decision was undermined. Each juror could take solace in the fact that his or her single decision would have only minimal (1/10 or 1/12) effect on the ultimate decision. Thus, the instructions unconstitutionally minimized each

juror's responsibility for the ultimate sentence. *Romano,* 512 U.S. at 8; *Beck,* 447 U.S. at 638; *Lockett,* 438 U.S. at 604.

The inaccuracy in the instructions and their probable effect on the jurors so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. *See Sawyer v. Smith,* 497 U.S. 227, 243-44 (1990) (observing that the *Caldwell* rule was added to the guarantee in *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974), of due process protection against fundamental unfairness). *See also Darden v. Wainwright,* 477 U.S. 168, 178-81 (1986). The jurors were seriously and unconstitutionally constrained from imposing a sentence of life imprisonment. An instruction that required the votes of 10 jurors seriously impeded the capacity of any single juror to vote for life, as was his or her right under the law. *See Romano,* 512 U.S. at 8.

The instructions further violate the tenant of fundamental fairness that is the bedrock of due process. The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333 (1966); *Gideon v. Wainwright,* 372 U.S. 335 (1963); *Betts v. Brady,* 316 U.S. 455 (1942); *Tumey v. Ohio,* 273 U.S. 510 (1927). *See Estes v. Texas,* 381 U.S. 532 (1965). *Cf. Griffin v. Illinois,* 351 U.S. 12 (1956). Floreswas not granted this requisite opportunity of fundamental fairness. Instead, he was sentenced to death by a jury that improperly was charged on the effect of their votes.

### Probable Effect

1. Reduced Responsibility. A reasonable likelihood exists that the jury applied the challenged instruction in a manner that violated the Constitution. Further, a reasonable likelihood exists that this influenced the jury's ultimate verdict, to the substantial prejudicial

-19-

effect of Flores.  The one or more who might be inclined to answer any of the issues differently

from the majority, who effectively would vote to sentence Flores to life imprisonment, cannot

take comfort in what truly is the law, knowing that one vote would result in life imprisonment.

Rather, they are misled into believing that the only means of avoiding the death penalty is to

persuade enough jurors to answer as they intend to do until the total number reaches 10.  This

false impression undermines the reliability in the sentencing determination that death is the

appropriate punishment in violation of the Eighth Amendment.  *See Woodson v. North Carolina*,

428 U.S. 280, 305 (1976) (plurality opinion).

2. Inherent Coercion. The instructions are inherently coercive.  Holdouts feel obligated to

vote negatively inasmuch as the jury has been instructed to return a verdict, and no possibility of

a life sentence, under the instructions as given, is possible.  *See Mills v. Maryland*, 486 U.S. 367,

383, (1988) (stating that, "[C]ommon sense . . . suggest[s] that juries do not leave blanks and do

not report themselves as deadlocked over mitigating circumstances after reasonable deliberation

unless they are expressly instructed to do so") (citation omitted).

The Supreme Court has expressed concern regarding minority coercion such as this in a

slightly different context.  The Court has criticized the practice of trial courts inquiring into the

numerical division of deadlocked juries prior to sending the jury back for further deliberation.

*See, e.g., Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S.

448, 450 (1926).  Specifically, the Supreme Court has held that "inquiry into the jury's numerical

division necessitated reversal because it was generally coercive and almost always brought to

bear 'in some degree, serious although not measurable, an improper influence upon the jury.'"

*Lowenfield*, 484 U.S. at 239 (citing *Brasfield*, 272 U.S. at 450).

Thus, the gravamen of the problem with inquiry into numerical division or a "dynamite charge" is its coercive effect upon the jury. It is this coercive effect that violates the Constitution. Thus, the coercive effect inherent in the instructions on mitigation in Flores' case necessarily violated Flores' federal constitutional rights and, accordingly, merits relief.

3. Arbitrary Verdicts. Without accurate instructions, any assurance of reliability in the final decision seriously is undermined. Further, simple due process fairness commands accurate jury instruction. The Supreme "Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 188 (1982) (O'Connor, J., concurring). This guarantee does not exist in Flores' case. The inaccuracy of the instructions submitted to the jury at the sentencing phase of Flores' trial violated the Eighth and Fourteenth Amendments.

**C.      The Failure to Place Upon the State the Burden of Proving the Mitigation Issue Beyond a Reasonable Doubt Relieved the State from Proving Beyond a Reasonable Doubt that Flores Merited a Death Sentence, Denying Flores Due Process.**

### Negating the Presumption of Innocence

The presumption of innocence, although not specifically articulated in the United States Constitution, is a basic component of a fair trial under the American system of criminal justice. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895).

From this principle arose *Winship*'s fundamental precept: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). *See Sandstrom v. Montana*, 442 U.S. 510 (1979); *Patterson v. New York*, 432 U.S. 197, 210 (1977). The sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). "[R]eliance on the 'reasonable doubt' standard among common-law jurisdictions 'reflects a profound judgment about the way in which law should be enforced and justice administered.'" *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (citing *Winship*, 397 U.S. at 361-62) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)).

The *Winship* principle extends to requiring the State to bear the burden of proving beyond a reasonable doubt all elements that result in imposition of a penalty of death: "Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999). The United States Supreme Court recently reaffirmed this principle in *Apprendi* and *Ring*. As stated in *Ring*, "Capital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589 (2002).

These principles are particularly compelling in capital cases. The Eighth Amendment simply requires States to apply special procedural safeguards when they seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976). When the State fails to afford these minimal protections, the constitutional prohibition against "cruel and unusual punishments" forbids its use. *Furman v. Georgia*, 408 U.S. 238 (1972).

The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. The Supreme Court has affirmed on numerous occasions that the penalty of death is qualitatively different from a sentence of imprisonment. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 (1981); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion). *See also Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). This qualitative difference engenders a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. *See Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion). In *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the Court stated that, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *See id.* at 999 n. 9. *See also Sawyer v. Smith,* 497 U.S. 227 (1990)*; Ford v. Wainwright,* 477 U.S. 399, 411 (1986) *(Marshall, J., plurality opinion)* (stating, "In capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C. J., concurring in judgment) (stating, "In capital cases the finality of the sentence imposed warrants

-23-

protections that may or may not be required in other cases"); *Barefoot v. Estelle*, 463 U.S. 880,

924 (1983) (Blackmun, J., dissenting) (stating that, *Woodson*'s concern for assuring heightened

reliability in the capital sentencing determination, "is as firmly established as any in our Eighth

Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) (Burger, C.J.,

dissenting) (stating, "[I]n capital cases we must see to it that the jury has rendered its decision

with meticulous care"); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality

opinion) (stating, "From the point of view of the defendant, [the death penalty] is different in

both its severity and its finality.  From the point of view of society, the action of the sovereign in

taking the life of one of its citizens also differs dramatically from any other legitimate state

action.  It is of vital importance to the defendant and to the community that any decision to

impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

These guiding considerations culminated in the *Apprendi* line of cases, including the

statement of Justice Thomas, concurring in the judgment:  "In the areas of capital punishment,

unlike any other area, we have imposed special constraints on a legislature's ability to determine

what facts shall lead to what punishment – we have restricted the legislature's ability to define

crime."  *Apprendi*, 530 U.S. at 522-23.  In *Apprendi*, the Court ruled the Due Process Clause of

the Fourteenth Amendment requires that a factual determination authorizing an increase in the

maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of

proof beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 469.  The application of this principle to

Flores' case is clear.  Because a negative finding on the mitigation issue, which the State so

assiduously advanced, mandates the death penalty, rather than life imprisonment, the State must

prove the elements of the issue beyond a reasonable doubt:  "When a judge's finding based on a

-24-

mere preponderance of the evidence authorizes an increase in the maximum punishment, it is

appropriately characterized as 'a tail which wags the dog of the substantive offense.'" *Id.* at 495

(quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)).  The person who is charged with

actions that expose him to the death penalty has an absolute entitlement to a jury trial on all the

elements of the charge." *Almendarez-Torres v. United States*, 523 U.S. 224, 227 (1998) (Scalia,

J., dissenting) (emphasis deleted).  The State did not prove the elements of the mitigation issue

beyond a reasonable doubt, making Flores' conviction unconstitutional under the Due Process

Clause.

### Distinguishing Authority

In *Basso v. State,* No. 73,672, slip op. at 36:37, 2003 WL 1702283 (Tex. Crim. App.

January 15, 2003) *cert den'd* 540 U.S. 864(2003), a non-published opinion, this court engaged in

some legal legerdemain in order to avoid the dictates of *Apprendi* and *Ring* as follows:

> "We have held that neither party bears the burden of proof at
> punishment on the mitigating evidence special issue. (Citations
> Omitted). The holding in [*Apprendi v. New Jersey,* 530 U.S. 466
> (2000)] does not affect our prior decisions or our determination of
> the appellant's point. Where a finding of a fact (other than a prior
> conviction) *increases the authorized punishment* for a crime, the
> State must prove and a jury must find that fact beyond a reasonable
> doubt. *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 2439, 153
> L.Ed.2d 556 (2002); [*Apprendi*], 530 U.S. at 476, 120 S.Ct. 2348
> (emphasis added). Under Tex. Code Crim. Proc., Article 37.071,
> there is no authorized increase in punishment contingent on the
> jury's finding on the mitigating special issue. *See Ring,* at 602. A
> jury will answer the mitigation special issue only "if [it] returns an
> affirmative finding to each issue submitted [the 'future
> dangerousness' special issue]." (Citation Omitted). In other words,
> a jury's finding on mitigation occurs only after the State has proven
> the elements of capital murder, at the guilt stage, and the
> aggravating circumstances-evidence of the defendant's future
> dangerousness-beyond a reasonable doubt. (Citation Omitted). By

-25-

the time the jury reaches the mitigation issue, the State has already demonstrated the defendant's eligibility for a death sentence; a negative answer on mitigation cannot increase his authorized punishment. The statute mandates only a reduction in punishment to a life sentence upon an affirmative finding of mitigation. (Citation Omitted). Therefore, [ *Apprendi* ] is not applicable to the appellant's point of error. The trial court did not err in not assigning the burden on the mitigation issue to the State. We adopt this discussion and reasoning here.

*See also Resendiz v. State,* 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003) cert denied 541 U.S. 1032 (2004); *Allen v. State,* 108 S.W.3d 281, 285 (Tex. Crim. App. 2003) *cert den'd* 540 U.S.1185(1984). *Blue v. State,* 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) *cert. denied,* 543 U.S. 853 (2004).

This attempt to avoid a constitutional obligation appears disingenuous. In order to be assessed a death penalty for a qualifying offense, the accused must be selected through the factor set out in special issue number one **AND** the jury must not find sufficient mitigation. A finding on the first special issue alone will not pass muster. Both questions must be answered in order to increase the punishment. The sophistry of this reasoning is readily demonstrated by merely inverting the issues. If the jury answers the Mitigation (first) issue yes, then there would be no need answer the aggravation issue. If the issue is answered no, then the state would still be required to prove the aggravating factor beyond a reasonable doubt. Claiming that the mitigation issue merely ratchets down a death sentence to life is an illogical construct that, as with the discussion of most issues related to mitigation, severely mis-analyses the purpose for, and importance of, that issue.

### Application of the Principle

The instruction submitted to the jury asks whether the jury finds sufficient mitigating circumstances exist such that a sentence of death is not appropriate. The jury is also instructed that certain answers on the two punishment issues submitted will result in imposition of a death sentence, while the opposite answers will result in imposition of a life sentence. Thus, the jury is aware of the effect of its answers.

The mitigation instruction effectively asks the jury to find whether the sentence of death is appropriate – a fact on which the State bears the burden of proof. However, the jury receives no instruction that the State bears this burden, much less the scope of that burden. This transgresses the Due Process Clause and the Eighth Amendment. *See Apprendi*, 530 U.S. at 469; *Winship*, 397 U.S. at 394.

In *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled in part; Ring v. Arizona*, 536 U.S. 584, 589 (2002), the Supreme Court wrote that, "So Flores as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.* The *Walton* case is, however, distinguishable from the instant application. In Flores' case, Texas' method of allocating the burden of proof (or not allocating it at all) unconstitutionally lessened the State's burden to prove the existence of aggravating circumstances. As *Apprendi* instructs trial courts, such a failure is unconstitutional and grounds for federal habeas relief. While the State steadfastly advocated a penalty of death, the State bore no burden to prove that a sentence of death was appropriate

-27-

because mitigating circumstances did not warrant a sentence of life imprisonment. Thus, as to the mitigation issue, the State bore no burden of proving death was the punishment the jurors should impose -- which is precisely the inquiry the issue posed. This failure is legally inappropriate and unconstitutional.

## Shifting the Burden

The State cannot shift to a capital defendant the burden of proving he does not merit death. This shifting of burdens effectively imposes upon the defendant the burden of disproving the State's case -- something the federal Constitution does not permit. If the State chooses to seek death, it must prove, beyond a reasonable doubt, all elements necessary to imposition of that punishment, including that mitigating circumstances do not warrant a lesser penalty. Due process – and the Eighth Amendment in the context of capital cases – requires the State bear the onus of proving its case. Because it did not do so at Flores' trial, the Court must vacate Flores' sentence.

**D.    The Instructions Relating to the Mitigation Issue Given to the Jury in the Charge at the Sentencing Phase of Flores' Trial Allowed Flores' Punishment to be Set in an Excessively Vague, Arbitrary, and Capricious Manner in Violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.**

## Eschewing Caprice

The Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972) held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that the penalty will be inflicted in an arbitrary and capricious manner. *See Gregg v. Georgia*, 428 U.S. 153 (1976). Thus, a state imposing capital punishment "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death

penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The Constitution requires the state to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing the sentence of death.'" *Id.* at 428 (citations and footnotes omitted). *See Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). Absent such constitutionally mandated standards, a State sentence of death is unconstitutional as "wantonly or freakishly" applied. *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring).

