IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES D. FLORES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:07-CV-413-M-BD |
| | § | ECF |
| | § | Referred to U.S. Magistrate |
| | § | **Death Penalty Case** |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Charles D. Flores's ("Flores") challenges his presumptively valid Texas conviction for capital murder and death sentence by means of a petition for federal writ of habeas corpus pursuant to 28 U.S.C. § § 2241 and 2254. Respondent  submits his answer pursuant to Rule 5 of the Rules Governing Section 2254 Cases and asserts that Flores's request for habeas relief should be denied.

## FLORES'S ALLEGATIONS

Flores alleges:

1. Jury instruction error occurred with respect to the mitigation special issue during the punishment phase in the following ways:

   a. Texas's "10-12 Rule" results in an mitigation instruction

        similar to the one that was found offensive in *Mills v. Maryland*;[1]

b.     jurors were "misled" into believing that a life sentence requires ten votes;

c.     the State was relieved of its duty to disprove mitigating circumstances beyond a reasonable doubt; and

d.     the mitigation instructions permitted the jury to sentence him in "an excessively vague, arbitrary, and capricious manner" and the trial court failed to "properly" define mitigation.

2.     The prosecutor failed to disclose impeachment evidence of a State's expert witness in violation of *Brady v. Maryland*;[2]

3.     Flores was deprived a fair trial and his right to confrontation when the trial court permitted the admission of eyewitness testimony that was "hypnotically enhanced"; and

4.     Flores's right to due process was violated during his state habeas proceeding because he was deprived of effective assistance of counsel in that proceeding.

Petition at 7, 32, 44, 48.

## STATE COURT RECORDS

Copies of Flores's relevant state court records have been previously forwarded to the court under separate cover letter. These records consist of Flores's direct appeal in *Flores v. State*, No. 73,463 (Tex. Crim. App. Nov. 7, 2001) and state habeas proceeding in *Ex parte Flores,* Application No. 64, 654-01

---

[1]     486 U.S. 367 (1988).

[2]     373 U.S. 83 (1963).

(Tex.Crim. App. Sept. 20, 2006) *cert. denied*, 128 S.Ct. 292 (Oct. 7, 2007).

## RULE 5 STATEMENT

Flores's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Respondent admits that Flores's petition was filed within the one-year limitations period as required by 28 U.S.C. § 2244 (d); and that it is not successive as defined by 28 U.S.C. § 2244 (b).

Respondent denies, however, that Flores has exhausted all of his claims by fairly presenting them to the state courts as required by 28 U.S.C. § 2254 (b). Specifically, Respondent asserts that claims 1(c),1(d) and 4 are completely unexhausted and that claim 3 is partly unexhausted. Finally, Respondent asserts that claims 1(a), 1(b), 1(c), 1(d), and 3 (in part) are procedurally barred from review.

## STATEMENT OF THE CASE

On April 1, 1999,  in cause number F-9802133-QN,  the 195th Judicial District Court of Dallas County, Texas sentenced Flores to death after a jury found him guilty of capital murder and answered the special issues submitted pursuant to Article 37.071 of the Texas Code of Criminal Procedure in favor of the State. Clerk's Record ("CR") at 155.   Direct review was automatically pursued to the Texas Court of Criminal Appeals, where Flores's conviction and

death sentence were affirmed on November 7, 2001. *Flores v. State*, No. 73,463, slip op. at 26 (Tex. Crim. App. 2001). Though Flores filed a *pro se* motion for rehearing on November 27, 2001, it was rejected because it was untimely. *Id.* at Letter by Troy C. Bennett, Jr., Clerk dated January 9, 2002.

On September 13, 2000, Flores, via state habeas counsel, filed his first and only state application for writ of habeas corpus in the convicting trial court. SHCR 2. [3] The original petition raised twelve grounds for review. *Id.* at 3-6. On December 14, 2000, Flores filed a *pro se* "amendment" to his state habeas application, in which he raised nineteen additional grounds for relief. *Id.* at 115-118. The trial court entered detailed findings of fact and conclusions of law, recommending that relief be denied on all grounds. *Id.* at 688-814.[4] The Texas Court of Criminal Appeals expressly adopted the trial court's findings and conclusions and denied Flores's application with written order on September 20, 2006. *Ex parte Flores*, Application No. 64, 654-01, slip op. at 1 (Tex.Crim. App. 2006).

Flores filed his skeletal federal habeas petition via habeas counsel on

---

[3]     "SHCR" refers to the clerk's record of documents and pleadings filed with the state habeas court followed by the page number.

[4]     In its findings of fact, the state habeas trial court references that it also considered "Petitioner's supplemental application for writ of habeas corpus" which is not contained within the official bate-stamped state habeas record. SHCR at 688. Along with this answer, the undersigned has forwarded a copy of this pleading as a supplemental state court record.

September 18, 2007.  "Skeletal" Petition  at cover; [5] Docket Entry ("DE") 27.  A

final petition was filed on March 24, 2008.  Petition at cover; DE 37.

## STATEMENT OF FACTS

In the direct appeal, the Texas Court of Criminal Appeals set out the facts

of the crime as follows:

> Elizabeth Black, the deceased, resided with her husband in Farmers
> Branch.  At approximately 6:30 a.m. on January 29, 1998, Mr. Black
> left for work.  He returned home three hours later to discover Mrs.
> Black's body beneath the den table.  Mr. Black immediately called
> the police, who arrived at the scene within a few minutes.  An
> autopsy established that Mrs. Black had died as the result of a
> single gunshot.
>
> Nearby, officers discovered the Blacks' Doberman pinscher,
> Santana, shot through the back.  The size of the would suggested a
> large-bore weapon, such a .44 caliber.  Fragments of potato littered
> the floor, table, walls, and ceiling in the vicinity of the victim.  On
> the floor near Mrs. Black's body, police officers found a .380 caliber
> bullet.  Officers located a shell casing of the same caliber and a piece
> of potato on the floor inside the garage.  The spent cartridge's
> presence suggested that a semiautomatic pistol, rather than a
> revolver, had fired the shot that killed Mrs. Black.  A police
> detective testified that a second round struck the dog.  Although
> officers did not find another bullet or shell casing, they did find a
> hole in the carpet, and the size of the wound and patterns of blood
> and potato spatter tended to corroborate this hypothesis.
>
> While searching the rest of the house, police discovered a hole in the
> wall above the toilet in the hall bathroom.  In the master bathroom,

---

[5]  Although a federal petition is deemed filed on the date it is placed in the
prison mail system, *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998), because Flores
is represented by counsel, he does not benefit from the "mailbox rule." *Cousin v.
Lensing*,310 F.3d 843, 847 (5th Cir.2002).

someone had punched a hole in the wall near the laundry hamper, opened the commode top, and torn the sink and medicine cabinet from the wall.  Police found a large potato inside the sink.  A ladder extending to the attic access-door stood in a rear room.  There were no signs of forced entry or struggle.

Officers discovered $39,000 in cash hidden inside the master bedroom closet.  Mr. Black stated that the Blacks' incarcerated son, Gary, had left this money with his parents before going to prison for selling drugs.  Gary's common-law wife, Jackie Roberts, had been receiving $500 of this money from the Blacks each month.

Neighbors reported that a purple, pink, and yellow Volkswagon had been parked in the Blacks' driveway around 7:35 on the morning of the murder.   The garage door was open a few feet, which was unusual.  The Volkswagon driver got out, rolled underneath the garage door, and raised the door to admit the Volkswagon's passenger.  A neighbor identified [Flores], dressed in dark-colored clothing, as the passenger, but other witnesses could not identify the passenger.  After entering the garage, the two men shut the door. One neighbor heard a thud, but stopped investigating the matter upon observing the multi-colored Volkswagon, which he had previously seen at the home of Jackie Roberts.

Jackie Roberts (Jackie), who was on probation for possessing methamphetamine, lived with her mother and three children on Emeline Street, a short distance from the Blacks' home.  She had become romantically involved with Ricky Childs about three weeks before the murder.  Childs, a drug dealer, habitually carried a .380 semiautomatic pistol in the back of his waistband.

Childs, [Flores], and several acquaintances spent the early morning hours of the day of the murder inside [Flores]'s trailer using methamphetamine and marijuana.  Childs and [Flores] left the trailer together in Child's multi-colored Volkswagon at approximately 3:00 a.m., arriving at Jackie's home at some time later that morning. Jackie had arranged for an acquaintance, Terry Plunk, to sell Childs and [Flores] a quarter-pound of methamphetamine.  She had expected [Flores], dressed in a long

6

black duster, to accompany her and Childs to purchase the methamphetamine, but [Flores] refused to hand over his money without attending the drug transaction for fear of being "ripped off." The trio rode in Jackie's El Camino to an apartment near Love Field Airport, where they met Plunk. During the transaction, [Flores] weighed the drugs on a portable digital scale and declared that the quantity delivered by Plunk was a quarter-ounce short.[6] Plunk made up the alleged shortage to avoid a confrontation. Jackie, Childs, and [Flores] then drove to [Flores]'s home with the drugs. [Flores] weighed the methamphetamine again and again accused Plunk of shortchanging him, insisting that the deal had been for a half-pound instead of a quarter-pound. [Flores] then pointed a gun at Jackie and asked what her "connection" would pay for her head. While Childs attempted to calm [Flores] down, Jackie telephoned Plunk to see if he would cover the claimed shortage. Plunk refused. Childs, [Flores], and Jackie then drove to a nearby house, where Childs and [Flores] acquired three firearms. [Flores] was armed with a "long, blue gun" and a handgun. Childs carried a larger handgun. When Jackie asked the men why they had armed themselves, they told her that it was none of her business.