### Making Decisions in a Vacuum

The instructions relating to the mitigation issue in this case violated these jealously guarded tenets of federal constitutional law that forbid the imposition of a sentence in an arbitrary and capricious manner. The jury was not informed which party held the burden of proof or what standard guided that burden. Rather, the jurors were informed, inaccurately and unlawfully, that 10 of their number must concur to reach a sentence imposing life imprisonment. Absent accurate and specific guidance, arbitrariness and capriciousness infected the procedure.

### Failure to Define "Mitigation" Properly

"The fundamental respect for humanity underlying the Eighth Amendment, [mandates the] . . . consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio,* 438 U.S. 586 (1978); *Roberts (Harry) v. Louisiana,* 431 U.S. 633 (1977); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325 (1976). Evidence about a defendant's background and character is relevant because of the belief, held by

this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems may be less culpable than defendants who have no such excuses. *California v. Brown,* 479 U.S. at 538, 545 (1987) (O'Connor, J., concurring). This is accomplished only through a process that requires the sentencer to consider in fixing the ultimate punishment of death, the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976). The *Lockett* principle "is the product of considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual. *California v. Brown,* 479 U.S. at 562. The underlying principle in *Lockett* and *Eddings* is that punishment should be directly related to the personal culpability of the criminal defendant. *Penry v. Lynaugh,* 492 U.S. 302 (1989). Thus, jury instructions must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to that evidence in rendering its decision." *Id.* at 321. Furthermore, an individual juror must be free to consider a mitigating factor, regardless of whether other members of the jury agree as to its existence. *Mills v. Maryland,* 486 U.S. 367 (1988). *See McKoy v. North Carolina,* 494 U.S. 433 (1990) (stating each juror must be permitted to consider and give effect to mitigating evidence). In other words, it is not enough "simply to allow the defendant to present mitigating evidence to the sentencer, rather there must not be any impediment through evidentiary rules, jury instructions or prosecutorial argument to the sentencer's full consideration and ability to give effect to mitigating evidence." *Penry,* 492 U.S. at 327.

Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness -- such as a history of positive

-30-

character traits, kindness shown toward children, or artistic talent. Nonetheless, the judge and prosecutor limited its discussion of mitigation to negative factors (RR4.120; RR16.86; RR18.26, 52; RR20.27; RR26.32; RR31.29; RR32.36-37) such as physical abuse, retardation and substance abuse issues, and one positive factor (RR4.191-192, 256-257; RR9.48-49; RR32.112): whether the Applicant had been an honor student. Although the statutory *Penry* special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," article 37.071, § 2(e), the statute's limited definition of "mitigating evidence" violates the Eighth and Fourteenth Amendments to the United States Constitution. U.S. CONST. AMENDS. VIII, XIV.

### *Jurek* Distinguished

The Supreme Court's holding in *Jurek v. Texas*, 428 U.S. 262, 276 (1976), upholding the constitutionality of the Texas death penalty scheme as it then existed, does not undermine Flores' claim. The petitioner in *Jurek* did not challenge the Texas statutory scheme on the bases Flores asserts and, consequently, *Jurek* has no precedential value on these issues.

### Summary

Cumulatively, the instructions submitted at the punishment phase of Flores' trial were arbitrary and capricious in violation of the Eighth Amendment and the Due Process Clause. Flores' sentence of death was "wantonly and freakishly" applied, and, consequently, is constitutionally deficient under federal law as interpreted by the Supreme Court.

## CLAIM II

**THE PROSECUTION VIOLATED ITS DUTY UNDER *BRADY V. MARYLAND* BY FAILING TO DISCLOSE KNOWN IMPEACHMENT EVIDENCE REGARDING THE HISTORY OF MENTAL ILLNESS AND RELATED EMPLOYMENT PROBLEMS OF THE STATE'S TRACE EVIDENCE ANALYST, CHARLES LINCH.**

### Relevant Facts

Betty Black, the victim, and her dog died from gunshot wounds. (RR36.119, 143, 145) According to the medical examiner, the dog was killed with a higher caliber weapon than used to kill Betty Black. (RR36.149-150) A .380 shell casing was found at the scene. (RR35.223) Further, potato splatterings found in the home, as well as a whole potato found in the bathroom sink (RR35.199-202) indicated that the potatoes had been used as a silencer. (RR35.243, 269) Initially, the prosecution suggested that Betty Black was killed with a .380 handgun that Flores had given to Homero Garcia, a friend of his. (RR36.220) However, subsequent ballistic testing conclusively established that the .380 recovered from Garcia did not fire the bullet found at the scene. (RR38.87-89) When Rick Childs was arrested, a .44 handgun (RR36.197) and bullets of the same manufacture as the casing found at the murder scene were in his possession. (RR36.179, 181-183) Ballistic testing confirmed that the .44 could not have fired the casing found at the scene. (RR38.97-98)

Apparently concerned that Flores and Childs were not sufficiently linked to the murder weapon, the State called Charles Linch to testify. Linch was asked to do a fiber analysis of the .44 during the trial. (RR36.214-215) According to Linch, starch grains that he scraped from the barrel of the .44 could be potato grains. (RR36.211-213) The State used this testimony to suggest that the .44 recovered from Childs was fired at Black's home. Linch was not impeached

-32-

regarding his qualifications to conduct these tests and reach these conclusions.  (RR36.214-215)

Subsequent to the trial, as alleged in the 11.07 application, evidence which called into question Linch's qualifications and training were discovered.

### State Writ

In the 11.071 application, state writ counsel alleged that the failure to disclose this information regarding Linch's qualifications to do fiber analysis constituted a *Brady* violation and that Linch's prior hospitalization would have been a proper subject for cross-examination. See *Virts v. State*, 739 SW2d 25 (Tex. Crim. App. 1987).  (CR.86-101)  In response, the State argued that introduction of evidence concerning Linch's mental health was not admissible because the hospitalization had occurred five years before the trial. (CR.229-230)  The State also argued that the testimony was harmless because Linch's testimony was inconsequential to the State's case.  (CR.232, 278-29)  Additionally, the State argued that prosecutors did not know about Linch's mental health at the time of trial  (CR.232-234) and that because Linch was not a government employee, knowledge of his illness could be imputed to the prosecutor. (CR.235-236, 243-244)

### Findings of Fact and Conclusions of Law

The Court of Criminal Appeals, in adopting the State court's findings, found that trial counsel had been given a full opportunity to cross-examine Linch and thus, there was no denial of confrontation.  (Finding of Fact 207, CR.743) The Court further found that there was no evidence to suggest that Linch's test results were unreliable.  (Finding of Fact 208, CR.743) Further, the court found that no harm had been established by the failure to cross-examination Linch regarding his mental health.  (Finding of Fact 211, CR.744)

-33-

As to the *Brady* claim, the court found that Linch was not a member of law enforcement and therefore, his knowledge could not be imputed to the prosecutor. (Findings of Fact 220-221, CR.746-747)   The court also found that mental health records are not subject to disclosure under *Brady*. (Findings of Fact 222, CR.747)   Finally, the court found that the error in failing to disclose was harmless because it was remote. (Finding of Fact 228, CR.748)   The court further found that the defense counsel could have uncovered this evidence prior to trial but failed to use due diligence. (Finding of Fact 234, CR.750)

As regards competency, the court found that Linch's depression was remote in time (Finding of Fact 239, CR.752) and that the testimony was inconsequential (Finding of Fact 241, CR.752).

### Brady's Requirements

Under *Brady v. Maryland*, 373 U.S. 83, (1963), the prosecution team has a duty to reveal to the defense any exculpatory evidence. *See* U.S. CONST., Amends. V, XIV, AND TEX. CONST. Art. 1, §19.  *See also United States v. Agurs*, 427 U.S. 97 (1976).  In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that, when the prosecution team withholds exculpatory evidence, a new trial is required if a reasonable probability exists that, with the evidence, a different outcome may occur in the case.  This reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome."  473 U.S. at 682, 105 S.Ct. at 3383; *see also Ex parte Richardson*, 70 S.W.3d 865 (Tex. Crim. App. 2002) (reversal of capital murder conviction based on suppression of exculpatory evidence); *Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) (suppression of exculpatory statement by eyewitnesses); *Ex parte Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989); *Crutcher v. State*, 481 S.W.2d 113 (Tex. Crim.

App. 1972) (discovery of police reports with exculpatory evidence); *Ball v. State*, 631 S.W.2d

809 (Tex. App. - Eastland 1982, pet. ref'd.) (error not to disclose picture of defendant at the time

of arrest with black eye when self-defense claimed).   The standard applicable as a matter of State

constitutional law when a specific request for material has been made is that evidence is

considered material if a reasonable possibility exists that the failure to disclose it might have

affected the outcome of the trial.   *People v. Vilardi*, 555 N.E.2d 915 (1990) (adopting).[12]

---

[12] In *Ramirez v. State*, 96 S.W.3d 386 (Tex. App. - Austin 2002), pet. ref'd. the Court
reversed a case based on the prosecution's failure to correct false testimony from a State's
witness that she was not looking for money based on being a victim of the crime alleged even
though she had hired a lawyer to pursue a lawsuit.   The Court in *Ramirez* summarized the law as
follows:

> In *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31
> L.ed.2d 104 (1972), the Court acknowledged that since *Mooney*, it
> has been clear that deliberate deception of a court and jurors by the
> presentation of known false evidence is incompatible with 'the
> rudimentary demands of justice.'   *See Pyle v. Kansas*, 317 U.S.
> 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942).   And in *Napue v.
> Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the
> Court concluded that the same result obtains when the prosecuion
> 'although not soliciting false evidence, allows it to go uncorrected
> when it appears.'   *Id.* at 269, 79 S.Ct. 763.   When the reliability of
> a given witness may well be determinative of the guilt or innocence
> of an accused, nondisclosure of evidence affecting credibility falls
> within the general rule discussed.   *Giglio*, 405 U.S. at 154, 92 S.Ct.
> 763.   This line of cases has sometimes been referred to as the
> *Mooney-Pyle-Napue* line of decisions.   *See* 42 George E. Dix &
> Robert O. Dawson Texas Practice: Criminal Practice and
> Prodecure § 22.51 (2d ed. 2002) (hereinafter "Dix").   *See also
> generally Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d
> (1967); *Alcorta v. Texas*, 335 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9
> (1957); *Ex parte Castellano*, 863 S.W.2d 476 (Tex. Crim. App.
> 1993); *Ex parte Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989);
> *Davis v. State*, 831 S.W.2d 426 (Tex. App. - Austin 1992, no pet.).

> Although *Brady* relied upon *Mooney, see Kyles v. Whitley*, 514
> U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and there

-35-

Favorable evidence is defined for purposes of *Brady* disclosures as "any evidence that if

disclosed and used effectively . . . may make the difference between conviction and acquittal."

*Thomas,* 841 S.W.2d at 40[1] (internal quotations omitted). Because the definition of favorable

evidence includes both exculpatory and impeachment evidence, *id.,* the prosecution has a duty

under *Brady* to provide evidence which would allow the accused the opportunity to impeach a

State's witness.

---

have been suggestions that the *Mooney* line of cases were [sic] incorporated in the later *Brady* rule, the two lines of decision are distinctive. *See United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). It has been stated that 'Although *Brady v. Maryland* and its progeny suggest the Due Process duty to disclose may have superseded and replaced the prohibition against the use of perjured testimony, this is not the case. The prohibition against the use of perjured testimony remains available to defendants as an alternative to *Brady* arguments.' *Mooney* contentions are sometimes more attractive to defendants because the criterion for determining the materiality of improperly used perjured testimony is more lenient than that for determining the materiality of improperly suppressed exculpatory evidence under *Brady*. The difference between the two due process rules is not entirely clear. Some situations will present viable arguments that both were violated. If a defendant is able to establish both that the State knowingly used perjured falsity of the testimony, the defendant is entitled to relief if he or she can show the testimony used is material under the perjured testimony line of decisions and its more relaxed materiality standard. *Dix* § 22.5 (citations omitted).

While appellant relies upon both due process rules, we conclude it is necessary to examine only the *Mooney-Pyle-Napue* line of decisions to reach the proper disposition of appellant's contention. We review the record to determine if the State 'used' the testimony, whether the testimony was 'false,' whether the testimony was 'knowingly used,' and if these questions are affirmatively answered, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.

-36-

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court discussed the showing necessary to obtain a new trial when the prosecution withholds exculpatory evidence. Under *Kyles,* this showing does not require a demonstration that the disclosure of this evidence would have resulted in an acquittal. Rather, as the Court stated, the question is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434, 115 S.Ct. at 1566; *see also United States v. Bagley*, 473 U.S. 667 (1975); *United States v. Fisher*, 106 F.3d 622 (5th Cir. 1997) (reversing for failure to reveal exculpatory evidence); *Sellers v. Estelle*, 651 F.2d 1074 (5th Cir. 1981) *cert. denied* 455 U.S. 927 (1982) (reversing under *Brady v. Maryland*, 373 U.S. 83,(1963), based on prosecution's suppression of exculpatory police reports). *See also Derden v. McNeel*, 938 F.2d 605 (5th Cir. 1991) (reversing for *Brady* violation); *United States v. Brumel-Alvarez*, 976 F. 2d 1235 (9th Cir. 1992); *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985) (listing cases finding *Brady* violations).

The first prong of *Brady* is satisfied where the evidence at issue "if disclosed and used effectively ... may make the difference between conviction and acquittal." *United States v. Bagley,* 473 U.S. 667, 676 (1985). *Brady* applies to both impeachment evidence as well as other exculpatory evidence. *Id.; Thomas,* 841 S.W.2d at 403. Suppressed police reports may meet the favorability requirement. *See, e.g., Strickler,* 527 U.S. at 282 (withheld police notes containing descriptions of the crime that contradicted witness's testimony violated *Brady); Cook v. State,* 904 S.W.2d 623, 628 (Tex. Crim. App. 1996) (failure of prosecution to disclose police report resulting in the inability to develop a potential defense theory based on alternative suspect violated *Brady); Sellers v. Estelle,* 651 F.2d 1074, 1076-77 (5th Cir. 1981) (suppressed police

reports were favorable to defendant because they could have been used to develop defense's theory of the case).  Withheld evidence has been determined to be material where the undisclosed evidence involves the impeachment of a key witness or a witness presenting evidence without strong corroboration.  *See, e.g., East v. Johnson,* 123 F.3d 235, 239 (5th Cir. 1997).