To make up the alleged shortage, she agreed to pay [Flores] $3,900 from the cash that Gary Black had hidden at his parents' home. Childs confirmed the existence of this money, and the two men dropped Jackie off at home sometime between 6:35 and 7:15 .a.m. Childs' former girlfriend, Vanessa Stovall, testified that Childs and [Flores] arrived at Childs' grandmother's home on High Meadow around 6:30 that morning. [Flores] and Stovall smoked some methamphetamine before they left in the Volkswagon between 6:45 and 7:00 a.m.

In her living room, Jackie spoke briefly with Doug Roberts (Doug), who had arrived to take their son to school. Later that morning, Jackie left to visit Plunk. A short time after Jackie's departure, her mother told Doug about the murder of Mrs. Black. That evening, Doug went to the home of the victim's daughter, Sheila Black, and

---

[6]   Jackie testified that Plunk had not shortchanged them and that [Flores] was trying to rip off Plunk.

learned that neighbors had observed a pink and purple Volkswagon outside the house. Doug drove to Plunk's house to inform Jackie not only about the murder but also that neighbors had seen the multi-colored Volkswagon at the scene. He tried to convince Jackie to go with him to the police immediately, but Jackie feared possible retaliation or prosecution. Consequently, Doug drove her from Plunk's house to a hotel.

On his way to the police station, Doug disposed of a map, discovered by Plunk, that Jackie had drawn showing the area of her own home and the Black's house.[7] He reported Childs' possible involvement to the police that night and submitted to another police interview the next day. Law enforcement officers apprehended Jackie at Doug's apartment four days after the murder. By then, the police had arrested Childs.

When he was arrested, Childs possessed amphetamine and a partial box of the same brand of .380 ammunition found at the murder scene. A police search of his grandmother's residence uncovered a .44 Magnum revolver and shells, two boxes of .357 bullets, and a pair of gloves. Polarized-light microscopy of granular material found inside the Magnum barrel identified starch grains consistent with those from a potato.

A day after the offense, [Flores] admitted to a friend, Homero Garcia, that he had shot the dog, but blamed Childs for killing the "old lady." [Flores] made a similar statement to his father-in-law.

Two days after the murder, [Flores] and two others towed Childs' Volkswagon to the parking lot behind the Grand Prairie roofing business owned by [Flores]'s father. There, between 6:00 and 7:00 p.m., [Flores] sprayed the Volkswagon with black spray paint. At some point, the license plates were removed. The group then towed the vehicle up an I-30 freeway entrance ramp and onto the shoulder of the road. [Flores] doused the Volkswagon with gasoline and set

---

[7]   At trial, Jackie denied drawing this map for Childs and [Flores], stating that she drew it four days before the murder to guide her ex-husband's girlfriend to the Blacks' home to babysit. She initially told police that she drew it for Childs.

the interior on fire.  When a passing motorist stopped to offer assistance, [Flores] got into the tow car and drove away.  Jonathan Wait, who was in the tow car with [Flores], testified that the other motorist followed, but [Flores] eluded the other vehicle after an extended high-speed chase during which [Flores] fired several shots at the other car.

On April 18, 1998, at 7:00 p.m. Kyle police officers Slaughter and Oaks stopped a blue Volvo traveling north on I-35.  [Flores], the vehicle's sole occupant, could not produce a driver's license, but identified himself as Juan Jojola, [Flores]'s brother, and presented a social security card bearing that name.  Because of the alias, the officers did not discover that [Flores] had an outstanding federal warrant for his arrest.  An angry motorist stopped at the scene to complain that the Volvo had almost run his automobile off the road.

After [Flores] failed a series of field sobriety tests, Officer Slaughter initiated an arrest for driving while intoxicated.  As the policeman started to cuff the suspect's hands behind his back, [Flores] turned quickly and struck Officer Slaughter's head with his elbow.  A struggle ensued, during which [Flores] tried to push both police officers in front of oncoming traffic on the freeway.  [Flores] called the arrest "bullshit" and insisted that it was not going to happen.  Finally, Officer Slaughter managed to push the group from the roadway into a nearby ditch.  By chance, Deputy Mike Davenport of the Hays County Sheriff's Department arrived on the scene and assisted the police officers in handcuffing [Flores].  The officers transported [Flores] to Hays County jail, where they charged him with driving while intoxicated and two counts of assault on a peace officer.  Officer Slaughter suffered a swollen eye, and Officer Oaks had a bite on her arm and an injury to her right hand.  [Flores] was released from jail on bond before authorities learned his true identity.

Following his arrest for the instant offense, [Flores] was taken to Parkland Hospital for treatment of a knee injury, accompanied by Officer Bobby Sherman.  Because of the nature of [Flores]'s injury and because he rode in a wheelchair, [Flores] was virtually unrestrained.  As Sherman and [Flores] passed through an infirmary door, [Flores] reached around with both hands and

9

grabbed the grip of Sherman's pistol. Sherman grabbed [Flores] by the neck, and they fell against the wall, then to the ground. Sherman felt the pistol coming out of his holster, but pushed the gun to the ground, forcing it from [Flores]'s hands. [Flores] struggled for it again, threatened to kill Sherman, then bit him just above the elbow. As Sherman yelled, "Grab the gun" he again forced the gun from [Flores]'s hand, and a doctor grabbed it. Sherman remained on top of [Flores] trying to hold him down, although [Flores] continued to struggle violently. Sherman then tried to spray [Flores] with Mace, but [Flores] grabbed the can from him and began spraying it into Sherman's eyes and on hospital staff members. Sherman continued to try to restrain [Flores] with the help of two or three hospital staff members. At some point, someone grabbed Sherman's handcuffs and handcuffed [Flores].

*Flores v. State*, slip op. at 2-9 (footnotes in original).

## ANSWER

Under 28 U.S.C. § 2254 (d), "[t]his Court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell,* 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

Federal habeas courts are to review pure questions of law and mixed questions of law and fact under subsection (d)(1), and pure questions of fact under subsection (d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). In

addition, section 2254 (e) requires that federal courts apply a presumption of correctness to the state court findings of fact unless they are rebutted clearly and convincingly.  Moreover, a state court's  implicit credibility findings are also entitled to a presumption of correctness. *Garcia v. Quarterman*, 454 F. 3d 441, 444-445 (5th Cir. 2006).

## I.   Flores's Jury Instruction Claims are Procedurally Defaulted and Without Merit.

Flores raises four complaints about the mitigation instructions given to the jury during the punishment phase of his state trial. Petition at 7-31. They are addressed in turn below.

### A.   Flores's complaint about Texas's "10-12 rule" is procedurally barred from federal review and without merit.

Flores first asserts that the mitigation instruction involving Texas's 10-12 rule is "substantially similar" to the one the Supreme Court found offensive in *Mills v. Maryland,* 486 U.S. 367 (1988).  Petition at 11.  He concludes that the instruction prevented the jury from considering his mitigation evidence.  *Id.* at 11-14. This court should reject this claim because it is procedurally barred from federal review, and it is without merit.

#### 1.   Flores's claim is barred by the state court's reliance on its *Gardner* rule when it rejected this claim.

A federal habeas court lacks jurisdiction to review a state court's resolution  of an issue of federal law if the state court's decision rests on an

11

adequate and independent state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991).   Flores sought review of the *Mills* claim for the first time in his state habeas proceeding.  SHCR at 3.  The state habeas trial court found this complaint could have been, but was not, raised on direct appeal.  SHCR at 698 (finding 30).[8]

The Texas Court of Criminal Appeals has long held that record-based claims that could have been brought on direct appeal are not cognizable on state habeas.  *See Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), *clarified on reh'g* (Feb. 4, 1998); *see also Rojas v. State*, 981 S.W.2d 690, 691

---

[8]     Although the state habeas trial court found that no objection to the mitigation instructions was lodged at trial,  SHCR at 700 (finding no. 38), it did not rely on the contemporaneous objection rule to deny review.  This is probably because under *Almanza v. State*, the failure to object to jury charge error at trial does not prohibit review of the alleged error on direct review. 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).  Nevertheless, in order to overcome the *Gardner* procedural bar, on which the state court did rely, Flores may allege that appellate counsel was deficient for failing to raise the claim on direct appeal.  Should he do so, such a claim would still not warrant review on the merits because Flores did not allege in his state habeas proceeding that appellate counsel was ineffective for this reason, which renders it unexhausted and procedurally barred.  Moreover, such a claim is without merit. In Flores's state habeas proceeding, the trial judge found that trial counsel's failure to object was the result of reasoned trial strategy.  The habeas trial judge, who was the same judge who presided over Flores's trial, determined that Flores received an instruction that was "more favorable" than that to which he was entitled under Texas law. SHCR at 700 (finding  37). Hence, according to the state habeas court, the failure to object was not deficient attorney conduct.  SHCR at 700 (finding 38). It follows that appellate counsel would likewise not be subject to an ineffective assistance challenge for failure to raise the unobjected-to jury charge error if he too believed the instruction was more favorable than that to which Flores was entitled under state law. But, in any event, Flores could not show prejudice from counsels' alleged deficiencies because the *Mills* claim is clearly foreclosed by state and federal precedent.