The suppression prong of the *Brady* test is met where the state failed to diligently research and provide evidence of similar crimes.  "In order to comply with *Brady* . . . the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf  . . . including the police." *Strickler,* 527 U.S. at 281; *see also Kyles,* 514 U.S. at 438.  In *Kyles,* the Supreme Court rejected squarely the State's argument "that [the State] should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor," declaring that "[t]o accommodate the State in this manner would . . . amount to a serious· change of course from the *Brady* line of cases." *Kyles,* 514 U.S. at 438.  Rather, because "procedures and regulations can be established to carry [the prosecutor's] burden and to ensure communication of all relevant information on each case to every lawyer who deals with it," the State is held to a standard of disclosure based on what all State officers knew at the time.  *Id.*  (quoting *Giglio v. United States,* 405 U.S. 150 (1972)).  The prosecution's duty to disclose *Brady* evidence applies irrespective of whether the accused has requested this evidence.  *Thomas,* 841 S.W.2d at 403-04 (citing *Bagley,* 473 U.S. at 682).

In *Bagley*, the Court expressed concern with "any adverse effect that the prosecutor's failure to respond [with exculpatory evidence] might have had on the preparation of the defendant's case." 473 U.S. at 683, 105 S.Ct. at 3384. *See also Derden*, 938 F.2d at 617 (stating a reviewing court may consider any adverse effects the prosecutor's failure to release information

-38-

might have had on the defendant's preparation and presentation of the case).

In *Banks v. Dretke*, 540 U.S. 668, (2004), the Court, in finding suppression of exculpatory evidence in a Texas capital murder case, stated the following:

> The State here nevertheless urges, in effect, that 'the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence,' Tr. of Oral Arg. 35, so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected. *Id.,* at 36. A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process. 'Ordinarily, we presume that public officials have properly discharged their official duties.' *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). We have several times underscored the 'special role played by the American prosecutor in the search for truth in criminal trials.' *Strickler*, 527 U.S., at 281, 119 S.Ct. 1936; *accord, Kyles*, 514 U.S., at 439-440, 115 S.Ct. 1555; *United States v. Bagley*, 473 U.S. 667, 675, n. 6, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Berger*, 295 U.S., at 88, 55 S.Ct. 629. *See also Olmstead v. United States*, 277 U.S. 438, 484, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.' *Berger*, 295 U.S., at 88, 55 S.Ct. 629. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. *See Kyles*, 514 U.S., at 440, 115 S.Ct. 1555 ('The prudence of the careful prosecutor should not . . . be discouraged').

Knowledge of government agents, such as police officers, of exculpatory evidence is imputed to the prosecution. *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980). Therefore, if a police officer has exculpatory evidence, this is the same as a prosecutor having it, and it must be turned over to the defense. *See Kyles,* 115 S.Ct. at 1566 (stating, "the individual prosecutor has a duty to learn of any favorable evidence

known to the others acting on the government's behalf in the case, including the police");

*O'Rarden v. State*, 777 S.W.2d 455 (Tex. App. - Dallas 1989, pet. ref'd) (holding that

prosecution team includes investigators).

Additionally, the duty to disclose exculpatory evidence is ongoing, and the State must

disclose it whenever it is discovered. *Flores v. State*, 940 S.W.2d 189, 191 (Tex. App. - San

Antonio, 1996, no pet.).

### Suppressed Evidence

The State violated its duty under *Brady* to provide evidence favorable to the Petitioner by

withholding known impeachment evidence regarding the State's trace evidence analyst Charles

Linch, specifically, that he had history of chronic depression, alcohol dependence and

employment problems that weighed heavily on his credibility and reliability as an expert witness.

In the present case, evidence available to the prosecution regarding Charles Linch's

history of chronic depression, alcohol dependence, and employment issues constituted favorable

evidence that, if disclosed, could have been used by Petitioner's defense counsel to impeach

Linch's reliability as an expert and consequently, his critical testimony regarding fiber analysis.

Specifically, as set out in testimony given by Linch in other cases, (November 27, 2006,

hearing on Michael Blair p. 27-31) Linch admitted writing letters to his supervisors in which he

noted his lack of qualification to conduct fiber analysis.  (See May 5, 1998, memo).  As a result,

Linch had been suspended from conducting such fiber analysis.  Also, in an April 22, 1998,

memo, Linch complained to his supervisor that he needed more proficiency training in fiber

analysis. In the memo, Linch noted that his training for fiber analysis consisted of a one-week

class in 1987. Further, in August 1995, Linch withdrew from employment at Southwest Institute

of Forensic Sciences as a trace analyst. On January 22, 1999, some two months before giving

testimony in this case, Linch had requested additional training to become more proficient in fiber

analysis.

### Mental Health

Linch's history of mental health difficulties and alcoholism, long known to his employer,

Southwestern Institute of Forensic Sciences ("SWIFS"), and to the Dallas County prosecutor's

office, was revealed publicly in May 2000. *See* Holly Becka and Howard Swindle, *Analyst Left*

*Psych Ward to Testify: County Forensic Expert Crucial in Murder Trials,* Dallas Morning News,

May 7, 2000, at 1A (Exhibit F); Holly Becka and Howard Swindle, *Routier Trial Expert Casts*

*Doubts on His Own Abilities: Prosecutors Say Forensic Analyst Competent; Defense Questions*

*Credibility of Testimony,* Dallas Morning News, May 10, 2000, at 1A (Exh. L).

Evidence shows that Linch suffered from alcoholism and deep depression brought about

by his employment as a forensic scientist at SWIFS, a job which included on-site investigation of

numerous violent murder scenes. Linch's depression and drinking problems reached a critical

point in February 1994, (Blair testimony p. 32) when he called SWIFS and informed the Institute

he was planning to quit because of job-related stress. Following Linch's phone call indicating

intentions to terminate his employment, two of Linch's colleagues arrived at Linch's home and

escorted him to Methodist Hospital to obtain mental health treatment. He had been taken from

the SWIFS Lab due to intoxication. (Blair testimony p. 33-34) Upon Linch's arrival at the

hospital, he was taken involuntarily into custody at the Doctor's Hospital in Dallas, where he was

diagnosed with chronic depression and alcohol dependence and involuntarily committed for approximately two weeks.

He was put in protective custody and suicide watch at that time, (Blair testimony p. 34-35) and underwent alcohol rehabilitation and psychiatric care. (Blair testimony P. 35)  He was admittedly diagnosed with alcohol dependency and depression. (Blair testimony P. 41)  Linch admitted that he resumed drinking in 1997. (Blair testimony P. 44)   The hospitalization lasted 13 days. (Blair testimony P.57)  Linch acknowledged that he was involuntarily admitted to Methodist (Blair testimony p.64) and he was prescribed Librium for his depression. (Blair testimony P.64)

## Unreasonable determination

Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, suppression of material, favorable evidence by the prosecution violates the due process rights of the accused under the Fourteenth Amendment to the United States Constitution, Art. I, § 19 of the Texas Constitution, and Article 1.05 of the Texas Code of Criminal Procedure. *See Thomas v. State,* 841 S.W.2d 399, 401-04 (Tex. Crim. App. 1992) (specifically adopting *Brady* and subsequent Supreme Court precedent). The Supreme Court has identified "three components of a true *Brady* violation." *Strickler v. Greene,* 527 U.S. 263, 281 (1999).  First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Id.* at 281-82. Second, "that evidence must have been suppressed by the State, either willfully or inadvertently." *Id. at* 282.  Third, "prejudice must have ensued." *Id.*  The third component is typically referred to as the materiality component.

The State's suppression of the above impeachment evidence constitutes a violation of the

prosecution's duty under *Brady,* and consequently, a violation of Petitioner's federal and state

constitutional rights to due process.   Under the first requirement of *Brady,* the evidence is

favorable in that it could have been used to undermine the credibility and reliability of one of the

State's critical expert witnesses.   As discussed above, Charles Linch provided key testimony

regarding his findings that debris found in the barrel of a gun found in the Black  home was

microscopically consistent with potato starches. The prosecution relied on this evidence in its

closing argument to suggest that Flores anticipated the murder.

Had the prosecutor not known of Linch's involuntarily psychiatric commitment, the

knowledge of SWIFS as an agency of the State would be imputed to the prosecution.  *Strickler,*

527 U.S. at 281 ("[i]n order to comply with *Brady* . . . the individual prosecutor has a duty to

learn of any favorable evidence known to others acting on the government's behalf"); *Kyles,* 514

U.S. at 438 (prosecution is held to a standard of disclosure based on what all State officers knew

at the time).  In Petitioner's trial, however, the prosecution's suppression of Linch's involuntary

commitment and depression was especially egregious.  On a previous occasion, assistant district

attorney and capital litigation  prosecutor Toby Shook had direct knowledge of Linch's mental

health problems.  Shook learned of Linch's psychiatric commitment through a friend at Doctor's

hospital, prompting Shook to ask Linch about his mental health history.  *See* Becka and Swindle,

*Analyst Left Psych Ward to Testify,* May 7, 2000, (Exhibit F).

The impeachment evidence meets the second prong of *Brady* because it was

unquestionably suppressed by the prosecution.  As discussed above, the district attorney's office

had direct knowledge of Linch's hospitalization for alcoholism and depression.  Even in the

-43-

absence of such knowledge, however, the knowledge of SWIFS as an agency of the State would be imputed to the prosecution. *Strickler,* 527 U.S. at 281; *Kyles,* 514 U.S. at 438.

Finally, the suppression of favorable impeachment evidence regarding Charles Linch was material under *Brady.* Had Linch been discredited as an unreliable witness, the prosecution would have been hard-pressed to rely on the invaluable inference suggested by Linch that a gun used in the murder was found at the co-defendant's house. Without the State's critical evidence, the "case is [placed] in such a different light as to undermine confidence in the verdict." *Kyles,* 415 U.S. at 435. Although the prosecution's suppression of this impeachment evidence is itself material in that such evidence would have undermined the credibility of a key expert witness, the ultimate determination of materiality "turns on the cumulative effect of all [favorable] evidence suppressed by the government" in Petitioner's case. *Id.* at 421.

## CLAIM III.

**FLORES WAS DEPRIVED OF DUE PROCESS OF LAW AND THE RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE TRIAL COURT ALLOWED THE STATE TO INTRODUCE AN EYEWITNESS IDENTIFICATION BY JILL BARGAINER WHEN HER RECOLLECTION HAD BEEN HYPNOTICALLY ENHANCED.**

### Relevant Facts

Although the State presented the testimony of several witnesses who had seen Flores in the company of Rick Childs the night before Ms. Black's death, the State initially had no witnesses who observed Flores at Ms. Black's residence the morning of the murder. The four witnesses' testimonny was as follows: Michelle Babbler, saw two suspicious-looking white men get out of a Volkswagen. (RR35.107-133) However, Babbler could not make a positive

-44-

identification. (RR35.113-114) Babbler's eight-year-old son, Nathan Taylor also saw two men

enter the Black's house. (RR35.141-142)   He could not make an identification.  Bobby

Bargainer, the Blacks' neighbor, noticed the Volkswagen but did not see anyone. (RR35.167)

The fourth witness, Jill Bargainer, told the police prior to trial that she could not make an

identification.  However, when she was called to testify, she told the prosecutors that, based upon

her in-court view of Flores, she could positively identify him as one of the two men she saw in

the Blacks' driveway. (RR35.152-157, RR36.283, 289-290, 294)

Based upon this surprising change in testimony, the Court conducted a *sub rosa* hearing

on whether Bargainer's identification had been improperly hypnotically enhanced.  Officer Jerry

Baker testified that he observed the hypnosis session. (RR36.19)  He testified that he was not

aware of the name Charles Flores before that session.[13]  (RR36.20-21)  He did not observe

Officer Serna, the officer who conducted the session, give any clues to Bargainer. (RR36.22)  He

also denied briefing Serna as to any of the facts regarding the murder prior to the session.

(RR36.22)  However, on cross-examination, he acknowledged that Serna, as a Farmers Branch

police officer, might have heard the descriptions of the assailant from other sources. (RR36.24-

25)  That description was two white males, the taller of the two having shoulder-length hair.

(RR36.25)   According to the officer, Bargainer had described the men prior to the hypnosis

session as a white male with dark clothing and shoulder-length hair, young, with one being taller

than the other and one being thinner than the other. (RR36.27)  Bargainer did identify Childs as

one of the assailants prior to the hypnosis session. (RR36.32)

---

[13] On cross-examination, the officer admitted that a police report identifying Flores as one
of the assailants accompanied by a picture of Flores was distributed to the department prior to the
hypnosis session.  (RR36.29)

Officer Serna, (RR36.33) conducted the hypnosis session of Bargainer using a "movie theater technique" (RR36.36) which was intended to have Bargainer give her recollection as a narrative. (RR36.36)   Serna denied having spoken to any other witnesses prior to the session. (RR36.37-38)   The session was videotaped and a copy of the video is attached hereto.   Serna denied knowing that Bargainer had picked out Childs as one of the assailants.  (RR36.43-44)   Specifically, Serna denied that he provided any feedback to Bargainer in order to cement her testimony.  (RR36.48-49, 59)

The State also called Dr. Mount, a psychologist who reviewed the session.  (RR36.60-61) He testified that Officer Serna used all of the proper procedures in conducting the session. (RR36.64) Specifically, he denied seeing any suggestions or feedback.  (RR36.64-65)

Finally, Jill Bargainer testified that she was able to identify Rick Childs from a line-up immediately after the line-up. (RR36.88) She testified that she was first able to identify Flores when she saw him in the courtroom on March 21, 1999.  (RR36.91)   She also testified that she helped draw up a composite of the passenger, which was introduced into evidence.  (RR36.94-96)

After argument, the trial court entered findings of fact and conclusions of law that the hypnosis session was conducted properly, that there was no impermissible taint of her identification.  (RR36.17-118)  Thereafter, Bargainer was permitted to identify Flores in open court.