(Tex. Crim. App.1998) (Baird, J., concurring) ("In my opinion, based on *Gardner,* the Court now bars every record claim not raised on direct appeal as procedurally defaulted"). The Fifth Circuit recognizes that Texas's *"Gardner* rule" is an independent and adequate state law ground prohibiting federal review of a federal claim. *See Aguilar v. Dretke,* 428 F.3d 526, 535 (5th Cir. 2005)("'[T]he *Gardner* rule set forth an adequate state ground capable of barring federal habeas review'")(quoting *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004)).

Relying on *Ex parte Gardner*, the state court expressly rejected this claim. SHCR at 698-699 (findings 31-33); *Ex parte Flores,* slip op. at 1. Accordingly, this court should find that the *Mills* claim is procedurally barred from review .

> ### 2. Alternatively, Flores fails to show that his mitigation instructions resemble those struck down in *Mills* or that previous circuit precedent rejecting similar challenges is distinguishable.

In *Mills,* the Supreme Court concluded that the mitigation instruction in that case created a "substantial probability that reasonable jurors" may have thought "they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384. In *Boyd v. California*, the Court altered the *Mills* standard and framed the inquiry as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of

constitutionally relevant evidence." 494 U.S. 370, 379-380 (1990).

Contrary to Flores's allegations, the record does not support his allegation that his mitigation instruction was sufficiently similar to the one given in *Mills* so as to require reversal of his death sentence. *See Mills*, 486 U.S. at 384-388 (appendix setting out the instruction). The *Mills* Court reversed the death sentence in that case because it was concerned that the jury may have erroneously believed it had to unanimously agree on each and every mitigating circumstance before it could assess life. *Id.* at 384. The Court was also concerned that the instruction could be read to permit a single juror voting for death to block a life sentence even though there existed mitigating circumstances warranting life. *Id.*

By contrast, Flores's jury received the following mitigation instruction:

### Instructions Regarding Special Issue Number 3

If the jury's answers to special issues 1 and 2 are both "yes," you will proceed to answer special issue number 3.  There is no presumption regarding the answer to special issue 3 and neither the State nor the defense has a burden of proof on it.  In answering this issue, the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.  The jury shall answer special issue number 3 "yes" or "no." Only by unanimous verdict may the jury answer "no" to this special issue and it may not be answered "yes" unless ten (10) or more jurors agree.  *Jurors need not agree on what particular evidence supports a "yes" finding.*

CR at 147-148 (emphasis added).   The special issues asked the following:

### Special Issue Number 1

14

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Charles Don Flores, would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue Number 2

Do you find from the evidence beyond a reasonable doubt that the defendant,  Charles Don Flores, actually caused the death of the deceased, Elizabeth Black, or, if he did not actually cause her death, that he intended to kill Elizabeth Black or another, or anticipated that a human life would be taken?

Only if the jury has unanimously answered special issues 1 and 2 "yes" shall it proceed to answer special issue 3.

### Special Issue Number 3

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

CR at 152-154.[9]    In addition, in its "Closing Instructions" the jury charge instructed that "if you are unable to answer any special issue with the required number of jurors agreeing and concurring, your foreman shall notify the court in writing." CR at 150.[10]

---

[9]      These instructions and special issue questions track the statutory language under Texas Code of Criminal Procedure Article 37.071 section 2.

[10]      Although the jury is not informed of this, under Texas law,  should the jury disagree on any of the special issues, a life sentence would be imposed.  Tex. Code of Crim. Proc. Art. 37.071 § 2(g).

The plain language in Flores's instruction makes clear that jurors need not unanimously agree with respect to a particular mitigating circumstance before it can recommend life, nor does it preclude the jury from considering any existing mitigating circumstance.   Moreover, because the instructions make clear that death cannot be imposed unless there is a unanimous negative finding with respect to mitigation, they guarantee that there is simply no possibility a single juror can block a life sentence and require death.   And there is nothing in the record that suggests the jurors were confused by the language of the mitigation instruction. The record reflects no notification from the jurors indicating they were unable to agree; and the record reflects that the jury returned findings favorable to the State within two hours. CR 8.

Indeed, the state habeas trial court entered findings of fact specifically finding that the result with which the *Mills* Court was concerned was not possible:

> the Texas scheme allows a single juror to give effect to mitigating evidence by voting "no" on any special issue.    . . . Moreover, the special issues in Article 37.071 broadly define the jury's role in the sentencing process rather than arbitrarily focusing the jury's attention on certain types of evidence. Thus the jury cannot be prevented from considering mitigating evidence by the act of one or two jurors who feel that a particular piece of evidence is not mitigating.   The jurors need not agree on what evidence is mitigating; rather, ten of the twelve jurors could each find

16

> something mitigating, independently of every other juror, and
> return a life sentence.  Most importantly, one or two jurors cannot
> skew the special issue process such that a death sentence is
> imposed.

SHCR at 701 (finding no. 40).  As these findings of fact have gone un-rebutted,

they are entitled to a presumption of correctness.  28 U.S.C. § 2254 (e)(1).

Relying on these findings of fact, the state habeas trial court concluded that

"unlike the facts in *Maryland v. Mills*, no single juror could impose a death

sentence in this case and that, therefore Texas' 12/10 rule did not violate

Applicant's rights under the Eighth and Fourteenth Amendments." SHCR at

701.

The state habeas trial court's conclusion is not an unreasonable

application of clearly established federal law.  Indeed, both the Fifth Circuit and

the Texas Court of Criminal Appeals have previously agreed with the trial

court's assessment under similar mitigation instructions given under the same

Texas death scheme.  *See, e.g., Miller v. Johnson*, 200 F.3d 274, 288-290 (5th

Cir. 2000)("This court has explained that *Mills* is not applicable to the capital

sentencing scheme in Texas.") *citing Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir.

1994); *Williams v. Texas*, 937 S.W. 2d 479, 490 (Tex. Crim. App. 1996); *Lawton

v. State,* 913 S.W.2d 542, 558 (Tex.Crim.App.1995), *overruled on other grounds*,

*Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998)("[U]nlike the

scheme[] in . . . *Mills,* Article 37.071 does not require the unanimous agreement

of the jury to give effect to mitigating circumstances.") "To the contrary, in [Texas's] capital punishment scheme, a single juror who believes that mitigating circumstances exist effectuates his belief by answering Article 37.071 § 2(e) affirmatively." *Lawton,* 913 S.W.2d at 558. "If the jury is hung eleven to one, the defendant will be sentenced to life imprisonment. Article 37.071 § 2(f)." *Id.* In fact, the Fifth Circuit has specifically "concluded that under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Miller,* 200 F.3d at 289.

Flores does not acknowledge this prior precedent, much less distinguish it. Consequently, he cannot demonstrate that the state court's rejection of his claim under these circumstances was incorrect or unreasonable. Accordingly, this claim is wholly without merit.

### B.    Flores's claim that jurors were "misled" by the jury instruction is likewise procedurally barred and  without merit.

Flores next contends that because Texas law prohibits informing jurors that disagreement on punishment will result in a life sentence, jurors are "misled" into believing that a life sentence requires ten votes in violation of the Eighth Amendment and his right to due process.   Petition at 14-21; *see also* Tex. Code of Crim. Proc.  Art. 37.071 § 2 (a)(1) (". . . The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform

18

a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e).").  This claim likewise should be rejected as procedurally barred and without merit.

> **1.** **The state court relied on its *Gardner* rule to reject this claim rendering it procedurally defaulted.**

For the same reasons that the *Mills* claim is procedurally barred, so too is this one. Flores did not raise this claim in his direct appeal, but could have.  The state court rejected the claim in Flores's state habeas proceeding by relying on the *Gardner* rule. SHCR at 698-699 (findings 31-33).  As this claim was rejected on procedural grounds in the state court, it likewise should be denied on procedural grounds here.[11]  *Coleman*, 501 U.S at 729-730.

> **2.** **Additionally, this claim should be denied on the merits because it is foreclosed by clearly established federal law, and habeas relief would be *Teague*-barred.**

---

[11]   Any allegation that Flores could overcome this procedural bar on the basis of ineffective  appellate counsel is foreclosed.  Flores acknowledges that the Court of Criminal Appeals has repeatedly rejected this argument. Petition at 15.  Flores cites *Francois v. Texas*, 2006 WL 2615306 at * 1, n. 15 (Tex. Crim. App. 2006); *Escamilla v. Texas*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Rosseau v. Texas*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *see also Lawton v. Texas*, 913 S.W.2d at 559 ("[A]ppellant's argument that jurors will be misled lacks merit; every juror knows that capital punishment cannot be imposed without the unanimous agreement of the jury on all three special issues. The jury is not informed of the consequences of a hung jury, but each juror will know that without his or her vote the death sentence cannot be imposed."). Moreover, in addition to the points previously raised in footnote 8, as discussed below, there is no federal precedent supporting Flores's additional jury instruction argument. Hence, raising this claim on direct appeal would have been frivolous.