### Objections

The issue of the propriety of the hypnotically refreshed identification was raised on direct appeal. (Appellant's brief, Point of Error No. 9)  Also, Flores raised a complaint in his 11.071

Application as ground for relief No. 7.    In response, the State alleged that the claim was barred because it was raised on direct appeal.  Secondly, that the hypnosis session did not firm up her identification of Flores as the second assailant. (Writ, CR.210)   Thirdly, that there was no evidence that her identification was the product of hypnosis.  (Writ, CR.211-212)  Fourthly, that the hypnosis technique was not suggestive.  (Writ. CR.222)

The trial court adopted each of the state's findings as follows:

First, the claim was procedurally barred because it was raised on direct appeal.  (Finding 174, Writ, CR.734)   Secondly, the hypnosis session was conducted properly and did not firm up her subsequent identification of Flores.  (Finding 184, Writ CR 737)  The court found that the identification was not tainted.  (Finding 193, Writ CR 740)  And that the identification was not the product of hypnosis.  (Finding 187, Writ CR 738)  These findings are objectively unreasonable.

### The Record Establishes Suggestive Hypnosis

Contrary to the findings of fact of the trial court, as adopted, the record establishes that the hypnosis interview did, in fact, improperly cement Ms. Bargainer's ability to make a subsequent identification.  At the end of the interview session, as reflected on the attached videotape, Officer Serna apparently says,[14] "You might find yourself just recalling things . . . after the session . . . almost a phenomenon the way it happens . . . it's not uncommon."  In response, Ms. Bargainer appears to say, "I feel like I could see a little better."   After the interview session, Bargainer was shown a line-up which included Flores' picture. (RR36.105-106)  She also remembered seeing a photograph of Flores in the newspaper relating to this

---

[14] Admittedly, the tape is garbled and difficult to understand.

prosecution.  (RR36.107-108)

As the attached affidavit from Dr. Geiselman attests, the result of Officer Serna's suggestion that Ms. Bargainer "might" recall things, was to lower the threshold for her identification.  In fact, the trial court's conclusion that the hypnosis interview did not firm up her subsequent identification is in stark contrast to her statement on the tape that, "I feel like I could see much more better."  Mr. Geiselman concludes, based upon the evidence and the facts presented to the trial court, that, contrary to the court's conclusions, the hypnosis session was unduly suggestive.  Therefore, the trial court's findings to the contrary are an unreasonable determination of the facts.

## CLAIM IV

### PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW ON HABEAS CORPUS REVIEW UNDER HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION.

The right of habeas counsel is one of the few individual rights specifically delineated in the United States Constitution.  As early as 1969, the United States Supreme Court explained that:

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.  Its pre-eminent role is recognized by the admonition in the Constitution that:  "The Privilege of the Writ of Habeas Corpus shall not be suspended . . . . "  U.S. Const. Art. 1, 9 cl. 2. The scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts and lawmakers.  The very nature of the writ demands that it be administered with the initiative and flexibility  essential to insure that miscarriages of justice within its reach are surfaced and corrected.

-48-

*Harris v. Nelson*, 394 U.S. 286, 290-291 (1969). Despite the foundational importance of habeas corpus to correct constitutional errors in criminal cases, the right to the effective assistance of counsel – as such – has not yet been extended to apply to indigent individuals who are statutorily entitled to receive competent counsel during state habeas proceedings. *See* TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A)(unequivocally stating that an "applicant *shall be represented by competent counsel*")(emphasis added). Because Charles Flores was entitled to receive competent counsel by statutory guarantee via Texas state statute, he believes that the traditional tests under due process and the Sixth Amendment further guarantee him the right to the effective assistance of counsel. *See Evitts v. Lucey*, 469 U.S. 387 (1985)(establishing a due process right to the effective assistance of counsel on first right of appeal).

### Background Facts

Flores was appointed an attorney, Roy Greenwood, to prepare his state writ. Greenwood, in turn, requested that Larry Mitchell assist in preparation of the writ. In turn, Mitchell hired a disbarred attorney, Keith Jagmin, to assist in the investigation of the writ. Numerous letters exchanged among counsel, the trial court, and Flores indicate that the attorneys did not conduct any investigation of the writ and simply threw the claims together at the last minute. The attorneys accused each other of misconduct and inaction. Flores provided his attorneys with a list of witnesses who could have presented mitigating evidence at the punishment phase of trial. Flores also provided an extensive critique of his attorneys' proposed writ, which set out in detail the factual inaccuracies in the writ and also a list of additional claims that Flores wanted to pursue. Despite repeated efforts by Flores, Flores' habeas counsel failed to conduct a proper investigation and failed to correctly raise many genuine meritorious claims.

Ultimately, Judge Nelms, the trial court judge, permitted both Larry Mitchell and Roy Greenwood to withdraw from the case. Thereafter, Judge Nelms allowed entry of another attorney, Steven "Rocket" Rosen, who failed to file anything on behalf of Flores. In fact, Judge Nelms threatened Mr. Rosen with contempt of court charges when it became obvious that Mr. Rosen had wholly failed to undertake any duties in regard to Flores. Only when threatened with contempt did Mr. Rosen bother to pick up the file in this case. (See Rosen letter to Nelms, dated March 26, 2001). Thereafter, Rosen failed to file any documents with the court and fulfill his obligations in relation to Flores.

Finally, a fourth attorney, Alex Calhoun began assisting Flores with his state writ proceedings. At this point, there was little Mr. Calhoun could do to protect Flores' rights and secure that all appropriate challenges were included in the state writ. Flores continually informed his counsel that their collective failure to include relevant and viable legal challenges, such as ineffective assistance of counsel at trial and on appeal, would subsequently bar Flores from raising these at the federal level. In essence, Flores tried desperately to communicate to each of his attorneys that counsel's continued failures would prejudice him in his later federal proceedings.

Thereafter, Flores wrote to the Texas Court of Criminal Appeals in an attempt to try and secure some minimal level of legal representation. In Flores' September 10, 2000, letter to the Texas Court of Criminal Appeals, Flores informed the court that he requested that appointed counsel investigate Flores' contentions relating to ineffective assistance of counsel – however, no investigation was ever conducted. A similar plea for investigative help with his state claims regarding ineffective assistance of counsel was also sent by Flores to the state habeas judge on

September 10, 2000, asking that Judge Nelms "please appoint me new co-counsel that is competent and willing to do their job." Flores also pleaded: "Your Honor I have done all I possibly can to further my investigation. It is not my fault that these men did not do their job. Please help me solve this problem." (Flores letter to Nelms, dated Sept. 10, 2000). Flores, much like he the communications he sent directly to appointed counsel, desperately pled for those in a position to secure compliance with the Texas statutory scheme – which unequivocally REQUIRES investigation in capital state habeas claims – to help preserve his claims for merits review. *See* TEX. CODE CRIM. PRO. ART. 11.071, SEC. 3(A)("Investigation of Grounds for Application: Sec. 3. (a) On appointment, *counsel shall investigate* expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus")(emphasis added).

## Legal Analysis

The United States Supreme Court has never directly addressed the issue of whether death row inmates are constitutionally entitled to receive the effective assistance of counsel during state writ proceedings. *See* Eric M. Freedman, *Giarratano is a Scarecrow: The Right to Counsel in State Capital Post-conviction Proceedings,* 91 Cornell L. Rev. 1079 (2006). This is particularly relevant as the passage of the Antiterrorism and Effective Death Penalty radically restructured the nature of federal habeas review – putting a heightened emphasis on state proceedings. Without the assistance of capable or competent counsel during state writ proceedings, state death row inmates will not be able to fairly or fully present their viable federal claims. And, as many of the means of overturning state convictions can only be raised during state writ proceedings, it is no

longer acceptable simply to say that state appellate challenges adequately protect capital convicts. And, unlike other state cases involving ineffectiveness challenges, cases involving capital convicts are irreversible and require, both legally and morally, additional protections.

To the extent that the State might try to rely on the Texas Court of Criminal Appeals holding in *Ex Parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), Flores would urge this Court to appreciate that the United States Supreme Court has left open the question regarding a right to effective appointed counsel where "state collateral review is the first place that a state criminal defendant can present a particular challenge to his conviction." *Id.* at 124, *citing Coleman v. Thompson*, 501 U.S. at 755. The *Graves* dissent continues that "[t]o the extent that the Fifth Circuit Court of Appeals holds that question no longer remains open, that Court is mistaken. And to the extent that the [Graves] majority fails to address this open question, it is also wrong." *Id.*

The question of whether an indigent capital convict is Constitutionally entitled to the effective assistance of counsel in his first state writ application where he is first able to assert constitutional deficiencies in his conviction and sentence remains an open question. As the dissent explains in Graves:

> If the defendant's habeas counsel performs deficiently, a meritorious claim may not be adequately raised or investigated. If the attorney appointed on his first writ is incompetent, then a defendant, who was deprived of effective assistance of counsel at trial, has no means to enforce his constitutional right to [the] affective [sic] assistance of counsel at trial.

*Id.* at 124-125.

Flores urges this court to find that the United States Constitution provides him protection during his state writ proceedings.  Judge Nelms initially appointed two attorneys to represent Flores – thereby preventing Flores from raising his own claims in order to protect his federal interests.  Following the appointment of counsel, Flores became completely dependent upon counsel to protect his later rights to challenge his conviction under the "Great Writ."  *See* U.S. Con., art. I, § 9.  The United States Constitution provides that the "writ of habeas corpus shall not be suspended. . . ," and, yet, where death row inmates receive the ineffective assistance of counsel from their state-appointed attorneys, these inmates will be effectively precluded from resorting to the Great Writ.

In reviewing the applicability of *Evitts v. Lucey* to the issue at hand, it bears noting several important components of Flores' claim.  First, in Texas, death row convicts are statutorily entitled to receive the aid of "competent counsel."  That phrase, when interpreted by the United States Supreme Court, has ALWAYS meant the effective assistance of counsel as defined by *Strickland v. Washington.  See Evitts v. Lucey*, 469 U.S. 387 (1985).  Harkening back to the genesis of the right to counsel, the *Evitts* court reminded that "Gideon rested on the 'obvious truth' that lawyers are 'necessities, not luxuries' in our adversarial system of criminal justice." *Id.* at 394.

Further, the United States Supreme Court has consistently held that "if a State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demand of Due Process and Equal Protection." *Id.* at 393.  The same should be true if a State has

-53-

created habeas review as an integral part of the system for finally adjudicating the guilt or innocence of a defendant. In Texas, appellate courts do not readily receive challenges to the effective assistance of counsel at trial – or, obviously, on appeal – and, instead, segregate those claims to habeas review. The reasons that *Evitts* extended the right to effective assistance of counsel on appeal apply with equal force to the first habeas challenge for Texas death row inmates. As the *Evitts* court noted, the United States Supreme Court has "made clear, the guarantee of counsel 'cannot be satisfied by mere formal appointment.'" *Id.* at 395.

Judge Nelms had actual knowledge that Flores' counsel were not protecting his interests or rights during the state habeas proceedings. Judge Nelms actually intervened in the case to try to "right the ship." However, as set forth above, the subsequent appearance of "Rocket" Rosen only further damaged Flores' chances of receiving legitimate federal review of his claims. Rosen was dilatory in moving to pick up the files turned over by Flores' first counsel and, thereafter, never actually filed anything on Flores' behalf. The United States Constitution assures state death row inmates that the privilege of the "writ of habeas corpus shall not be suspended. . . .," yet in this case, for all practical purposes due to counsel's many, many failings, the writ has indeed been suspended for Flores.

A cursory review of the Supreme Court's death penalty jurisprudence during the past 10 years underscores the need for the effective assistance of counsel during state writ proceedings. *See Terry Williams v. Taylor*, 529 U.S. 362 (2000); *Michael Williams v. Taylor*, 529 U.S. 420 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003). The majority of death penalty cases that have been overturned as invalid or as violating the Constitution were held so during habeas corpus

proceedings – not during direct appellate proceedings. *See Rompilla v. Beard*, 545 U.S. 374

(2005); *Miller-El v. Cockrell*, 537 U.S. 322 (2003); *Miller-El v. Dretke*, 545 U.S. 231 (2005);

*Roper v. Simmons*, 543 U.S. 551; *Panetti v. Quaterman*, 551 U.S. ____ (2007). The role of

habeas corpus in preserving Constitutional rights is vital. Without ensuring that state death row

inmates receive competent counsel, the right to raise these Constitutional challenges becomes

chimerical. For these reasons, Flores respectfully requests that this Court find Flores was

deprived his Constitutional right to counsel. At a minimum, Flores should be permitted to return

to state court to pursue claims that he requested be investigated and raised prior to this Court

determining the sustainability of his conviction and sentence.

> **A.** **Counsel appointed to represent Petitioner in his state habeas corpus proceedings, abandoned Petitioner in the middle of the process, thus denying Petitioner the effective assistance of counsel as well as due process of law. These acts of counsel violated Petitioner's Fifth, Sixth, and Fourteenth Amendment rights of the United States Constitution.**

As set forth above, Judge Nelms permitted Flores' initial attorney – an attorney who did

precious little to protect Flores' interests – to withdraw from this case without effectively

conducting any investigation into Flores' claims or presenting any viable arguments challenging

the Constitutional deficiencies in the state court proceedings. This failure clearly violated TEX.

CODE CRIM. PRO. ART. 11.071, SEC. 3(A). Thereafter, Judge Nelms allowed entry of another

attorney who wholly failed to protect and preserve the interests of Flores as they relate to habeas

corpus. Much like the first appointed attorney, the substitution attorney also failed to conduct any

meaningful investigation into Flores' claims despite repeated correspondence – to both attorneys,

Judge Nelms and the Texas Court of Criminal Appeals – explicitly noting the failures and

providing appropriate investigative leads.  Such failures of counsel – and the complicity of Texas

courts in sanctioning the deficient counsel -- call into question the propriety of Flores' underlying

conviction and sentence.  Flores has been deprived any real assessment of his Constitutional

challenges based solely on his counsel's (both the original and substitute) refusal to investigate

the claims of ineffective assistance Flores alerted counsel to.