Flores fails to identify any Supreme Court precedent holding that the Constitution mandates that the jury be informed of the consequences of a deadlock in a death penalty case. While Flores points to numerous Supreme Court cases that he says stand for the proposition that the Constitution requires a "heightened assurance" in death penalty cases, Petition at 15-21, none of them support his claim that his jury should have been told that failure to agree on punishment would result in a life sentence. To the contrary, clearly established federal law holds otherwise.

In *Jones v. United States*, a death penalty case, the Supreme Court rejected the defendant's contention that he was entitled to a jury instruction that informed the jury that the trial judge would impose a life sentence without parole if the jury could not reach a punishment verdict. 527 U.S. 373, 381 (1999). The Court said:

> In no way, however, was the jury affirmatively misled by the District Court's refusal to give petitioner's proposed instruction. The truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role---when deliberations break down and the jury is unable to produce a unanimous sentence recommendation.

*Id.* at 382. The Court specifically observed that Jones's contention that the Eighth Amendment required the jury be given "any bit of information that might possibly influence an individual juror's voting behavior" had "no merit." Id.

20

Rather, the Court held that the trial court correctly refused to tell the jury the consequences of a deadlock because such a refusal serves the Government's "strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'" *Id.* (citations omitted). It opined that providing the jurors with the defendant's proposed instruction "might well have the effect of undermining this strong governmental interest" because " it would have been an open invitation for the jury to avoid its responsibility and to disagree." *Id.*

As Flores fails to point to any Supreme Court authority that overrules *Jones*, his claim must fail. *See Jackson v. Dretke*, 181 Fed.Appx. 400, 412 (5th Cir. 2006)(denying COA on same issue on the basis of *Jones*). In addition, to the extent that Flores seeks a new rule that would require such an instruction, federal habeas relief would be unavailable under *Teague v. Lane*, 489 U.S. 288, 316 (1989).

C.   **Flores's claim that the State is required to prove the absence of mitigating circumstances beyond a reasonable doubt is unexhausted, procedurally barred, without merit, and *Teague* barred.**

Next, relying primarily on *Apprendi v. New Jersey*[12] and *Ring v. Arizona*,[13]

---

[12]     530 U.S. 466 (2000).

[13]     536 U.S. 584 (2002).

Flores argues that the Texas mitigation special issue is unconstitutional because it does not require the prosecution to prove the nonexistence of mitigating factors beyond a reasonable doubt. Petition at 21-28. This claim should be rejected as unexhausted and procedurally barred. Alternatively, it is foreclosed by circuit precedent and should, therefore, be denied on the merits. *See* 28 U.S.C. § 2254(b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the state courts.").

1. **Flores failed to present this claim to the state courts for review and cannot now return to exhaust without running afoul of Texas's abuse of the writ doctrine.**

In order to satisfy the exhaustion requirement under 28 U.S. § 2254 (b)(1), a claim must be presented to the highest court of the state for review. *Deters v. Collins,* 985 F.2d 789, 795 (5th Cir. 1993); *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). For purposes of exhaustion, the Texas Court of Criminal Appeals is the highest court in the state which has jurisdiction to review a petitioner's conviction. Tex. Code Crim. Proc. Ann. art. 44.45 (Vernon Supp. 1996); *Richardson*, 762 F.2d at 431.

Furthermore, even though a claim has not been reviewed by the state courts, this court may find that claim to be procedurally barred. *Coleman*, 501 U.S. at 735 n.1; *Harris v. Reed*, 489 U.S. 255, 269-270 (1989). The normal rule

22

precludes federal review only where a state court applies a procedural bar explicitly. This normal rule does not apply to cases where even though a petitioner has failed to exhaust his state court remedies, the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. *Id.* In such cases, federal habeas corpus review is precluded by the federal procedural default doctrine. *Id.*; *see also Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred); *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997) (same).

Flores did not raise this claim in either his direct appeal or in his state habeas application. If Flores were to return to state court to try to exhaust this claim, his second state habeas application would be considered successive under Texas Code of Criminal Procedure Art. 11.071 section 5(a). Were Flores to file a successive habeas petition in the Texas state courts, that section would prohibit a Texas court from considering the successive petition on the merits, unless it met certain exceptions, which Flores does not attempt to meet here. Accordingly, this claim should be rejected as unexhausted and procedurally barred from review.

    **2.    Alternatively, this claim is foreclosed by circuit precedent and should be denied on the merits.**

There is no Supreme Court authority requiring the State to prove beyond a reasonable doubt the lack of mitigating circumstances.  *Rowell v. Dretke* 398 F.3d 370, 379 (5th Cir. 2005).   Indeed, the Fifth Circuit has previously considered and rejected Flores's exact argument:

> We have specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances. In *Granados v. Quarterman*,[14] we stated that "the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death," and we concluded that "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.

*Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir. 2007)(footnote added).

In addition,  even if Flores was somehow able to convince a federal court to impose such a requirement on the State, it would constitute a new rule, which would foreclose federal habeas relief under *Teague*.  *Rowell* at 379.  For these reasons, this claim should be denied on the merits.  28 U.S.C. § 2254 (b)(2).

> **D.**   **Flores's claims that the mitigation instructions permitted the jury to sentence him in "an excessively vague, arbitrary, and capricious manner" and that the trial court failed to "properly" define mitigation, are likewise unexhausted, procedurally barred, without merit, and *Teague*-barred.**

Flores contends that the combined effect of the three previous allegations

---

[14]     455 F.3d 529, 536-537 (5th Cir. 2006).

of jury instruction error is that the jury assessed his punishment in an "arbitrary and capricious manner." Petition at 29. He also claims that the instructions failed to "properly" define "mitigation." *Id.* For the same reasons Flores's prior claim is unexhausted and procedurally barred from review, so too are these claims.

Flores never raised these claims in either his direct appeal or state habeas proceeding, but could have. Consequently, they too should be denied as unexhausted and procedurally defaulted. *Harris,* 489 U.S. at 269-270; *Nobles,*127 F.3d at423. Alternatively, these claims are foreclosed by circuit precedent and without merit, and therefore should be denied on its merits. 28 U.S.C. § 2254(b)(2).

With respect to the combined effect of the previous three claims of jury instruction error, Respondent re-urges his arguments made above. With respect to the claim that the jury instructions "improperly" defined mitigation, Flores specifically alleges that there are "numerous types of constitutionally relevant mitigating evidence" that " have nothing to do with a capital defendant's moral culpability or blameworthiness--such as a history of positive character traits, kindness shown toward children, or artistic talent." Petition at 30-31. He claims that because the "judge and prosecutor limited [their] discussion of mitigation to negative factors," the jury faced an "impediment" to giving full consideration

25

and effect to his mitigating evidence. *Id.* at 30-31.

The record, however, does not support Flores's claim. The mitigation special issue in this case asked:

> Taking into consideration *all of the evidence*, including the circumstances of the offense, *the defendant's character and background*, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

CR 154.[15]

This instruction tracks the language contained in the Texas statute, which has been previously approved by the Fifth Circuit. *See Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)("Likewise, our reading of the statute leads us to

---

[15] The trial judge explained this instruction to the voir dire panel in the following way: "But if the answer is yes, then you do proceed to the third one, and that is whether taking into account all the evidence, including the circumstances of the offense, the Defendant's character and background, person- --let's see, personal moral culpability. That means blamability of the Defendant. Is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? Even if you think the first two are true, but you think the last one, maybe there's hope for the guy, you know, that there's no---there is mitigating evidence, and the jurors, the 12 maybe that say that there's mitigating evidence, could all have a different view of what that mitigating evidence was. One may think that the accused was mistreated as a child. The other one may say there's mitigating evidence because he was partly mentally retarded, and another might think because he had a wooden leg. You know, all of you could have a different view of it. But as long as you agree there is mitigating evidence, then. . . he would not be [sentenced to death]." 5 RR 17-18. The judge gave another explanation later in which he refers to acts "of kindness and charity and love." 33 RR 32-33.

conclude that the amended statute does not unconstitutionally 'preclude[ ] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death'") (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

Indeed the Supreme Court itself has suggested that the special mitigation question given in Flores's case is constitutionally sufficient:

> A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*Penry v. Johnson,* 532 U.S. 782, 803 (2001).

Faced with the knowledge that this instruction would be given, Flores's attorneys were permitted both at voir dire and during their punishment case to present any argument and/or any evidence regarding Flores positive character traits---including kindness shown toward children or artistic talent. That the judge and prosecutor did not discuss positive traits of Flores or otherwise, does not mean that Flores was prevented from discussing or raising

27

these traits himself, nor was there any  impediment preventing the jury from

considering his positive mitigation evidence, if he chose to present any.

Clearly, the jury charge here did not instruct the jury that mitigating

evidence was *limited* to the negative factors Flores identifies in his petition

"such as physical abuse, retardation and substance abuse issues." Petition at

31.  Flores suggests, however, that the jury charge should have nevertheless

instructed the jury that "mitigation" included evidence of positive traits.  The

Supreme Court, however, has not held that such an instruction is required.

Indeed the Court has held quite the opposite:

> Once the jury finds that the defendant falls within the legislatively
> defined category of persons eligible for the death penalty, ... the
> jury then is free to consider a myriad of factors to determine
> whether death is the appropriate punishment. Indeed, the
> sentencer may be given *unbridled discretion* in determining
> whether the death penalty should be imposed after it has found
> that the defendant is a member of the class made eligible for that
> penalty.