Taking collectively, and under these unique facts, the actions of counsel and the court in

sanctioning counsel's inertia violate Flores' right to due process of law.  The *Evitts* Court

properly found that:

> The right to appeal would be unique if it could be withdrawn
> without consideration of applicable due process norms.  For
> instance, although a State may choose whether it will institute any
> given welfare program, it must operate whatever program it does
> establish subject to the protections of the Due Process Clause.  *See*
> *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  Similarly, a State
> has great discretion in setting policies governing parole decisions,
> but it must nonetheless make those decisions in accord with the
> Due Process Clause.  *See Morrissey v. Brewer*, 408 U.S. 471, 481-
> 484(1972).  *See also Graham v. Richardson*, 403 U.S. 365, 374
> (1971); *Bell v. Burson*, 402 U.S. 535, 539 (1971); *Sherbert v.*
> *Verner*, 374 U.S. 398, 404 (1963); *Joint Anti-Fascist Refugee*
> *Committee v. McGrath*, 341 U.S. 123, 165-166 (1951).  In short,
> when a State opts to act in a field where its action has significant
> discretionary elements, it must nonetheless act in accord with the
> dictates of the Constitution – and, in particular, in accord with the
> Due Process Clause.

*Evitts*, 469 U.S. at 400-401.

All of Flores' counsel violated their Texas statutory requirements under Article 11.071

that promises "[a]n applicant shall be represented by competent counsel unless the applicant has

elected to proceed pro se. . . . ." *See* TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A).  Further,

Texas counsel appointed pursuant to Article 11.071 are required to "investigate expeditiously, before and after the appellate record is filed . . . the factual and legal grounds for the filing of an application for a writ of habeas corpus." *See* TEX. CODE CRIM. PRO. ART. 11.071, SEC. 3(A). Yet, as the record reveals, no investigation was conducted – in large measure because the originally appointed counsel delegated the task of investigation to an individual who had been disbarred and who lacked a drivers' license. Despite the commands of *William v. Taylor* and *Wiggins v. Smith*, no investigation was conducted at the state level during trial, appeal or state habeas. As such, Flores' counsel failed to preserve his due process rights inherent in the Texas state habeas scheme.

Surely the Constitution is offended when individuals appointed under a state statutory regime fail to live up to their statutory mandates. Due Process requires, at a minimum, that state death row inmates receive some measure of representation during state habeas proceedings when they are appointed counsel via state statute. To turn a blind eye to the many, many failings of state counsel, particularly the repeated failures to conduct any meaningful investigation, would be tantamount to depriving Flores of any state habeas review at all. In light of the draconian provisions of the AEDPA, the Constitution surely requires a modicum of process and representation before approving a flawed state trial condemning an individual to death without ever reviewing the viable substantive claims available to – but ignored by – counsel.

Much like the analysis in *Evitts*, this Court should consider that:

> In establishing a system of [state habeas review] as of right, the
> State [of Texas] has implicitly determined that it was unwilling to
> curtail drastically a defendant's liberty unless a second judicial

-57-

decisionmaker, [the habeas court] was convinced that the conviction was in accord with law.  But having decided that this determination was so important –having made [the state habeas review] the final step in the adjudication of [the Constitutional propriety of the conviction], the State could not in effect make it available only to the wealthy.  Such a disposition violated equal protection principles because it distinguished between poor and rich with respect to such a vital right.  But it also violated due process principles because it decided the [state habeas review] in a way that was arbitrary with respect to the issues involved

. . .

As noted above, all these cases dealt with the responsibilities of an attorney representing an indigent criminal defendant on appeal.  Although the Court reached a different result in Jones from that reached in Anders and Entsminger, all of these cases rest on the premise that a State must supply indigent criminal [habeas applicants] with attorneys who can provide specified types of assistance – that is, that such [applicants] have a right to the effective assistance of counsel."

*Evitts*, 469 U.S. at 404.

For these reasons, and the reasons set forth throughout this Petition, Flores' respectfully requests this Court find that his due process rights and his right to the effective assistance of counsel during habeas proceedings were violated.  At a minimum, this constitutional shortcoming should provide Flores with an opportunity to present his viable state habeas claims to the State of Texas for a merits-based review.  Based solely on the deficiencies of appointed counsel, Flores has not yet received a fair evaluation of his viable state habeas claims.

**B.      Flores Received Ineffective Assistance of Counsel During His State Habeas Writ Proceedings Where Writ Counsel Failed to Conduct Even a Cursory Investigation into Flores' Claims, Failed to Timely Inform the Trial Court That Co-counsel Was Ineffective and Did Nothing, and Hired an Investigator That Had Substance Abuse Issues and Expired Drivers' License, Thereby Limiting His Abilities in the Case, and, Failed to Raise Obvious and Viable Constitutional Challenges to Flores' Conviction and Confinement.**

Flores' originally-appointed state habeas counsel clearly violated state law in failing to conduct any meaningful investigation into the viable substantive claims Flores' informed counsel existed. TEX. CODE CRIM. PRO. ART. 11.071, SEC. 3(A). Texas law requires appointed counsel to do much more than merely draft and submit boilerplate claims. Texas law, and its unequivocal guarantee that appointed counsel will be "competent," requires that counsel perform at a meaningful level. TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A).

In this case, counsel readily conceded his failings when on September 12, 2000, counsel moved the court to grant a "Motion for Extension Of [sic] Time to continue our investigation under the provisions of Article 11.071(4)." (Greenwood Letter to Nelms, dated September 12, 2000) Thereafter, Flores, confined by the Texas Department of Criminal Justice-Institutional Division, relied upon counsel's assertions to the habeas court that additional investigation would be done. However, no qualified investigator was ever hired and no investigation was subsequently conducted. The only filing that occurred after counsel's September 12th letter was the supplemental pro se writ prepared by Flores – a filing that counsel had to know should have been ignored by the habeas court. (Greenwood Letter to Nelms, dated December 15, 2000).

Flores repeatedly wrote to his appointed counsel pleading for counsel to investigate his claims. Flores' numerous letters clearly convey Flores' concern that counsel's continued failings

would later hamstring Flores' efforts to obtain habeas relief. Cruelly, this is precisely what has

occurred to date, due solely to counsel's repeated failures to live up to the Texas statutory

mandates, the promises contained in the Motion for Extension Of [sic] Time, and the

Constitutional right to be represented by competent counsel at all vital stages of litigation. These

failures rise to the level of Constitutional error and should permit, at a minimum, Flores to return

to state court for a meaningful presentation of and review of his state habeas claims.

C.      **Flores' Due Process Rights Were Violated Where State Habeas Writ Counsel
Failed to Investigate and Raise Obvious and Viable Constitutional
Challenges to Flores' Conviction and Confinement.**

Flores urges this Court to embrace a due process right to investigation during habeas

corpus proceedings similar to that announced by the United States Supreme Court in *Wiggins v.*

*Smith*, 539 U.S. 510 (2003). While the vernacular emphasized in *Wiggins*, and prior decisions

like *Williams v. Taylor*, is the right to effective assistance of counsel, a similar due process right

should be incorporated into capital habeas challenges. As the Court in *Wiggins* found:

> Our opinion in *Williams* v. *Taylor* is illustrative of the proper
> application of these standards. In finding Williams'
> ineffectiveness claim meritorious, we applied *Strickland* and
> concluded that counsel's failure to uncover and present
> voluminous mitigating evidence at sentencing could not be
> justified as a tactical decision to focus on Williams' voluntary
> confessions, because counsel had not "fulfill[ed] their
> obligation to conduct a thorough investigation of the
> defendant's background." 529 U.S., at 396 (citing 1 ABA
> Standards for Criminal Justice 4—4.1, commentary, p. 4—55
> (2d ed. 1980)). While *Williams* had not yet been decided at the
> time the Maryland Court of Appeals rendered the decision at
> issue in this case, cf. *post*, at 5 (Scalia, J., dissenting),
> Williams' case was before us on habeas review. Contrary to the
> dissent's contention, *post,* at 6, we therefore made no new law

in resolving Williams' ineffectiveness claim. See *Williams*,
529 U.S., at 390 (noting that the merits of Williams' claim "are
squarely governed by our holding in *Strickland*"); see also *id.,*
at 395 (noting that the trial court correctly applied both
components of the *Strickland* standard to petitioner's claim and
proceeding to discuss counsel's failure to investigate as a
violation of *Strickland*'s performance prong). In highlighting
counsel's duty to investigate, and in referring to the ABA
Standards for Criminal Justice as guides, we applied the same
"clearly established" precedent of *Strickland* we apply today.
Cf. *Strickland,* 466 U.S., at 690—691 (establishing that
"thorough investigation[s]" are "virtually unchallengeable" and
underscoring that "counsel has a duty to make reasonable
investigations"); see also *id.,* at 688—689 ("Prevailing norms
of practice as reflected in American Bar Association standards
and the like … are guides to determining what is reasonable").

In light of these standards, our principal concern in deciding whether Schlaich and
Nethercott exercised "reasonable professional judgmen[t]," *id.,* at 691, is not
whether counsel should have presented a mitigation case. Rather, we focus on
whether the investigation supporting counsel's decision not to introduce
mitigating evidence of Wiggins' background *was itself reasonable. Ibid.* Cf.
*Williams* v. *Taylor, supra,* at 415 (O'Connor, J., concurring) (noting counsel's
duty to conduct the "requisite, diligent" investigation into his client's
background). In assessing counsel's investigation, we must conduct an objective
review of their performance, measured for "reasonableness under prevailing
professional norms," *Strickland,* 466 U.S., at 688, which includes a context-
dependent consideration of the challenged conduct as seen "from counsel's
perspective at the time," *id.,* at 689 ("[E]very effort [must] be made to eliminate
the distorting effects of hindsight").

*Id.* A fair interpretation of *Wiggins* suggests that to perform at a competent level, counsel

in death penalty cases must conduct a meaningful investigation into potential mitigation

evidence. In this case, none of Flores' counsel followed the requests of their client to investigate

the numerous claims that Flores' advised counsel might exist. Clearly, trial counsel performed

only perfunctory services during the penalty phase of Flores' trial. Appellate counsel was equally

deficient. These shortcomings were, unfortunately, compounded by habeas counsel as habeas

counsel failed to conduct any investigation into the viability of claims raised by Flores during numerous communications with counsel. And, yet, counsel even petitioned the habeas court for additional time to investigate Flores' claims.

Despite being granted additional time to investigate, no investigation was conducted. The only expenditures for investigative services were those performed by an un-licensed investigator who carried a suspended drivers' license. The chosen investigator was, thereby, literally unqualified to perform the services for which he was selected by counsel. These shortcomings should not bar Flores from having his Constitutional claims heard by this, or the state, court.

To date, Flores has not received any meaningful review of his habeas claims based on the failure of appellate and habeas counsel to investigate, or otherwise attempt to support, Flores' viable Constitutional claims. Although trial counsel presented virtually no evidence at the punishment phase of trial, much less any mitigation evidence, State writ counsel questioned neither the investigation conducted into punishment issues (*See*, *Wiggins*, *supra*), nor the fact that no punishment evidence was presented. As this court is well aware, the mitigation phase of trial is one of the most fruitful areas for post-conviction relief. Still, State habeas counsel refused to raise these claims even in the face of repeated requests by Flores. State habeas counsel apparently made no effort to inquire as to the existence of any "strategy" to concede the punishment phase of trial.

Moreover, no issues regarding jury selection were raised by either appellate or habeas counsel – despite the obvious error by Judge Nelms' beginning and then, without explanation or reasoning, suspending the *Batson v. Kentucky* hearing. An obvious *Batson* issue was raised and should have been fully challenged by both appellate and habeas counsel. Similarly, there were

many issues relating to the penalty phase that any reasonable counsel would have recognized needed to be investigated and evaluated. Yet, these claims were abandoned without ever assessing their merit – again, due to a complete investigation by appellate and habeas counsel.

The promise of *Wiggins v. Smith* and *Williams v. Taylor* should be incorporated into the habeas context. For only with the assistance of investigation will viable claims ever be uncovered and presented on behalf of capital convicts. To assume that no right to investigate lies inherent in state habeas proceedings is to deprive hundreds of death row inmates the privilege of the Great Writ. And, in the State of Texas, a statutory right to investigation clearly exists and should be embodied under a Due Process protection. TEX. CODE CRIM. PRO. ART. 11.071, SEC. 3(A).

**D.** **Flores' Due Process and Equal Protection rights were violated where Flores, an indigent death row prisoner, has been foreclosed from raising obvious and viable constitutional challenges to his conviction and confinement due to the appointment and reappointment of incompetent state habeas writ counsel despite statutory requirements that he be provided "competent counsel" to represent him during state habeas proceedings.**

Charles Flores is an indigent criminal defendant. Our system of criminal procedure provides certain protections to indigents to ensure that they are not victims of poverty and, thereby, lose procedural rights that other, more wealthy, individuals maintain. The State of Texas has a statutory scheme in place to ensure that indigent criminal defendants are provided the right to "competent counsel." TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A).

Despite the statutory commands, Flores received inferior and deficient legal representation based solely on his economic status. While the United States Supreme Court has not yet ruled directly on this issue, the Texas Court of Criminal Appeals has considered a similar

challenge in *Ex Parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002). In holding that Graves

was not entitled to the effective assistance of counsel during his state habeas proceedings, the

Court of Criminal Appeals misapplied the Supreme Court's findings in *Murray v. Giarratano*

and *Pennsylvania v. Finley.*

Relying on two Fifth Circuit cases, the Texas Court of Criminal Appeals found "that a

statutory right to appointment of counsel on habeas corpus review does not confer a concomitant

right to constitutionally effective counsel." *Id.* At 112. This holding, and those of the Fifth

Circuit, appear to be based on the Sixth Amendment right to counsel and its "full panoply of

procedural protections." *Id..* at 113. Yet, the statutory right that inures to Flores must provide

him with some form of protection against *incompetent* counsel – once the State of Texas has

chosen to undertake an intricate statutory scheme that provides both "competent counsel" and

investigative requirements for counsel. Somehow, the Court of Criminal Appeals interprets this

statutory scheme to be of little comfort to indigent defendants.