*Tuilaepa v. California*, 512 U.S. 967, 979 (1994)(emphasis added, internal quotes

and citations omitted); *see also Buchanan v. Angelone*, 522 U.S. 269, 276-77

(1998)("[W]e have never . . . held that the state must affirmatively structure in

a particular way the manner in which juries consider mitigating evidence. And

indeed, our decisions suggest that complete jury discretion is constitutionally

permissible."). Indeed, in *Penry II*, the Supreme Court nodded approvingly at the

28

"brevity and clarity" of the current mitigation instruction. 532 U.S. at 803.

Additional instructions giving the jury more detailed instructions and/or a laundry list of examples of the types of mitigation evidence it can, or should, consider would create a high risk of confusion and potentially limit the types of evidence a jury would consider. *See, e.g. Mills*. Texas has determined it wants the jury to have "unbridled discretion" when considering mitigation evidence in the context of a capital sentence decision,  which the Supreme Court has never said is constitutionally impermissible.  All that the Constitution requires is that the jury be permitted to give full consideration and effect to any mitigating evidence.  *See Smith v. Quarterman,* 515 F.3d 392, 409 (5th Cir. 2008)("The touchstone of the Court's *Penry* jurisprudence is that jurors be able to give meaningful effect to all a capital defendant's mitigating evidence in the penalty phase.").

There is no evidence in this record that the jury was prevented from doing so here either by the mitigation special issue instruction or the statements by the judge or prosecutor.  Hence this claim is without merit.  In addition,  to the extent that Flores seeks a new rule that would require a more detailed instruction on what constitute's "mitigation," federal habeas relief would be unavailable under *Teague*. 489 U.S. at 316 .

29

II.   **Flores fails to demonstrate that the state court's rejection of his** *Brady* **claim is contrary to clearly established federal law or based on an unreasonable determination of the facts.**

Flores alleges that the State violated *Brady v. Maryland* by withholding evidence he claims he could have used to impeach the state's forensic expert, Charles Linch.  Petition at 32-44.  At trial Linch testified that he found starch grains, consistent with those from a potato,  inside the barrel of a gun recovered from codefendant, Richard Childs. 36 RR 211.[16]  Potato fragments were found all over the crime scene and police suspected that the potatoes had been used as silencers. 35 RR 192, 199, 243-44.  Childs' gun was not the murder weapon, but the State argued it was used to kill a dog during the offense. 36 RR 148-50, 210.

Before trial, Flores filed an omnibus pretrial motion in which he requested "disclosure of any and all exculpatory and/or mitigatory evidence or evidence favorable to the defendant in any way which the prosecution or any law enforcement agency may have in its possession. . .  ." CR 11.  According to Flores, the State was aware at the time of his 1999 trial that Linch had been hospitalized in a mental institution in 1994 and that Linch "had a history of chronic depression, alcohol dependence and employment problems that weighed heavily on his credibility and reliability as an expert witness," but failed to

---

[16]    "RR" refers to the reporter's record in Flores's trial court proceedings, preceded by the volume number and followed by the page number.

disclose this information to him. Petition at 40.

In the state habeas proceeding, the prosecutors denied knowing anything about the hospitalization, or Linch's mental health problems or alcoholism. SHCR at 324-325, 327-328. In addition, defense counsel submitted an affidavit stating that Linch's testimony "was not one crucial to the State's case against Mr. Flores" because the defense "did not dispute that potatoes had been used as silencers or that there was potato splatter all over the crime scene . . . nor did [they] have any reason to believe [Linch's testimony] was inaccurate." *Id.* at 331. A second defense attorney submitted an affidavit asserting that "[t]he testimony of Charles Linch was not unanticipated and was not crucial to the State's case." *Id.* at 320.

## A.  Clearly established federal law as stated in *Brady v. Maryland*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  The duty to disclose extends to evidence that may be used for impeachment.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).

However, even if a prosecutor violates this duty and suppresses evidence, suppression will not justify setting aside a conviction unless the evidence was

31

material. *See id.* at 678 ("suppression of evidence amounts to a constitutional violation only if it deprives the defendant a fair trial"). Evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Moreover, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir. 1996). Indeed, the State "has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence. Nor is the State obligated under *Brady* to disclose evidence that is available from other sources." *Rector v. Johnson* 120 F.3d 551, 558-559 (5th Cir. 1997)(internal citations omitted).

### B.   The state court entered detailed findings of fact supporting its rejection of Flores's *Brady* claim.

**1. Suppression**. The state habeas trial court entered findings of fact supporting its conclusion that the State did not suppress the information. The state court first explained it read and considered the affidavits of both

32

prosecutors and found both prosecutors to be "credible witness[es]" and "accept[ed]" their statements as "true and correct." SHCR 745-746 (finding 216-217). Based on the prosecutor's affidavits, the state habeas court found that the prosecutors "did not have actual knowledge of Linch's prior treatment for mental illness." *Id.* at 746 (finding 218).

The state habeas court further found that knowledge of Linch's prior mental illness treatment could not be imputed to the State. The court determined that Flores "had not presented any evidence" that the Southwest Institute for Forensic Science ("SWIFS"), for whom Linch worked at the time of his testimony, "functions as law enforcement personnel" or that its services were available only to the State. *Id.* (finding 220). Consequently, the prosecutors could not be "imputed with knowledge of Linch's mental health history. . . " *Id.* at 747 (finding 221). [17]

**2. Favorability.** The state court also entered findings of fact supporting its conclusion that the information was not favorable to Flores. The state court determined Linch's mental health history was "not exculpatory because it does not justify, excuse or clear [Flores] from guilt." *Id.* at 748 (finding 226). The state court also determined that the information was not impeaching because it

---

[17]     In the alternative, the state habeas court found that "[m]ental health information is privileged information under the law, therefore, knowledge of it cannot by law be imputed by the State." SHCR at 747 (finding 222).

did not relate to Linch's credibility. *Id.* at 749 (finding 229). The court based these conclusions on the fact that Flores did not present evidence that "Linch's laboratory results were unreliable due to his mental state or that he was incapacitated with depression and alcoholism" either at the time Linch performed the test or at the time he testified. *Id.* at 748 (finding 227-228).

Finally, the state habeas court determined that the information was "remote in time, irrelevant to Linch's credibility, and constitutionally privileged and protected from disclosure." *Id.* at 748 (finding 228).

**3. Materiality**. The state court next entered findings of fact supporting its conclusion that the information was not material. It found that "Linch's testimony was not vital to the State's case against [Flores] and was strongly corroborated by other evidence." *Id.* at 749 (finding 231).

**4. Equally Available**. Finally, the state habeas trial court entered findings of fact supporting its conclusion that the information was equally available to Flores if he had exercised reasonable diligence to obtain it. Specifically, the state court found that Linch's mental health history "was not in the exclusive control of the State," and was indeed, "ultimately discovered. . . by the local newspaper." *Id.* at 750 (finding 234). The state court further determined that defense counsel's statements that Linch's testimony was "not unanticipated" were credible and accepted as true. *Id.*

34

These findings of fact find ample support in the record and therefore entitled to a presumption of correctness.  28 U.S.C. § 2254 (e)(1).  Although Flores attempts to rebut these findings in his federal petition he does not do so clearly and convincingly.

C.   **Flores does not rebut the state court findings clearly and convincingly because his extra-record evidence is unexhausted; and/or it does not address all four dispositive state court findings, which are supported by the record.**

1.   **Flores's extra-record evidence is unexhausted and should be excluded from consideration in this proceeding.**

Flores attaches two exhibits in support of his claim in this federal proceeding, which were never produced in the state court proceeding. Respondent objects to these exhibits on the ground they were not presented to the state court and therefore, they are irrelevant to this Court's inquiry under 28 U.S.C. § 2254 (d)(1) and (d)(2).

Flores's exhibits include a three-part series of articles appearing in the Dallas Morning News on May 7, 2000, and May 10, 2000, revealing Linch's mental health history, and a transcript of a hearing in *Ex parte Blair*, Appl. No. 40, 719-02 occurring on November 27, 2006, in which Linch appeared as a witness.  PX (Petitioner's Exhibits) 1 and 2.  Neither exhibit was produced in the

state court proceeding.[18] Therefore, the state court was denied the opportunity
to review, consider, and attach factual findings to this evidence in the context of
Flores's factual circumstances in violation of the interests of comity and finality.
*See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992)(it is "irrational to distinguish
between failing to properly assert a federal claim in state court and failing in
state court to properly develop such a claim"); *see also id.* at 9 ("the state court
is the appropriate forum for resolution of factual issues in the first instance. . .").

Nevertheless, if Flores can show cause and prejudice for failing to present
this evidence in the state court proceeding, or that a fundamental miscarriage of
justice will result from failure to admit his evidence, this Court can rely on it. *See
Keeney,* 504 U.S. at 11-12; *Williams v. Taylor*, 529 U.S. 420, 435-437 (2000).
Here, the record does not provide support for any cause or prejudice argument.
Certainly there was no reason that the newspaper articles could not have been
presented to the state court.  They were undoubtedly available at the time of the
state court proceeding because they appeared in a public newspaper before Flores
filed his state application and because Flores referenced them in his state
application.  And although the transcript of Linch's testimony was not available,

---

[18]     When Flores raised his *Brady* claim in the state habeas proceeding, as
proof of his claim he referenced the three-part series of articles that appeared in the
Dallas Morning News on May 7 and 10, 2000.  SHCR at 94-95. Though Flores claimed
to have attached the articles to his state application, they do not appear in the state
habeas record. *Id.*  Hence, they appear for the first time here. PX 1.