The Court of Criminal Appeals, without truly considering the legislative history of Article

11.071 and the right to "competent counsel" somehow transmogrifies this right to competent

counsel to mean only that counsel must be competent on paper before appointment – not that

competent assistance must be rendered. *Id.* at 115-116. As the Court states:

> The [Texas] Legislature has consistently shown a great interest
> in the appropriate appointment of competent counsel in these very
> serious cases. What the Legislature has not done, however, is
> evince any intention that its choice of the term "competent
> counsel" as it applies to the appointment of a habeas attorney
> *also* applies to the final product or services rendered by that
> otherwise experienced and competent counsel. To require the
> trial court to appoint "competent counsel who will render
> effective assistance to his client in this case" would legislatively

> mandate a degree of prescience that not even Texas trial judges
> can be expected to display.

*Id.* at 115-116.

Incredibly, in interpreting past federal precedent, the Texas Court of Criminal Appeals somehow erases the Constitutional meaning of the effective assistance of counsel as set forth in *Strickland v. Washington* and *Evitts v. Lucey.* Neither *Stickland* nor *Evitts* requires any measure of prescience or prognostication from Texas trial courts. Instead, both *Strickland* and *Evitts* simply require that counsel, particularly appointed counsel, perform under minimum levels of reasonableness.

In a fantastically myopic view of the right to counsel, the Court of Criminal Appeals holds that "competent counsel" only means someone whose paper qualifications seems to comport with the statutory mandate. This holding clearly ignores the requirement of Article 11.04 that "[e]very provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." TEX. CODE CRIM. PRO. ART. 11.04.

The Court of Appeals holding in *Graves* ignores every previous federal ruling regarding competent counsel – which since *Strickland, Cronic* and *Evitts*– has focused on actual performance not paper qualifications. What good does it do a criminal defendant to be represented by F. Lee Bailey or Ted Olson if counsel fails to perform any of the actual tasks required of the lawyer?

Not surprisingly, there were vigorous dissents in *Graves.* As Judge Price's dissent begins:

> The majority presents a severely limited view of cognizability.

> Article 11.071 represents a legislative declaration that the State
> [of Texas] has no legitimate interest in the finality of a judgment
> of conviction and death sentence obtained in the absence of the
> appointment of competent counsel for the preparation of the initial
> [state habeas] application. "Competent counsel" ought to require
> more than a human being with a law license and a pulse. Today
> the majority requires nothing more than that to ensure society's
> interest in fundamental fairness.

*Id.* at 118.

Judge Price continues in explaining that "[t]he legislature had no intent to expedite the imposition of death sentences at the expense of a full and fair review on the merits of inmates' claims. The majority's view of competent counsel deletes this requirement from the statute. The appointment of counsel is meaningless without the requirement that counsel be competent." *Id.* at 121. Further, "[e]ven assuming that the reference to competent counsel in article 11.071 concerns counsel's qualification and abilities, this reference is not inconsistent with requiring that the final product of counsel's representation be competent work." *Id.* at 120. In debunking the notion that the United States Supreme Court has ruled on the issue of competent counsel in all cases, the dissent reminds that "[i]n the absence of a constitutional requirement for counsel, the defendant bears the risks of mistakes made by counsel." *Id.* at 123-124.

Likewise, in Judge Johnson's dissent, he explains:

> The only sensible interpretation of "competent counsel" is the
> traditional one: counsel reasonably likely to render, and rendering,
> effective assistance. This is so for several reasons. First, the
> guarantee of the effective assistance of counsel is what makes the
> one-application limitation [of state habeas writs] comport with
> traditional notions of fair play and substantial justice. Second,
> nothing is more firmly established in our law than that the right to
> counsel means the right to the effective assistance of counsel.
> Article 11.071's guarantee of "competent counsel" would be a
> cruel joke if it did not comprehend the right to the effective assistance

-66-

of counsel.  The Legislature could not have intended a cruel joke.

*Id.* at 130.

The right to the effective assistance of counsel should exist for rich and poor alike.  The

economic status of an individual should not determine whether that individual receives the

effective assistance of counsel.  *See Gideon v. Wainwright*, 372 U.S. 335 (1963).  Rather, under

Equal Protection, counsel appointed pursuant to Article 11.071 should be required to *perform*

their job in a competent fashion.  Likewise, where a state statutory scheme promises indigent

defendants the right to "competent counsel," the Due Process Clause requires that the promise be

fulfilled, not eviscerated through an absurdly narrow reading of plain statutory language.  The

failure of Flores' counsel to so perform under the Texas mandate of "compete counsel" violates

both Due Process and Equal Protection.

**E.      Flores' Due Process rights Were Violated and He Was Denied "Fundamental Fairness" When He Was Deprived of State Habeas Review of His Claims Due to the Appointment and Representation of Incompetent State Habeas Counsel.**

For the reasons set forth throughout this Petition, Flores' due process rights were violated

where the State of Texas appointed incompetent counsel and failed to fulfill the requirements of

TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A).  An essential ingredient to due process is a

proceeding that is fundamentally fair.  In a case such as this where the trial court is patently

aware of the shortcomings and failings of counsel number one, counsel number two and counsel

number three, then fundamental fairness has not been achieved.

Flores wrote to his counsel and to the habeas courts to please assist him in presenting his

viable habeas claims.  Despite pleading to anyone that had the power to assist him, Flores

ultimately suffered a fate that was pre-ordained by the appointment, and representation of incompetent state habeas counsel – the failure of any court to provide him meaningful review of his viable habeas claims.

Fundamental fairness requires, at a minimum, that Flores be provided some right to have his constitutional challenges to his capital conviction and death sentence reviewed by some court. Due to the structure of the AEDPA, claims that were not properly raised before the trial court could be precluded review – not based on any merits evaluation, but rather, based merely on counsels' inexcusable failures to present his claims. Such procedural bar or default violates fundamental fairness where the court was actively involved in selecting and re-appointing incompetent counsel. To date, Flores has not truly received anything more than a pro forma hearing of his constitutional challenges to his conviction and sentence. To execute an individual who received ineffective assistance of counsel at trial, and later on appeal, and, still, later during his state habeas proceedings violates all notions of fundamental fairness and should not be sanctioned by this court.

At a minimum, Flores should be entitled one opportunity for a court – any court – to provide meaningful review of his constitutional challenges to his conviction and sentence.

F.     **Flores' Due Process Rights Were Violated and He Was Denied "Fundamental Fairness" Where He Was Deprived State Habeas Review of His Claims When the Trial Court Permitted State Habeas Counsel to Withdraw from His Case and Be Replaced with Equally Incompetent Counsel, Even Though the Trial Court Had Actual Knowledge of and Active Control over These Appointments and Substitutions.**

Flores received ineffective assistance of counsel during his initial habeas presentation. Based on the habeas court's actual knowledge of these deficiencies, Judge Nelms allowed new

counsel to assist Flores in pursuing his claims. Thereafter, the newly appointed counsel failed to

provide *any* representation to Flores. Counsel even refused to pick up the state trial record until

threatened with contempt of court by Judge Nelms. For the reasons set forth above and

throughout this petition, such substitutions only compounded the errors of previously-appointed

counsel. The trial court's awareness of substitute counsel's reticence to help and his refusal to

even pick up the trial record indicates an awareness of the habeas court that Flores' rights were

being ignored, overlooked and abused by appointed counsel. The remedy of contempt of court,

even if utilized – and, ultimately, it was not – does not serve as an adequate protection to the

rights of Flores to secure his privilege of the Great Writ. Further, such appointment and

substitution did not suffice under the Texas statutory scheme for appointment of counsel and

"competent" representation.

Fundamental fairness requires, at a minimum, that Flores' be provided some right to have

his constitutional challenges to his underlying conviction and sentence reviewed by some court.

Due to the structure of the AEDPA, claims that were not properly raised before the trial court

could be precluded review – not based on any merits evaluation, but rather, based merely on

counsel's repeated errors. Such procedural bar or default violates fundamental fairness where the

court was actively involved in selecting and allowing substitution of incompetent counsel. To

date, Flores has not truly received anything more than a pro forma hearing of his complaints. To

execute an individual who received ineffective assistance of counsel at trial, and later on appeal,

and, still, later during his state habeas proceedings violates all notions of fundamental fairness

and should not be sanctioned by this court.

G.    **Flores' Due Process Rights Were Violated When He Was Deprived His Right to Access the Courts by the Trial Court's Appointment and Substitution of Incompetent State Habeas Counsel.  The Trial Court Was Fully Aware of the Importance of State Habeas Review and Its Preclusive Effect on Federal Habeas Review and Still Permitted Incompetent Counsel to Represent Flores During His Only Real Opportunity to Have His Claims of Constitutional Violation Heard and Reviewed.**

For the reasons set forth above, the arguments relating to the appointment and reappointment of counsel, and the evidence and argument raised therein, Flores claims that his due process rights have been violated due to a lack of access to the courts.  Flores requests that all prior arguments and evidence be incorporated herein to support his claim.  As demonstrated above, both Judge Nelms and the Texas Court of Criminal Appeals had actual awareness through numerous pieces of correspondence between the lawyers and Flores that Flores was not receiving his statutorily protected right to competent counsel.  Still, the habeas court appointed and re-appointed deficient counsel to continue to represent Flores during his state proceedings.  Judge Nelms was actively involved in arranging for the initial substitution of counsel once the issue of deficient performance became clear.  Thereafter, Judge Nelms allowed substitution of another attorney that refused to even pick up – much less review – Flores' trial record.  With the knowledge that Flores was drifting about without the aid of counsel, Judge Nelms did not step in a third time to ensure that Flores received access to the courts by fulfilling the mandates of TEX. CODE CRIM. PRO. ART. 11.071.  Instead, Judge Nelms threatened counsel with contempt – a tacit recognition that something needed to be done to motivate substitute counsel to do *something . . . anything* on behalf of Flores.

Throughout these proceedings, Judge Nelms had actual awareness that Flores was incarcerated and unable to capably represent himself.  Judge Nelms also had actual knowledge

that his various counsel were not following the reasonable requests of Flores in investigating and pursuing viable habeas claims. This appointment of incompetent counsel has prejudiced Flores' right to present viable habeas claims to this federal court. As such, Flores has been denied his Constitutional right to freely access the courts by being forced to utilize counsel that the court knew—actually knew--was not adequately protecting Flores' rights.

At a minimum, Flores should be provided one meaningful opportunity to present his habeas claims to a court capable of considering his claims on the merits. Otherwise, the right to counsel set forth in TEX. CODE CRIM. PRO. ART. 11.071 becomes hollow and Flores' right to access the courts non-existent.

**H.     Flores' Procedural Due Process Rights Have Been Violated Where the State of Texas Provides the Right, Via a State Statute, That Creates a Protected Liberty or Property Interest to the Effective Assistance of Counsel During State Habeas Proceedings and Flores Failed to Receive Such Ccounsel.**

*Board of Regents of State College v. Roth*, 408 U.S. 564 (1972), established that procedural due process rights exist where a state creates – via statute – a liberty or property right. TEX. CODE CRIM. PRO. ART. 11.071 SEC. 2(A) provides just such a right where the State of Texas guarantees state inmates sentenced to death that they will be "represented by competent counsel unless the applicant has elected to proceed pro se." In the instant case, Flores requested, and was granted, the appointment of counsel pursuant to Article 11.071. Accordingly, and in reading the language relating to state habeas proceedings in Texas, Flores should be considered as having either a cognizable liberty or property interest in the appointment of competent counsel. *Id.*

-71-

As the Court in *Roth* found:

> Certain attributes of "property" interests protected by procedural due process emerge from [Supreme Court] decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

> [Liberty] interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* It is axiomatic that Constitutionally protected liberty and property interests are found and enshrined in state statutory schemes. The laws governing the state writ process promise that "[e]very provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." *See* TEX. CODE CRIM. PRO. ART. 11.04. Thus, in giving favorable construction to Flores' claim of competent counsel, this Court should find that the Texas scheme provides Flores with a protected liberty or property interest in the right to competent counsel during state writ proceedings.

Flores, however, did not receive the promised "competent counsel" promised in TEX. CODE CRIM. PRO. ART. 11.071, SEC. 2(A). Instead, Flores received three grossly incapable individuals – all of whom refused to review his claims, investigate his case and present viable constitutional challenges to his state conviction. Because procedural due process requires an

-72-

analysis of the "process" that is due, Flores would contend that his due process mandates a review, at either the state or federal level, of the claims that could have – and should have – been raised at the state level, but due to incompetent counsel were not, before his conviction and sentence of death is carried out.  This case challenges the very notions of due process – notice and an opportunity to be heard.  To date, Flores' claims have not been heard . . . largely because these claims were never properly presented by the statutorily mandated competent counsel.

Accordingly, Flores should be entitled to that which is promised him via the Texas statutory scheme:  competent counsel.  Having failed to live up to its assurance, the State of Texas should not be permitted to rely on procedural bar or any other default rule to preclude consideration of Flores' viable habeas claims.  In the alternative, Flores should be entitled to return to state court to pursue his viable state habeas claims – this time, with the assistance of "competent counsel."

I.    **Flores' Due Process Rights Were Violated When the Trial Court Failed to Complete the *Batson* Hearing as Begun and Required by *Batson v. Kentucky*.**

When the authors of the Bill of Rights wrote into the Sixth Amendment "the right to a speedy and public trial, by an impartial jury of the state and district," they did not specify the nature of an impartial jury. The states and districts were left to grapple with that definition as they set standards and procedures for selecting juries. Since the early days of the republic, jury service has remained a mark of citizenship and a touchstone of civic duty. "Aside from paying taxes or registering with the Selective Service, it is the only public service that is presently compulsory in American society," writes legal policy analyst Evan R. Seamone.