Flores offers no explanation for why the testimony contained therein could not have been obtained by affidavit.

Though Flores sought an evidentiary hearing in the state court proceeding, he did not specifically allege that he could not obtain the evidence he seeks to introduce for the first time in this federal proceeding without a hearing. SHCR at 97. Indeed, in his state application, Flores claimed to have issued federal subpoenas for "the hospital records, doctors reports, and any other information concerning Linch's mental history, this commitment, or any prognosis . . . " SHCR at 95.[19] Thus, it seems Flores could have presented this evidence to the state court if he had been diligent. Because Flores was at fault for failing to develop the factual basis of his claim, and because he does not allege he is actually innocent, this court should not rely on the unexhausted exhibits here. *Keeney*, 504 U.S. at 5-11; *Williams*, 529 U.S. at 435-437.

2.   **Flores fails to show "the prosecution" suppressed evidence because he does not demonstrate that knowledge of privileged mental health history can be imputed to the prosecutors.**

Alternatively, even if this court determines this evidence can be properly considered, these exhibits only go toward "imputed" knowledge of the complained-of information to the prosecutors. Flores claims Linch's employer,

---

[19]   Likewise, no hospital records, doctors reports, and any other information were produced in the state court proceeding, nor have they been produced herein.

SWIFS, was "an agency of the State," Petition at 43, and that consequently, the prosecutors had access to, and constructive knowledge of, Linch's privileged mental health history.[20]   Flores's evidence and the cases on which Flores relies simply do not support his contentions .

"Before a *Brady* claim can arise, [Flores]  must show that the prosecution team had access to the evidence."   *Summers v. Dretke,* 431 F.3d 861, 874 (5th Cir. 2005).  Flores does not demonstrate with clear and convincing evidence that the prosecution team had any more access to private mental health records---which were held by a mental health facility---than he did.     Even if  Flores could somehow show that SWIFS was an organization gathering information on behalf of the State he still fails to show that Linch's mental health information was readily accessible to the prosecutors who tried him.

While it is true that "the prosecution" for *Brady* purposes encompasses more than the individual prosecutors trying the case, *see Strickler v. Greene*, 527 U.S. at 263, 281 (1999)("the individual prosecutor has a duty to learn of any

---

[20]  Flores also makes a secondary argument which is that knowledge should be imputed to the prosecutors that tried him because another assistant district attorney, Toby Shook, became aware of Linch's mental health problems "through a friend at Doctor's hospital" at some unspecified time. Petition at 43.  This argument, however, is even less valid because under these facts, even if true, Shook did not become aware of Linch's mental health problems by virtue of the State's relationship with SWIFs  or because of Shook's status as a prosecutor. This argument only serves to further support the Respondent's argument that this information was not solely accessible by the State.

favorable evidence known to others acting on the government's behalf"), "there are limits on the imputation of knowledge from one arm of the government to prosecutors." *U.S. v. Webster*, 392 F.3d 787, 798, n.20 (5th Cir. 2004). "'The prosecution is deemed to have knowledge of information *readily available to it. . . .'" *Id.* (emphasis in original)(quoting *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991).).

Here, Flores makes no showing that the prosecutors had readily available to them privileged information about Linch's remote mental health history. Indeed, the state court entered findings of fact expressly finding that this information was protected from disclosure under state and federal law and not subject to the *Brady* disclosure rule.  SHCR at 747 (finding 222). [21] Nor does Flores point to any Supreme Court or circuit precedent holding that the prosecutors have a duty to investigate privileged mental health information of its witnesses.

Rather, the cases on which Flores relies concern information actually discovered by **police** during their investigation of the crime. *See Strickler*, 527 at 273( *Brady* claim consisted of undisclosed notes taken by **police detective** during his interviews of state's witnesses which would cast doubt on the accuracy

---

[21]    The state court relied in part on *Tarrant Hospital v. Hughes*, 734 S.W.2d 675, 679 (Tex. App.--Fort Worth 1987) and *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995).  SHCR at 747.

of their memories); *Kyles*, 514 U.S. at 428-429 (*Brady* claim consisted of undisclosed evidence obtained by **police investigators** including eyewitness statements, internal police memorandum, and evidence linking a state's witness to other crimes.)   While these cases stand for the general proposition that the prosecutor can be imputed with knowledge of information known to investigating **police officers** about the investigation of the crime itself, they do not support Flores's contention that Linch's knowledge of his own mental heath history, which has nothing to do with investigating the crime,  can  be imputed to the prosecutors in this case.

As Flores does not show that clearly established federal supports his contention, the state court was not unreasonable in rejecting it.

### 3.    Flores's contention that Linch's mental health history is material is not supported by the purpose behind *Brady* or federal precedent.

Even assuming, without conceding,  that Flores can show that knowledge of Linch's mental health history should be imputed to the prosecutors and they had more access to privileged health records than he did, Flores still falls short of demonstrating his *Brady* claim.   Two  other  adverse factual findings by the state court, namely  non-favorability and  immateriality,  are dipositive of his claim and they have gone unrebutted.

"[T]he Constitution is not violated every time the government fails or

chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436-437 (1995).  While the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf[,]. . ." the State will only suffer reversal of a conviction due to the prosecutors failure to meet this obligation if the undisclosed evidence "ris[es] to a material level of importance." *Id.* at 437-438.

Indeed, the materiality requirement in *Brady* recognizes  that "not every violation of [the prosecution's duty of disclosure] necessarily establishes that the outcome was unjust." *Strickler v. Greene*, 527 U.S. 263, 281(1999).  In *Agurs*, Justice Marshall explained:

> One of the most basic elements of fairness in a criminal trial is that available evidence tending to show innocence, as well as that tending to show guilt, be fully aired before the jury; more particularly, it is that the State in its zeal to convict a defendant not suppress evidence that might exonerate him. (citation omitted) . . . No interest of the State is served, and no duty of the prosecutor advanced, by the suppression of evidence favorable to the defendant. On the contrary, the prosecutor fulfills his most basic responsibility when he fully airs all the *relevant* evidence at his command.

*United States v. Agurs,* 427 U.S. 97, 116 (1976) (Marshall, J., dissenting)(emphasis added). Flores makes no showing that Linch's mental health history had anything to do with Flores's innocence or that any "relevant" evidence was withheld from him.

Flores does not show that Linch's personal credibility was crucial to the State's case, nor does he show that Linch's testing procedures were flawed or that the test result was incorrect. Linch's testimony consists of a mere seven pages, which includes the cross-examination by the defense, in a 48-volume record. 36 RR 209-215. Linch was not an eye-witness to the crime. Rather, Linch was there to testify about an objective lab result--a lab result that was not disputed at trial and remains undisputed on collateral review.

Indeed, defense counsel Bradley Lollar's affidavit forecloses any possibility that Flores could have shown Linch's lab result was incorrect. Lollar said that Linch's testimony regarding the starch grains on Childs's gun "merely confirmed" what Flores told his attorneys, i.e that "he and [Childs] had gone to the house to do the burglary and had armed themselves with potato-laden guns in order to quietly shoot the doberman dog they expected to find there." SHCR at 320. In addition, there was plenty of other evidence to support the conclusion that Childs was at the scene of the crime with a gun.[22]

Moreover, while the prosecutors were duty-bound to disclose any evidence

---

[22]    *See* 34 RR 144,153 (testimony of Jackie Roberts who saw Flores and Childs, who both carried weapons, traveling in the Volkswagen one hour before the murder); 36 RR 289 (testimony of Jill Bargainer, the Blacks neighbor, who positively identified Childs as entering the Black home at the time of the murder); 34 RR 246 (testimony of Doug Roberts indicating that Childs drove a pink and purple Volkswagen and that he told police Childs had murdered the victim).

to which they had access and was within the sole custody of the State, rendering Linch's test result incorrect or suspect, Flores fails to show how Linchs's hospitalization four years before he conducted the test in this case could have possibility affected the test result.  Likewise, Flores offers no evidence that even suggests  Linch was in the habit of drinking alcohol at the time he conducted his tests.  His evidence actually demonstrates that Linch did *not* drink while he was "work[ing] a big case." PX 2 at 42.

Consequently, Flores cannot show that the hospitalization or any history of alcohol abuse by Linch was relevant, much less material to his case.  As this information was irrelevant, it was inadmissible. Tex. R. Evid. 402.  Indeed, the state habeas trial court specifically found this information was "irrelevant" to the case.  SHCR at 748 (finding 228).  Information that is not admissible at trial is not "evidence" at all and therefore cannot be material for *Brady* purposes. *See Wood v. Bartholomew,* 516 U.S. 1, 6 (1995)(holding that failure to disclose polygraph results "could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses.").

In sum, as Flores fails to overcome the presumption of correctness afforded to the state court findings of fact, he fails to show the state court's rejection of his prosecutorial misconduct claim was based on an unreasonable determination

43

of the facts in light of the evidence presented   Nor does he show it was contrary to, or an unreasonable application of, clearly established federal law it. Accordingly, this claim should be denied.