Indeed, for those who are called, jury service can be what Thomas Jefferson referred to as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution." For those who are not called or cannot serve,

however, jury duty can serve as a reminder that states and districts
have, at times, denied their citizens certain rights and
responsibilities of citizenship.

See FINAL REPORT OF THE PENNSYLVANIA SUPREME COMMITTEE ON RACIAL AND GENDER BIAS IN THE
JUSTICE SYSTEM.

Prior to the start of trial in this case, Judge Nelms and counsel conducted

individual voir dire of the jury panel.  In exercising its peremptory strikes, the State of Texas

struck minority members from the jury panel.  Flores' trial counsel realized that these strikes

posed a constitutional dilemma and petitioned the trial court for a *Batson* hearing.  *Batson v.*

*Kentucky*, 476 U.S. 79 (1986).  The following day, apparently convinced that Flores had

demonstrated the requisite *prima facie* case pursuant to *Batson*, the court began hearing evidence

on Flores' claim that the State had unconstitutionally struck jurors based on race.


As recently as March 20, 2008, the United States Supreme Court again addressed the

issue of invidious race discrimination in jury selection.  *Snyder v. Louisiana*, 552 U.S. \_\_\_\_

(2008).  Justice Alito, writing for the *Snyder* majority, reminded that *Batson* demands a three-part

inquiry when a *Batson* issue is properly preserved at trial.  *Id.* at 3.

> *Batson* provides a three-step process for a trial court to use in
> adjudicating a claim that a peremptory challenge was based on
> race:  "First, a defendant must make a prima facie showing that a
> peremptory challenge has been exercised on the basis of race[;
> s]econd, if that showing has been made, the prosecution must offer
> a race-neutral basis for striking the juror in question[; and t]hird, in
> light of the parties' submissions, the trial court must determine
> whether the defendant has shown purposeful discrimination."

*Id. (citing Miller-El v. Dretke).*  Justice Alito further admonished that "[t]he trial court played  a

pivotal role in evaluating *Batson* claims. *Id.* In Flores' case, the trial court, inexplicably, abandoned its "pivotal role" *AFTER* it determined that Flores had established a *prima facie* case of race discrimination.

*AFTER* Flores' trial counsel timely and properly interposed a *Batson* objection, Judge Nelms determined that the State would be required to provide a race-neutral reason for exercising its peremptory strikes against minority panel members. Thereafter, the trial court ordered the State to explain its peremptory strikes. Then, curiously – and in clear violation of *Batson* -- the trial court recessed the hearing, permitting the State additional time to provide its race-neutral reasons for striking the minority members of the jury panel.

As Justice Alito recently explained, "[i]n this situation, the court *must* evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* This language is mandatory – the "court MUST evaluate" the prosecutor's reasons and assess its reasoning in light of *Batson*. Here, Judge Nelms abdicated his duty. As a result, Flores was denied due process and the promise of equal protection enshrined in *Batson*.

| MR. LOLLAR: | We're going to raise a Batson objection. |
| THE COURT: | On Mr. Castillo? |
| MR. LOLLAR: | Yes. And Ms. Cantu from yesterday. May it please the Court, comes now the Defendant, Charles Don Flores |
| THE COURT: | Excuse me for interrupting. you, who was it that talked to Ms. Cantu yesterday? I don't remember. |
| MS. MILLER: | That was Greg. |
| THE COURT: | Well, isn't she already sworn in? Ms. Cantu, already sworn in?MS. MILLER: She's excused. |
| THE COURT: | Yeah, she is. |
| MR. LOLLAR: | Strikes. |

THE COURT:         Yeah, she was a strike.

MR. LOLLAR:        We are going to raise a Batson objection. We first ask the Court to take Judicial Notice that theDefendant is a member of the Hispanic race, he's Mexican/American.

THE COURT:         I take Judicial Notice of that, gladly.

MR. LOLLAR:        Your Honor, we would ask the Court to take Judicial Notice that Ms. Cantu yesterday and Mr. Castillo today are also Hispanics.

THE COURT:         I will do that.

MR. LOLLAR:        Your Honor, we would suggest to the Court that the State has exercised Peremptory Challenges Nos. 11 and 12 to strike from the jury panel two members of the Hispanic race, that both of these jurors have qualified under the law, that the State used two peremptory challenges to strike them from the Jury. We suggest that there is no other apparent reason from the Record that the State did this without the reason being that they simply don't want a Hispanic on the Jury.

THE COURT:         We already have a Hispanic on the Jury, don't we?

MS. MILLER:        Yes, we do.

MR. LOLLAR:        No, sir.

THE COURT:         I think the very first one is Hispanic.

MS. MILLER:        No, the third one, Elva Caballero, Hispanic female.

MR. LOLLAR:        We'd like the Court to take Judicial Notice of that as well.

THE COURT:         Court takes Judicial Notice of everything that's going on.

MR. LOLLAR:        We suggest to the Court that State exercised the last two strikes -- the last two strikes they have struck Hispanics and suggest that it is racially motivated. Ask that the Court consider that we have made a prima facia case of racial discrimination by the State in exercising a peremptory challenge.

THE COURT:         Well, I don't believe that the attorney that made the challenge to Gloria Cantu is in the Courtroom today. And I would have to refresh my recollection of what did go on at that time; however, I can say that the Court did not observe anything yesterday that would appear to be racially motivated.   What is the State's response to striking Damon Castillo?

-76-

MR. WEST:          Judge, am I to assume that you do believe there's a prima facia case to Castillo?

THE COURT:         Well, I'm going to assume there is and I want to hear your side of it.

MR. WEST:          One, with regard to death penalty, he did state he felt uncomfortable and unsettled about serving as a juror in death penalty case. He mentioned he's still caught within the emotional grips of his divorce. Second, he -- not in any particular order here, he has given statements better to acquit all people than to convict even one. He called the death penalty a place of last resort. He said that he would need past criminal conduct in order to answer Special Issue No. 1. He's shown that he has a cousin that also has been convicted of an offense, shown to be rape. He has shown his uncomfortableness or inability to express the concept of circumstantial evidence case as -- when we talked about it. And in addition to those reasons, Your Honor, we also pose the reasons that we had given the Court on our submission to challenge for cause. And he's shown with regards to issue of parties that he anticipates -- he said he would want someone as himself as a juror if he was the accused and what is shown is that in adopting the fact that he would require prior background in Special Issue No. 3, we feel that based upon all of these factors that they are not racially -- they are race-neutral factors and those in which we can take into consideration in determining whether or not we want to exercise a peremptory challenge.

MR. LOLLAR:        Your Honor, the Court will recall what Mr. Castillo's testimony was. He never said that he couldn't not answer Special Issue No. 1 yes in the absence of any history of the Defendant being presented. What he said was it would be more difficult to.

THE COURT:         Well, that would be in the Court's opinion a proper grounds for using a peremptory challenge. The Court with respect to Damon Castillo, No. 1829, finds and believes from the evidence that the State's strike of Mr. Castillo was not based

|                  |                                                                                                                                                                                                                                                                                                                                                                                                        |
|------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | on any racial reasons, but rather on reasons having to do with his probability of convicting the Defendant and assessing the death sentence. So that motion is denied. With respect to Gloria Cantu, I think we need to have Mr. Davis down here to refresh his memory from his notes and refresh the Court's memory also. Off the top of my head, I can't recall anything that appeared to me to be racially motivated in the examination of Ms. Cantu or the State's strike. |
| MR. JANUARY:     | Mr. Davis will at least be available in the morning. We've got a funeral to attend this afternoon, one of our investigator's fathers. I'm not sure if he's going to be back this afternoon or not. |
| THE COURT:       | Okay. I'd appreciate it if Batson challenges were made at the time of the strike. Kind of hard to remember back when we've talked to 62 people. We will follow that – |
| MR. WEST:        | Pot the Record, Your Honor, we submit that challenge is untimely at this point. |
| THE COURT:       | I'm sorry, you what? |
| MR. WEST:        | We submit for the Record that challenge is untimely, the one yesterday. |
| THE COURT:       | Well, I'll hear evidence on it nonetheless. |
| MR. WEST:        | Okay. |
| THE COURT:       | Everybody come back at 1:00.  Is there an agreement on those two? |
| MR. LOLLAR:      | I guess so. |
| THE COURT:       | 1956. |
| MR. WEST:        | Yes. Okay. |
| THE COURT:       | That does it. |

(Whereupon, the proceedings recessed for the day.)

After being provided additional time to explain the challenged strikes, the State never revisited the issue of race neutrality and its *Batson* obligation. Neither the court nor any of the attorneys sought to reinstitute and complete the mandated hearing. Yet, as *Snyder* reminds,

*Batson v. Kentucky* requires the utilization of a three-part analysis: first, where a defendant establishes a *prima facie* case of racial discrimination during jury selection, the trial court must demand that the state provide a race neutral reason for exercising their strikes. *Id.*, at 4. Once the state proffers any race neutral reason, any plausible reason, the burden again shifts to the defendant to demonstrate that the reason provided is mere pretext for discrimination. *Id.* No basis is provided to cease or suspend the requisite *Batson* hearing once the *prima facie* case has been established. In fact, counsel is not aware of any law or case that permits a court to refuse to complete the requisite hearing once that hearing has been deemed necessary. Judge Nelms' failure to require the State of Texas to meet its *Batson* burden violates due process and undermines the reliability of Flores' verdict and sentence.

In Flores' case, the trial court did not complete the hearing it began. Even though the trial court obviously determined that several minorities were struck creating the presumption of racial bias and constitutional violation, neither the court nor Flores' trial attorneys ever required that the State of Texas meet its minuscule burden to provide a race- neutral explanation for its peremptory strikes. The issue was never resolved, and a ruling was never entered. What remains clear from the record is that the trial judge found that Flores had established a *prima facie* case of illegal race discrimination and the burden of explanation was then shifted to the State.

Thereafter, the issue was left unresolved and a jury devoid of true racial balance was seated, sworn in, and, ultimately, determined the fate of Charles Don Flores, a Hispanic male.

*Batson v. Kentucky* protects against such constitutional violations. *See also Hernandez v. New York*, 500 U.S. 352 (1991).

Flores contends that *Batson v. Kentucky* imposes a due process requirement on the trial judge to complete a *Batson* hearing that has been deemed necessary and has begun. Once Flores met his burden of proving a *prima facie* case of race discrimination, the trial court was required, under *Batson*, to actually complete the requisite hearing. In this case, Judge Nelms deemed that a potential violation had occurred and ordered the State of Texas to explain its discretionary strikes of minority jurors. Thereafter, the trial court abandoned the mandate of *Batson* and permitted the State of Texas to proceed without explaining its apparent racial strikes. The objection was never waived. The requirement to prove race neutrality did not dissipate. Instead, Judge Nelms simply failed to return to the issue he left suspended and hanging incomplete. This failure resulted in Flores being tried by an impermissibly selected jury. This equal protection violation is compounded by the trial court's failure to complete the necessary *Batson* hearing that it ordered. The court's failure to fulfill its judicial oversight of jury selection violates *Batson v. Kentucky* and has, accordingly, deprived Flores of due process.

Judge Nelms had a legal obligation to complete the *Batson* analysis. The abandonment of the *Batson* hearing without resolution resulted in a racially imbalanced jury chosen in a constitutionally impermissible manner. This violation is fundamentally unconstitutional and denied Charles Flores a fair trial. The prejudice Flores suffered by being tried by a predominantly white jury is inescapable. The prejudice of one, particularly a minority, being tried by a nearly all white jury for the killing of a white female, is clear. *Batson* deemed such trials in conflict with Equal Protection. Thus, being tried in a manner that violates Equal Protection prejudices an individual from receiving a fair trial in accordance with due process.

-80-

Much like the recent decision in *Snyder*, Judge Nelms' failures as set forth above constitute clear error and require a reversal of Flores' conviction.

**J.      Flores Received Ineffective Assistance of Counsel When Trial Counsel Failed To Secure a Ruling on His *Batson* Challenge Once the Court Began, But Did Not Complete, the Hearing Ordered Pursuant to *Batson v. Kentucky.***

*Batson v. Kentucky* remains an unfortunate cornerstone of American legal studies. In fact, many law students learn the case in both federal civil procedure and criminal procedure. *Batson* may even be taught in an ethics or professional responsibility course. The case is neither novel nor ignored during a lawyer's legal training. Rather, there are few American lawyers who are unfamiliar with the mandates of *Batson*. It is not hyperbolic to proclaim that all lawyers are aware that it is still unconstitutional and unprofessional to use a peremptory strike to excuse a potential juror member based solely on their race.

Flores' trial counsel was obviously aware of this prohibition when they moved for a *Batson* hearing to protect Flores' constitutional right to a jury selected without resort to racial bias. Flores' trial counsel most assuredly were also aware that *Batson*'s three-part shifting burden test requires that a court actually rule on the issue. Failure to complain about a *Batson* violation prior to the time the jury is sworn in will waive any error that occurred. In this regard, Flores' trial counsel fell woefully short of their professional obligations in securing a ruling on the *Batson* claim.

**1.      Deficiency**

In assessing whether counsel has performed in accordance with reasonable professional norms, reviewing courts must evaluate counsel's performance in light of the governing ABA

standards. There can be no serious question that *Strickland v. Washington* and its progeny are clearly established federal law as envisioned by 28 U.S.C. § 2254 (d)(1). *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Thus, the *Strickland* standard of requiring that counsel's actions be judged based on reasonable professional norms is the appropriate standard.