III.   **Flores's Claim that the Admission of Bargainer's In-court Identification Violated His Rights to Confront his Accusers and to a Fair Trial are Either Unexhausted, Procedurally Barred, Without Merit, and/or Harmless.**

Next, Flores alleges that a "hypnosis interview"of Jill Bargainer, conducted by the police during its investigation, "improperly cement[ed]" Bargainer's  subsequent ability to identify Flores in court as the passenger of a vehicle she saw at the Black's residence around the time of the murder.  Petition at 44-48, 47.  Flores complains that Bargainer's in-court identification should have been excluded by the trial court because it was tainted by an "unduly suggestive" hypnosis session.  Petition at 48.   He raises both a due process and a confrontation challenge.  This claim should be denied because it is partly unexhausted, procedurally barred, inadequately briefed and without merit.

A.   **The confrontation claim is unexhausted,  procedurally barred, and inadequately briefed.**

To the extent that Flores alleges his right to confrontation under the Sixth Amendment was violated by the admission of Bargainer's in-court identification, his claim is unexhausted and procedurally barred from review.  Although Flores

complained about the admission of Bargainer's testimony in both his direct appeal and in his state habeas proceeding, he never alleged it violated his right to confrontation.

In his direct appeal, Flores complained the trial court erred when it admitted the testimony because it failed to comply with the state procedure as set out in *Zani v. State*, 758 S.W.2d 233 (Tex. Crim. App. 1990). *Flores v. State*, Appellant's Brief at 63-71. In his state habeas application, Flores complained that the admission of Bargainer's testimony violated only his right to a fair trial under the Fourteenth Amendment. SHCR 77-85. As Flores never presented this claim in the state courts as a confrontation challenge, but could have, it should be dismissed as unexhausted and procedurally barred. *Harris,* 489 U.S. at 269-270; *Nobles,* 127 F.3d at 423.

In addition, Flores fails to brief the confrontation claim in his federal petition. Petition at 47-48. Consequently, there is no confrontation argument to which Respondent can reasonably respond. It should, therefore, be deemed waived.

**B.      Because the trial court meticulously adhered to the state's procedural guidelines in finding Bargainer's testimony admissible, Flores cannot show a due process violation.**

Texas law does not hold that post-hypnotic testimony is *per se* unreliable

or inadmissible in every case. *Zani v. State*, 758 S.W.2d 233, 243 (Tex. Crim. App.,1988); *State v. Medrano*, 127 S.W.3d 781, 783 (Tex. Crim. App. 2004). Texas courts do recognize, however, that the "uncertainties inherent in posthypnotic testimony" *may* render such testimony untrustworthy. *Zani* at 243. Consequently, Texas law requires the proponent of such testimony to "demonstrate to the satisfaction of the trial court, outside the jury's presence, by clear and convincing evidence, that such testimony is trustworthy." *Id.* To ensure that the admission of such testimony comports with fundamental fairness, the Texas trial courts are required to follow the procedural guidelines set out in *Zani*.[23]

---

[23]        In *Zani*, the court instituted procedural safeguards to protect against "the four-prong dangers of hypnosis: hypersuggestibility, loss of critical judgment, confabulation, and memory cementing." *Zani,* 758 S.W.2d at 244 (internal quotations omitted). The court adopted a non-exclusive list of factors that a trial court can consider when deciding whether hypnotically enhanced testimony is admissible in a given case. *Id.* The factors adopted in *Zani* were: "the level of training in the clinical uses and forensic applications of hypnosis by the person performing the hypnosis; the hypnotist's independence from law enforcement investigators, prosecution, and defense; the existence of a record of any information given or known by the hypnotist concerning the case prior to the hypnosis session; the existence of a written or recorded account of the facts as the hypnosis subject remembers them prior to undergoing hypnosis; the creation of recordings of all contacts between the hypnotist and the subject; the presence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as the location of the session; the appropriateness of the induction and memory retrieval techniques used; the appropriateness of using hypnosis for the kind of memory loss involved; and the existence of any evidence to corroborate the hypnotically-enhanced testimony." *State v. Medrano*, 127 S.W.3d 781, 783 (Tex. Crim. App. 2004).

The following facts were undisputed by Flores at the *Zani* hearing. Jill Bargainer, the Blacks' neighbor, was a witness for the State. 35 RR 152. During the investigation of the murder, Bargainer told police she saw two men drive to the victim's home in a purple, pink and yellow Volkswagen on the morning of the murder. *Id.* 154-162. Before hypnosis, she identified Childs as the driver of the Volkswagen from a photographic lineup and she gave a description of the passenger. *Id.* at 154-155. She stated the passenger had "dark hair, dark eyes, medium build." 36 RR 102.   Before the hypnosis session, Bargainer was not shown a photographic lineup that included Flores, and police were unaware at the time of the hypnosis session that Flores was a suspect.  36 RR 14.

After the hypnosis session, Bargainer said the passenger had "brown eyes."  36 RR 15. Bargainer was later shown a photographic lineup which contained an old photograph of Flores, but she was unable to identify him as the passenger.  *Id.* While viewing Flores in person at trial, however, and before she testified, Bargainer told the prosecutor that she could positively identify Flores as the passenger in the Volkswagen.  *Id.*  Flores objected to the admissibility of this testimony.  The trial court conducted a *Zani* hearing outside the presence of the jury to determine whether Bargainer's post- hypnotic in-court identification was admissible.

Following the hearing, the trial court entered detailed findings of fact

supporting its conclusion that the testimony was admissible, and allowed it.  36 RR 117-118, 283-85.   In addition, the trial court gave the jury written instructions to disregard Bargainer's  in-court identification and "not consider it for any purpose whatsoever"  if the jury  believed the in-court identification was the product of "a false memory or the result of suggestion or any improper influence, whether intentional or unintentional, arising from her having been hypnotized, if she was hypnotized, which rendered her in-court identification of the defendant untrustworthy . . .  ." CR  at 134-135.

On appeal, the state court found that the "procedures utilized by the trial court in this cause substantially conformed with those set out in *Zani*, and that it did not abuse its discretion in allowing the testimony." *Flores v. State*, slip op. at 23.   On state habeas, relying only on the record, Flores argued that "the totality of these circumstances does not satisfy the State's burden to prove the reliability of identification testimony by clear and convincing evidence." SHCR at 83. Thus, although Flores relied on federal cases[24] to support his argument,

---

[24]     Flores relied on *Mersh v. City of Dallas*, 207 F.3d 732 (5th Cir. 2000), and *Rock v. Arkansas*,483 U.S. 44 (1987).  SHCR 83-85.  Neither of these cases provide support for a viable constitutional claim, however, because neither of them hold that post-hypnotic testimony is inadmissible in every case, nor do they provide a constitutional standard for admissibility.  The *Rock* Court, for example, reversed a state conviction because the State's *per se* rule barring such testimony interfered with a defendant's right to testify.  And *Mersh*  applied the federal rules of civil procedure to a civil § 1983 proceeding.  Indeed, the *Rock* Court specifically observed that state courts "would be well within its powers if it established guidelines to aid trial courts

his complaint at bottom was that the state court misapplied its own law.   SHCR at 77-85.

Here, likewise, Flores does not contend that the *Zani* procedures were not utilized, i.e. he does not claim, nor can he, that no hearing was held outside the presence of the jury or that the trial court did not carefully consider and apply the factors delineated in *Zani.*   He merely disagrees with the conclusion reached by the state court.[25]   To the extent that Flores contends that the state court misapplied  its own law, his claim is uncognizable in this federal habeas proceeding.  *See Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995)("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law.").

--------

in the evaluation of post-hypnosis testimony. . ."  *Rock*, 483 U.S. at 61.

[25]  Specifically, Flores challenges three conclusions entered by the state habeas court: 1)  the hypnosis session was conducted properly; 2)  the identification was not tainted; 3) the identification was not the product of hypnosis. Petition at 47.  However, even this challenge is foreclosed because it is dependent on the unexhausted  affidavit of Dr. R. Edward Geiselman. In this federal proceeding Flores submits, for the first time, the affidavit of Dr. Geiselman, a psychologist, who opines that "the forensic hypnosis interview session might have caused and otherwise affected the in-court identification. . ." Pet.'s Ex. 3 at page 5.  As this affidavit is clearly unexhausted, Respondent objects to its use here. 28 U.S.C. § 2254 (b)(1); *Keeny.*  However, even if the court relies on this affidavit, it does not alter the result that is mandated in this case.  The state court's determination both at trial and on state habeas were not unreasonable given the record and the evidence before it. And Flores offers no justifiable excuse for not presenting this affidavit in the state habeas proceeding. Consequently, he cannot expand the record with Geiselman's affidavit.

Flores may argue that his claim is nevertheless viable because when there has been a violation of state procedure, the proper inquiry is to determine whether there has been a constitutional infraction of defendant's due process rights which would render the trial as a whole fundamentally unfair. *Manning v. Blackburn*, 786 F.2d 710, 711 -12 (5th Cir. 1986). However, as previously stated the state court never found that the state procedure under *Zani* was violated---which is a matter of state law that this Court cannot redetermine. Hence, Flores cannot make the threshold showing that would warrant further review of his due process claim.