Likewise, there can be no doubt that *Batson v. Kentucky* is clearly established federal law. See *Miller-El v. Dretke*, 545 U.S. 231 (2005), *J.E.B. v. Alabama*, 511 U.S. 127 (1994). Defense counsel can boast no strategic reason for ignoring the mandates of *Batson*, particularly when representing a racial minority. See *Hernandez v. New York*, 500 U.S. 352 (1991). In fact, the United States Supreme Court recently uncovered that Dallas County has a particularly unfortunate past in relation to exercising discriminatory jury strikes in criminal cases. *See Miller-El v. Dretke*, 545 U.S. 231 (2005). While trial counsel knew enough to raise the issue and to present a *prima facie* case of violation, counsel failed to realize the importance of seeing the issue through. Because counsel did not pursue the *Batson* issue following the trial court's recess, trial counsel seemingly abandoned any right Flores had to a jury selected free from racial bias. Reasonably competent counsel would have ensured that once a *Batson* objection was properly lodged, and a *prima facie* case successfully established, that same counsel would have ensured that some ruling – any ruling -- was received on the issue. Much like Judge Nelms' abdication of the *Batson* process, Flores' trial counsel abdicated their duty to secure a ruling on the issue.

This is NOT a case where counsel failed to raise a timely objection. Likewise, this is NOT a case where the court found that counsel failed to demonstrate a *prima facie* case. Rather, this is a case where the trial judge seemed favorably disposed to ensure that the jury chosen was one free from racial discrimination. However, once the judge abandoned his duty under *Batson*,

counsel remained under a continuing duty to secure a ruling on the issue. As the jury was sworn in, and the *Batson* issue left hanging unresolved, counsel committed error that constitutes deficient performance under *Batson*.

### 2.   **Prejudice**

Being denied a right to Equal Protection during trial is clear prejudice. *Batson*'s governing principle is that juries must be selected without resort to racial bias. Unfortunately, Flores' counsel deprived him of Equal Protection by abandoning his *Batson* objection without requiring resolution on the issue.

The State of Texas was clearly unable, without continuing the proceedings, to simply provide a race-neutral reason for exercising its peremptory challenges against minority members of the venire. Thereafter, the State never attempted to set the record straight and establish that the peremptory dismissal of racial minorities comported with Equal Protection. The burden was left on the State to affirmatively provide a race neutral reason for exercising its peremptory strikes. It failed to do so. Accordingly, had the State been pressed on this issue and no race-neutral reason for the strikes been given, the *Batson* challenge would have succeeded and the jury disqualified. In the end, had counsel merely pressed this issue to completion, Flores would have been tried by a jury selected in conformity with Equal Protection. Counsel's failure to see this issue through to completion – as reasonable counsel would have done – deprived Flores of Equal Protection and prejudiced his trial with racial bias.

And, while *Batson* applies in all cases and on behalf of all defendants, the racially motivated violation seems most egregious when a nearly all-white jury sits in judgment over a racial minority. *This* was the promise of *Batson* - that prosecutors who utilize their discretionary

strikes to secure an all white jury will lose their improperly obtained conviction.  But, in order to preserve the error and protect the defendant from race discrimination during jury selection, trial counsel has an affirmative obligation.  The obligation is not merely to object.  Rather, counsel also must pursue the issue until completion and to secure a ruling that preserves the issue.  Failure to do so amounts to ineffective assistance of counsel as it deprives a defendant the right to be convicted by a jury selected without resort to racial bias.

Because Flores' counsel failed to fully preserve the *Batson* issue, Flores was denied Equal Protection during jury selection.  This deprivation prejudiced Flores' trial by infecting the proceedings with racial bias – beginning with impermissible jury selection.  Because this error infected the entire proceedings, Flores' conviction is constitutionally infirm and cannot stand.

> **K.**    **Flores received Ineffective Assistance of Appellate Counsel Where Appellate Counsel Failed to Raise a Due Process Challenge to the Trial Court's Failure to Complete Its *Batson* Hearing as Begun and Required by *Batson v. Kentucky*.**

*Batson* is a cornerstone in our American jurisprudential system.  All reasonable counsel should be aware of its mandates.  The three-part *Batson* test has been incorporated into both civil and criminal cases, and applies equally to challenges based on race, gender or ethnic discrimination.  *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991); *J.E.B. v. Alabama*, 511 U.S. 127 (1994); *Hernandez v. New York*, 500 U.S. 352 (1991).

Thus, Flores' appellate counsel should have been aware of the trial court's obvious shortcomings in failing to complete the *Batson v. Kentucky* hearing that the court initiated.  The trial court apparently found that Flores had established a *prima facie case* of racial discrimination during jury selection because the trial court entertained a hearing on the matter.  In fact, the State

was initially required to provide explanations for striking minority members of the jury panel. Appellate counsel – had counsel reviewed the voir dire, as reasonable counsel would have done – would have known that the court began a hearing and then, without any explanation or reasoning, abandoned that hearing without providing Flores his constitutionally-protected opportunity to demonstrate the State's violation of *Batson*. The failure to challenge this issue on appeal deviates from what would be expected of reasonable counsel.

### 1.   Deficiency

Reasonable appellate counsel would have read the entire trial proceedings – including voir dire – in search of cognizable appellate issues. *Batson* is a cognizable appellate issue. Reasonable counsel, having uncovered an obvious shortcoming in the *Batson* hearing, would have raised an objection to the trial court's failure to conduct and conclude the *Batson* hearing once the trial court determined that Flores had established a *prima facie case* of race discrimination. However, appellate counsel wholly failed to raise this claim and preserve the error for appellate review. This failure caused Flores to suffer prejudice in that his *Batson* claim has never been analyzed or considered by any court of law. Had the State been pressed to explain its use of peremptory strikes to dismiss racial minorities from the jury, Flores would have been tried by a proper and constitutionally-selected jury. Instead, Flores, a Hispanic male, was tried by a nearly all white jury and was deprived his due process and Equal Protection rights to a jury selected in accordance with *Batson v. Kentucky*.

### 2.   Prejudice

As set forth directly above, the doctrine of Equal Protection entitled individuals accused of a crime to be tried by a jury that is selected without resort to racial bias. The only mechanism

known in law to protect against such racial bias is the test imparted by *Batson*. Thus, *Batson* challenges serve as the only measure to ensure Equal Protection during jury selection. Where counsel timely asserts a *Batson* challenge, the trial court is legally bound to assess whether the challenger has set forth a *prima facie* case of race discrimination. Once this determination is reached – that the defendant HAS established a *prima facie* case of race discrimination – the court MUST then evaluate whether actual discrimination has occurred by requiring the State to proffer a race-neutral reason for the peremptory strike.

All of this occurred in Charles Flores' trial. Minorities were struck by the State. A timely objection was interposed. A *prima facie* case was established. And, then, the trial judge required the State of Texas to provide a race-neutral reason for its peremptory strikes. But just as quickly as the issue was raised and considered, the issue somehow vanished without the State of Texas ever proffering the requisite race-neutral reason for using its peremptory challenges against minorities. This omission, oversight or error should NOT have gone unnoticed by reasonably competent appellate counsel.

Because the State of Texas failed to provide the trial court with a race-neutral reason for exercising its peremptory challenges, it failed to sustain its burden under *Batson*. This failure should have resulted in a dismissal of the jury selected in violation of Equal Protection. However, these last steps were not taken. Instead, the trial court permitted the jury to be sworn and seated – despite its own determination that a *prima facie* case under *Batson* had been established. This ruling would have necessarily been overturned on appeal had the issue been presented.

Because Flores' appellate counsel wholly failed to present, and preserve, this issue for appellate review, Flores' appeal was affirmed. However, Flores' conviction is invalid under Equal Protection and should be reversed. Had appellate counsel merely raised this issue, the appellate court would have been required to overturn the conviction in light of *Batson*. Thus, Flores has been prejudiced by appellate counsel's failure to raise a clearly viable, and successful, appellate issue.

**L.** **Flores received Ineffective Assistance of Appellate Counsel where Appellate Counsel Failed to Raise an Ineffective Assistance of Counsel Challenge to Trial Counsel's Failure to Secure a Ruling on Flores' *Batson* Challenge Once the Court Began, But Did Not Complete a Hearing Pursuant to *Batson v. Kentucky*.**

Appellate counsel had a constitutional obligation to provide effective assistance during the state appellate proceedings. *Evitts v. Lucey*, 469 U.S. 387 (1985). In failing to fully review the state court record, including voir dire, Flores was deprived the right to have any court evaluate whether he was convicted by an unconstitutionally-selected jury based on race discrimination. This claim was an obvious error and should have been raised by appellate counsel. Appellate counsel, Bob Abbott, has since been sanctioned in other Texas death penalty proceedings. Counsel's performance in Flores' appeal was extremely deficient and should merit, at a minimum, the right to file an appeal – with the aid of constitutionally effective counsel -- to challenge his improperly obtained conviction and sentence.

**1.** **Deficiency**

Either the trial court or trial counsel is responsible for failing to ensure that the *Batson* hearing was properly conducted. Once Flores had established a *prima facie* case of race

discrimination during jury selection, the trial court was obligated to demand a race-neutral reason

from the State for exercising its peremptory strikes against racial minorities. *See Batson v.*

*Kentucky*, 476 U.S. 79 (1986); *Hernandez v. New York*, 500 U.S. 352 (1991). There is no known

exception to completing the *Batson* hearing. The failure of the court, and counsel, to ensure this

issue was properly considered and addressed in conformity with *Batson* should have drawn

immediate attention. Reasonable counsel would have undoubtedly noticed the error.

Accordingly, appellate counsel had a professional obligation to preserve and challenge

this error during the appellate proceedings. Because appellate counsel failed to do so, this Court

should find both that counsel was deficient.

### 2. **Prejudice**

Equal Protection entitles individuals accused of a crime to be tried by a jury that is

selected without resort to racial bias. *See Hernandez v. New York*, 500 U.S. 352 (1991). The

only mechanism known in law to protect against such racial bias is the test imparted by *Batson*.

Thus, *Batson* challenges serve as the only measure to ensure Equal Protection during jury

selection. Where counsel timely asserts a *Batson* challenge, the trial court is legally bound to

assess whether the challenger has set forth a *prima facie* case of race discrimination. Once this

determination is reached – that the defendant HAS established a *prima facie* case of race

discrimination – the court MUST then evaluate whether actual discrimination has occurred by

requiring the State to proffer a race-neutral reason for the peremptory strike.

While trial counsel acted properly by interposing a timely *Batson* objection, counsel

seemed to abandon the objection thereafter. But, the trial court's receptivity to demanding a

race-neutral explanation from the State indicates that a *prima facie* case was established. *See*

*Batson v. Kentucky*, 476 U.S. 79 (1986). Thus, trial counsel was under a continuing obligation to ensure that the trial judge required the State of Texas to provide a race-neutral reason for its peremptory strikes. But just as quickly as the issue was raised and considered, the issue somehow vanished without the State of Texas ever proffering the requisite race-neutral reason for using its peremptory challenges against minorities. This omission, oversight or error should NOT have gone unnoticed by reasonably competent trial counsel. Likewise, reasonably competent appellate counsel would have known to challenge trial counsel's shortcomings in abandoning this issue.

Because the State of Texas failed to provide the trial court with a race-neutral reason for exercising its peremptory challenges, it failed to sustain its burden under *Batson*. This failure should have resulted in a dismissal of the jury selected in violation of Equal Protection. However, these last steps were not taken. Instead, the trial court and Flores' trial counsel permitted the jury to be sworn and seated – despite the trial court's previous determination that a *prima facie* case under *Batson* had been established. This ruling would have necessarily been overturned on appeal had the issue been presented.

Because Flores' appellate counsel wholly failed to present, and preserve, this issue for appellate review, Flores' appeal was affirmed. However, Flores' conviction is invalid under Equal Protection and should be reversed. Had appellate counsel merely raised this issue, the appellate court would have been required to overturn the conviction in light of *Batson*. Thus, Flores has been prejudiced by appellate counsel's failure to raise a clearly viable, and successful, appellate issue.

**WHEREFORE,** Petitioner prays that the Court grant petition or relief to which he may

be entitled in this proceeding.

Respectfully submitted,


_____
BRUCE ANTON
Texas State Bar No. 01274700

**SORRELS, UDASHEN & ANTON**
2301 Cedar Springs, Suite 400
Dallas, Texas 75201
(214) 468-8100 - Telephone
(214) 468-8104 - Facsimile


MARY MARGARET PENROSE
Texas State Bar No. 00788179

**UNIVERSITY OF OKLAHOMA**
**COLLEGE OF LAW**
300 Timberdell Road
Norman, OK  73019
(405) 514-1811 – Telephone
(405) 325-0389 - Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have served Ana Marie Jordan, Assistant Attorney General, with a copy of this Petition for Writ of Habeas Corpus for a Person in State Custody by e-mail at ana.jordan@oag.state.tx.us and by United States Mail at Post Conviction Litigation Section, State of Texas Attorney General's Office, 209 w. 14th Street, PO Box 12548, Austin, TX 78711-2548, on this the 24th day of March 2008.

_____
BRUCE ANTON

## AFFIDAVIT

THE STATE OF TEXAS     §
                       §
COUNTY OF DALLAS     §

BEFORE ME, the undersigned official, personally appeared **BRUCE ANTON**, a person known to me, and after being sworn upon his oath, deposed, and stated:

"My name is Bruce Anton. I am an attorney licensed by the State of Texas and in this Court. I am the attorney of record for the Petitioner, appointed by this Court. Because of the time limitations imposed on filing this Petition for Writ of Habeas Corpus, I am unable to transmit this Petition to Petitioner for his signature before filing. I have read the foregoing Petition for Writ of Habeas Corpus, and said Petition is true and correct from my investigation of this cause thus far, based upon a review of the previous pleadings filed in the state habeas proceedings, according to my knowledge and belief."

 

_____
BRUCE ANTON

SWORN TO AND SIGNED BEFORE ME on this the 24 day of March 2008.

_____
Notary Public, State of Texas

My Commission Expires: 9-25-2008

**Inmate's Declaration**

I, CHARLES DON FLORE, Inmate No. 999299, being presently incarcerated in the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, declare under penalty of perjury that according to my belief, the foregoing information and allegations of the application are true and correct.

Signed on ____3. 2 4. 0 8____

       **(date)**

_Charles D. Flores_

**CHARLES DON FLORES**