Nevertheless, even if Flores could somehow show that there has been a violation of state procedure and that Bargainer's in-court identification was erroneously admitted, such error was harmless. The state court found that there was "ample corroboration of the fact that the Defendant was the passenger in the Volkswagen." 36 RR 118.[26] As this finding is supported by the record, it

---

[26] The prosecutor summarized the corroborating evidence at the *Zani* hearing. 36 RR 111-113. This evidence included: Jamie Dodge saw Flores and Childs in the Volkswagen a few hours before the murder and they told him they were going in the direction where the murder occurred, 34 RR 84,86; Jackie Roberts saw Flores and Childs, who both carried weapons, in the Volkswagen one hour before the murder, 34 RR 144,153; Homero Garcia and Jonathon Wait testified that Flores admitted being at the murder scene, 36 RR 220; 37 RR 85; Flores burned the Volkswagen following the murder. 36 RR 268. In addition, Michelle Babler another neighbor of the Blacks, testified that Flores's build, height and weight was similar to the passenger in the Volkswagen she saw go into the Black home on the morning of the murder. 35 RR 116

is entitled to a presumption of correctness. 28 U.S.C. § 2254 (e)(1).

Moreover, as previously mentioned, in an abundance of caution, the trial court gave a curative instruction to the jury, which the jury is presumed to have followed. *Zafiro v. U.S.,* 506 U.S. 534, 540-541 (1993). If the jury believed Bargainer's in-court identification was the product of being improperly hypnotized or was untrustworthy, the jury was free to disregard it. CR at 134-135. The state habeas trial court entered factual findings to this effect, which are entitled to a presumption of correctness. SHCR at 740 (findings 197-201). This curative instruction provides further support for the conclusion that the admission of this testimony was harmless under *Brecht v. Ambrahamson*, 507 U.S. 619, 638 (1993).

For these reasons, habeas relief should be denied on this claim.

## IV.    Flores's Claim that he Received Ineffective Assistance of Habeas Counsel is Unexhausted and Uncognizable.

Finally, Flores alleges he received ineffective assistance of habeas counsel during his civil post-conviction state habeas proceeding. Petition at 48-73. Flores has yet to present this claim to the state courts. Consequently, it is unexhausted. 28 U.S.C. § 2254 (b)(1); *Deters*, 985 F.3d at 795. In addition, this claim should be denied because it is uncognizable.

First, whether Flores received ineffective assistance of counsel during his

state habeas proceeding is irrelevant to whether his underlying conviction is valid. Even if it is true that counsel was ineffective during the state habeas proceeding, Flores would not be entitled to release from Respondent's custody because the resulting judgment denying his habeas petition is not the judgment that authorizes his confinement. As Flores's claim of ineffective assistance in this context does not affect the "fact or duration" of Flores's confinement, it is uncognizable in a federal habeas proceeding. *Cook v. Texas Dept. of Criminal Justice Transitional Planning Dept.*, 37 F.3d 166, 168 (5th Cir. 1994).

Second, the Supreme Court has long held that a criminal defendant does not have a federal constitutional right to counsel to pursue discretionary postconviction appeals. *Pennsylvania v. Finley,* 481 U.S. 551, 559 (1987). No right to counsel means no right to "effective" assistance of counsel. *Finley* at 559; *see also Coleman v. Thompson,* 501 U.S. 722, 725 (1991)(("Because there is no constitutional right to an attorney in state postconviction proceedings. . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.").

Though Flores has a statutory right to "competent counsel" under Texas Code of Criminal Procedure Article 11.071, Section 2(a), such a right is based on

state law,[27] not the Federal Constitution.  Hence, Flores could not have been

deprived *effective* assistance of counsel as contemplated by the Sixth

Amendment during his habeas proceeding.  *Wainwright v. Torina*, 455 U.S. 586,

587-88  (1982).

Although Flores contends that the principles of due process compel the

determination that a statutory right to counsel means that effective assistance

is guaranteed, the Supreme Court has specifically rejected the argument that

the Due Process Clause compels application of federal principles of effective

assistance to postconviction review.  *Finley,* 481 U.S. at 555-56 (*citing Ross v.

Moffit*, 417 U.S. 600 (1974)).  In *Finley*, the Court observed that "the fact that

the defendant has been afforded assistance of counsel in some form does not end

the inquiry for federal constitutional purposes." *Id.*  at 556.  Rather, "it is the

source of that right to a lawyer's assistance, combined with the nature of the

proceedings, that controls the constitutional question." *Id.*  Here, just like the

---

[27]        Moreover, according to the Court of Criminal Appeals, "[t]he words of the [11.071] statute themselves state that counsel shall be "competent" *at the time he is appointed*. The reference to "competent counsel" in both subsections (a) and (c) concerns habeas counsel's qualifications, experience, and abilities at the time of his appointment. All of *these provisions concern the initial appointment of counsel and continuity of representation rather than the final product of representation.*" *Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002) (emphasis added). Flores offers no evidence to show that state habeas counsel was incompetent at time of the appointment or that he subsequently became so during his state proceeding.  Rather, Flores's finds fault with the product of the representation, which, even under state law does not render counsel "incompetent" as contemplated by the state statute.

defendant in *Finley*, Flores's access to a lawyer in his state habeas proceeding, which is a civil proceeding, "is the result of the State's decision, not the command of the United States Constitution." *Id.*

Moreover, "when a State chooses to offer help to those seeking relief from convictions, the Federal Constitution [does not] dictate[s] the exact form such assistance must assume." *Id.* at 559. On the contrary, in the postconviction context, "States have substantial discretion to develop and implement programs to aid prisoners seeking to secure postconviction review" . . . and states are not required to adopt the "strict procedural guidelines" enunciated in federal cases applicable to a first appeal of right. *Id.*

The plain language in the state habeas statute provides for competent counsel, but it does not create a constitutional right to effective assistance of counsel. Tex. Code of Crim. Proc. Art. 11.071 § 2(a); *Ex parte Graves* ,70 S.W.3d at 110; *see also In re Goff*, 250 F.3d 273, 275-76 (5th Cir.2001) (Texas prisoner sentenced to death could not claim ineffective assistance of habeas counsel in successive habeas petition because he had no constitutional right to counsel on habeas review).

In sum, the Supreme Court has repeatedly held that the right to effective assistance of counsel under the Federal Constitution does not extend to postconviction proceedings, which are civil in nature and no longer considered

part of the criminal process, even where the state chooses to provide an attorney to the defendant.    Nor does the Due Process Clause mandate that one be inferred.   The Due Process Clause mandates only that the state procedures comport with "fundamental fairness." *Finley*, 481 U.S. at 556-57.

Here, there is no proof that the state habeas procedures themselves do not comport with fundamental fairness.  Because the Federal Constitution does not require representation by counsel at all in this context, it must follow that the state's choice to provide competent counsel goes *beyond* what is constitutionally mandated by the Due Process Clause. Flores would have the federal courts require that the state courts go even farther by mandating constitutional effectiveness.  But, the Supreme Court has made clear that the states are not required to do so. And the Texas Court of Criminal Appeals has held that counsel's assistance in this context is not subject to constitutional scrutiny.  For these reasons, this claim should be summarily dismissed.[28]

---

[28]      A remedy Flores seeks via his IAC in state habeas claim is  permission to return to state habeas court to pursue several "viable state habeas claims." Petition at 55, 73-89. These claims are: 1) a *Batson v. Kentucky,* 476 U.S. 79 (1986), claim; 2) IAC for trial counsel's failure to secure ruling on *Batson* challenge; 3) IAC for appellate counsel's failure to raise *Batson* claim on direct appeal; 4) IAC for appellate counsel's failure to raise IAC of trial counsel claim in direct appeal on *Batson* issue. *Id.* As Flores does not raise these claims as independent grounds on which he currently seeks federal habeas relief, Respondent did not address their merits herein. However, to the extent that Flores may rely on these claims as a basis for a stay and abatement under *Rhines v. Webber*, 544 U.S. 269 (2005), they cannot serve to delay this proceeding because they are admittedly unexhausted and procedurally defaulted, and therefore, "plainly meritless." *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir.  2005).

## CONCLUSION

For the reasons discussed above, Flores's request for federal habeas relief should be denied, his petition should be dismissed with prejudice, and a certificate of appealability should be denied.

Respectfully submitted,
GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ERIC J.  R.  NICHOLS
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division
/s/ Ana Marie  Jordan
 ANA MARIE JORDAN*

*Attorney in Charge        Assistant Attorney General

State Bar No. 00790748
P.O. Box 12548, Capitol Station
Austin, Texas   78711
(512) 936-1400/Fax No. (512) 936-1280
Email: Ana.Jordan@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that on August 1, 2008, I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court, Northern District of Texas, using the electronic case-filing system. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorney of record, who consented in writing to accept this Notice as service of this document by electronic means:

Bruce Anton

Sorrels, Udashen & Anton

2301 Cedar Springs, Suite 400

Dallas, Texas 75201

(214) 468-8100

(214) 468-8104 (Fax)

ba@sualaw.com

Mary Margaret Penrose

University of Oklahoma College of Law

300 Timberdell Road

Norman, Oklahoma

(405) 514-1811

(405) 325-0389 (Fax)

mpenrose@ou.edu

          /s/Ana Marie  Jordan_____

ANA MARIE JORDAN

Assistant Attorney General