IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES DON FLORES, | § | |
| | § | |
| Petitioner, | § | |
| | § | 3:07-CV-00413-M |
| v. | § | |
| | § | |
| RICK THALER, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

---

## PETITIONER'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
## FINDINGS AND RECOMMENDATIONS

---

Respectfully submitted,


_____/s/Bruce Anton_____
Bruce Anton
Texas State Bar No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax

ATTORNEY FOR PETITIONER

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... ii

INDEX OF AUTHORITIES.............................................................................................. iv

THE CRUEL IRONY OF THIS CASE............................................................................. 1

   I.     Flores' Trial .......................................................................................................... 2

   II.    Flores' Sentencing .............................................................................................. 7

   III.   Flores' Appeal..................................................................................................... 9

   IV.   Flores' State Writ............................................................................................... 10

   V.    Summary of Flores' Journey through the State Criminal Justice System ..................... 12

OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATIONS ........... 13

    Objection # 1 ............................................................................................................ 15

I.     The Magistrate Judge committed error by creating a rule that makes Petitioner's Sixth Amendment right to the effective assistance of trial and appellate counsel illusory. ................ 15

    Objection # 2 ............................................................................................................ 19

II.    The Magistrate Judge committed error when he erroneously found that Petitioner's Due Process claim alleging a protected right to counsel during state habeas proceedings was governed solely by *Pennsylvania v. Finley* and not the proper authority protecting state property rights, *Board of Regents of State College v. Roth.*...................................................... 19

    Objection # 3 ............................................................................................................ 22

III.   The Magistrate Judge committed error by finding that "[a]lthough petitioner has a statutory right under Texas law to be represented by 'competent counsel' on state habeas review, the performance of state habeas counsel is not judged by Sixth Amendment standards. 22

    Objection # 4 ............................................................................................................ 24

IV.   The Magistrate Judge committed error when he found that there is no constitutional right to the assistance of counsel during habeas proceedings, particularly where the first opportunity to present many substantive claims of Constitutional error is on habeas review and not direct appeal. ........................................................................................................... 24

    Objection # 5 ............................................................................................................ 31

V.    The Magistrate Judge committed error when he failed to evaluate or rule on Petitioner's claim that his Due Process rights were violated when the trial court failed to complete the *Batson* hearing as begun and required by *Batson v. Kentucky.* ................................................. 31

    Objection # 6 ............................................................................................................ 33

VI.   The Magistrate Judge erred by finding that there is no evidence the prosecution team knew or should have known about impeachment evidence regarding a key witness at the time

of trial and therefore, should have disclosed it pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). 33

    Objection # 7 ................................................................................................................ 34

VII.    The Magistrate Judge committed error by finding that Jill Bargainer's in-court identification of Flores allegedly made possible by a hypnosis session conducted by the police was admissible and by finding that Petitioner did not overcome the "presumption" that the habeas judge's legal conclusion and finding that he (also the trial judge) properly admitted the testimony at trial was correct. ................................................................................... 34

    Objection # 8 ................................................................................................................ 37

VIII.    The Magistrate Judge committed error by failing to consider the merits of Petitioner's claim that the "10-12 Rule" violated the Due Process Clause of the Fourteenth Amendment and Eighth Amendment's guarantee that procedural safeguards will be stringently followed before sentencing a defendant to death. ................................................................................... 37

    Objection # 9 ................................................................................................................ 43

IX.    The Magistrate Judge committed error by finding Petitioner's other claims involving the jury instructions on punishment to be "plainly meritless." ....................................................... 43

    Objection # 10 .............................................................................................................. 47

X.    The Magistrate Judge committed error by finding Petitioner's other claims involving the jury instructions on punishment to barred by *Teague* ............................................................. 47

CONCLUSION ............................................................................................................... 48

CERTIFICATE OF SERVICE ........................................................................................ 49

## INDEX OF AUTHORITIES

**Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ........................................................ 39

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ........................................................................... 39

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................................................... 43, 44

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ...................................................................... 39

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................................... 31, 32

*Beck v. Alabama*, 447 U.S. 625 (1980) ...................................................................... 40, 41

*Betts v. Brady*, 316 U.S. 455 (1942) ............................................................................. 42

*Board of Regents of State College v. Roth*, 408 U.S. 564 (1972 ................................ 20, 21

*Boyd v. California*, 494 U.S. 370 (1990) ....................................................................... 40

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................ 33

*Bullington v. Missouri*, 451 U.S. 430 (1981) ............................................................ 38, 40

*Burns v. Ohio*, 360 U.S. 252 (1959) .............................................................................. 23

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ............................................................ 40,41

*California v. Brown,* 479 U.S. 538 (1987) .................................................................. 45, 46

*California v. Ramos*, 463 U.S. 992 (1983) ..................................................................... 39

*Caperton v. A.T. Massey Coal Co.*, 129 S.Ct. 2252 (2009) ...................................... 35, 36

*Cofin v. United States*, 156 U.S. 432, 453 (1895) .......................................................... 43

*Coleman v. Thompson*, 501 U.S. 722 (1991) .......................................................... passim

*Daniels v. United States*, 532 U.S. 347 (2001) .............................................................. 25

*Darden v. Wainwright*, 477 U.S. 168 (1986) ............................................................. 41,42

*Donnelly  v. DeChristoforo*, 416 U.S. 637 (1974) ......................................................... 41

*Douglas v. California*, 372 U.S. 355 (1963) .................................................................. 22

*Duncan v. Louisiana*, 391 U.S. 145 (1968) ................................................................... 44

*Estelle v. McGuire*, 502 U.S. 62 (1991) ....................................................................... 40

*Estes v. Texas*, 381 U.S. 532 (1965) ............................................................................. 42

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................... 16, 22, 27, 28

*Ford v. Wainwright*, 477 U.S. 399 (1986) ..................................................................... 39

*Furman v. Georgia*, 408 U.S. 238 (1972) ...................................................................... 39

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................................................ 38, 39, 44

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ........................................ 1, 15, 26, 42

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ..................................................................... 39

*Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) ............................................................. 39

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................... 1, 40

*Griffin v. Illinois*, 351 U.S. 12 (1956) ........................................................................... 42

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936) .................................................. 15

*In re Winship*, 397 U.S. 358 (1970) .............................................................................. 44

*Jones v. United States*, 527 U.S. 373 (1999) ............................................................. 40, 44

*Lockett v. Ohio*, 438 U.S. 586 (1978) ........................................................................... 47

*Mapp v. Ohio*, 367 U.S. 643 (1961).................................................................................... 19

*McKoy v. North Carolina*, 494 U.S. 433 (1990)................................................................. 46

*Michael Williams v. Taylor*, 529 U.S. 420 (2000) ........................................................... 29

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ...................................................................... 29

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .................................................................... 29, 32

*Mills v. Maryland*, 486 U.S. 367 (1988) ........................................................................... 46

*Murray v. Giarratano*, 492 U.S. 1 (1989)......................................................... 23, 25, 26, 28

*Oldham v. State*, 977 S.W.2d 354  (Tex.Crim.App. 1998)................................................ 17

*Padilla v. Kentucky*,130 S. Ct. 1473 (2009) .................................................................... 29

*Panetti v. Quaterman*, 551 U.S. 930 (2007) .................................................................... 29

*Patterson v. New York*, 432 U.S. 197 (1977).................................................................... 44

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) .................................................................. 21

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................................................... 46

*Powell v. Alabama*, 287 U.S. 45 (1932) ........................................................................... 26

*Ring v. Arizona, 536 U.S. 584 (2002)* .......................................................................... 44, 46

*Roberts (Harry) v. Louisiana*, 431 U.S. 633 (1977) ....................................................... 45

*Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325 (1976) ................................................ 45

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ............................................................... 40, 41, 42

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................... 26, 27, 29

*Roper v. Simmons*, 543 U.S. 551 (2005) ........................................................................... 29

*Roper v. United States*, 543 U.S. 551 (2005) .............................................................. 15, 42

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ................................................................... 44

*Sawyer v. Smith*, 497 U.S. 227 (1990) ......................................................................... 39, 41

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ..................................................................... 42

*Simmons*, 512 U.S. 154 (1994) ......................................................................................... 40

*Snyder v. Louisiana*, 552 U.S. 472 (2008)................................................................... 31, 32

*Strickland v. Washington*, 466 U.S. 668 (1984) ..................................................... 16, 26, 27

*Thompson v. State*, 9 S.W.3d 808 (Tex.Crim.App. 1999) ............................................... 16

*Tumey v. Ohio*, 273 U.S. 510 (1927) ................................................................................ 42

*Weeks v. United States*, 232 U.S. 383 (1914) ................................................................... 18

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................. 16, 26, 27, 29

*Williams v. Taylor*, 529 U.S. 362 (2000) .............................................................. 26, 27, 29

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975)..................................................................... 36

*Wolf v. Colorado*, 338 U.S. 25 (1949) ............................................................................. 18

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .................................................. 39, 40, 45

## Statutes

TEX. CODE CRIM. PRO. ART. 11.071 SEC. 2(A). ............................................................. 20

U.S. Const. amend. V............................................................................................................ 1

U.S. Const. amend. VI .......................................................................................................... 1

U.S. Const. amend. VIII........................................................................................................ 1

U.S. Const. amend. XIV ............................................................................................ 46
U.S. CONST. AMENDS. VIII .......................................................................................... 46
U.S. CONST., AMEND VI ............................................................................................ 44
U.S. CONST., AMEND. V ............................................................................................. 44

**Other Authorities**

Eric M. Freedman, *Giarratano is a Scarecrow: The Right to Counsel in State Capital Post-
conviction Proceedings,* 91 Cornell L. Rev. 1079 (2006) ....................................... 25
The Federalist No. 49, p. 314 (C. Rossiter ed.1961) ................................................ 14

**Treatises**

*George E. Dix and Robert O. Dawson,* 41 Texas Practice: Criminal Practice and Procedure §
24.94 (1995) .......................................................................................................... 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES DON FLORES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 3:07-CV-00413-M |
| | § | |
| RICK THALER, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## OBJECTIONS TO THE MAGISTRATE JUDGE'S
## FINDINGS AND RECOMMENDATIONS

Now comes Petitioner Charles Don Flores by and through undersigned counsel and files the following Objections to the Magistrate Judge's Findings and Recommendations.

## THE CRUEL IRONY OF THIS CASE

The Fifth, Sixth, and Eighth Amendments to the United States Constitution guarantees important fundamental rights to those who stand accused of committing a crime. *See* U.S. Const. amend. V, U.S. Const. amend. VI, U.S. Const. amend. VIII. The rights guaranteed by these amendments provide procedural safeguards that are indispensable to ensuring that each defendant receives a fair trial and fair punishment. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335 (1963) (discussing the importance that the right to counsel plays in safeguarding against unfair trials); *see also Gregg v. Georgia*, 428 U.S. 153 (1976) (finding that the Eighth Amendment requires States to apply special procedural safeguards when the death penalty is sought).

In this case, there can be little question that Flores has not been afforded many of these constitutionally guaranteed rights. As a result, the corresponding procedural safeguards of these rights were not in place to ensure that Flores was given a fair trial, a fair punishment, a fair

appeal, or fair state habeas review.  Respondent, the State, has not even attempted to argue that Flores was actually afforded many of these procedural safeguards.  Instead, Respondent argues that Flores is procedurally barred from seeking relief for the deprivation of these procedural safeguards.  The result of accepting Respondent's argument is that Flores' will be put to death without one single court ever considering whether he was deprived of the procedural safeguards guaranteed to him by the Constitution.  The cruel irony and utter absurdity of this result can be seen from examining the circumstances of Flores' trial, sentencing, appeal, and state habeas proceedings.

I.  <u>Flores' Trial</u>

Betty Black was killed early on the morning of January 29, 1998, while her husband was at work.  No one saw the murder. There was no evidence of a struggle.   And no direct evidence regarding this crime has ever been tied to Flores.  Instead, in a case involving drugs, money, greed and family, Flores was implicated based solely on conduct preceding the murder and conduct that occurred many weeks following the crime.  No gun – no bullet – no money – no fingerprints – no DNA – no map – nothing, absolutely nothing directly links Flores to this crime. (RR35 at 222-228, 273-274.)

It is important to note that prior to Flores' trial, Ricky Childs confessed to and pled guilty to murdering Ms. Black.  A vast amount of evidence and testimony was admitted at Flores' trial which proved beyond a reasonable doubt that Ricky Childs was the man who shot Ms. Black.[1] For Childs' role as the actual shooter, he was sentenced to thirty-five years in prison.  For Flores'

---

[1] The evidence against Child's included: (1) being found in possession of the same ammunition found at the murder scene; (2) a revolver with starch grains inside the barrel consistent with those from a potato was found at his grandmother's residence; (3) a witness directly identified Childs as being present at the crime scene; (4) Jackie Roberts, the victim's daughter-in-law, was Childs' girlfriend at the time; (5) Roberts told Childs that there was money hidden in the Blacks' home; (6) Childs own confession; and (7) Childs' guilty plea.

denial of guilt, alleged presence at the crime scene, and desire to exercise his constitutional

rights, he was tried for Capital murder and the State relentlessly sought to have him executed.

The State's fanatical desire to have Flores put to death at any cost began with the jury

selection process.  When it was time for both sides to exercise their peremptory strikes the State

used its strikes to remove a number of minority (Hispanic) members from the jury panel.  Flores'

trial counsel objected and made a prima facie showing that a *Batson* hearing should be held.

Thereafter, the trial court ordered the State to explain its peremptory strikes.  Then, curiously –

and in clear violation of *Batson* – the trial court recessed the hearing, permitting the State

additional time to provide its race-neutral reasons for striking the minority members of the jury

panel.  And then, even more curiously, the issue was never addressed again.  The court never

required the State to provide race-neutral reasons for striking minority members of the venire

and, though the issue was properly preserved for appeal, none of the attorney sought to

reinstitute and complete the mandated *Batson* hearing.

Without completing the *Batson* hearing, the jury – which did not include the minorities

struck by the State – was sworn and seated.  The failure of defense counsel to vigorously pursue

the *Batson* hearing constituted nothing less than ineffective assistance of counsel.  For Flores,

these constitutionally questionable circumstances meant that before either side gave opening

statements he had already been deprived of two procedural safeguards emanating guaranteed by

the Constitution.

Nonetheless, Flores' trial proceeded with his **life** in the hands of an attorney who had

already failed to provide effective assistance of counsel.  Unfortunately, it did not take long for

doubts as to the fairness of Flores' trial and the effectiveness of his counsel to increase. The trial

began with counsel for the State giving a compelling and passionate opening statement laying

out its version of the case. Then, instead of providing the jury with what Flores believed the

evidence would show, defense counsel made the questionable and inexplicable decision to

reserve his opening statement until the beginning of Flores' case in chief. As a result, the jury

spent the first seven-days of Flores' trial knowing exactly what the State believed it would prove

and hearing all of the State's witnesses, but not having the slightest clue as to Flores' defense.

The State put a number of witnesses on the stand during Flores' trial, but the most

pertinent testimony came from Jill Bargainer. Prior to trial, Bargainer – like the other three eye-

witnesses[2] – told police that she was unable to identify the man with Childs' at the crime scene.

At trial however, Bargainer provided the type of shocking and damning testimony that viewers

often anticipated in the final scenes of the Perry Mason or Matlock television shows.

Specifically, Bargainer testified that from her in-court view of Flores, she could positively

identify Flores as one of the two men she saw in the Blacks' driveway the morning that Childs'

murdered Ms. Black.[3]  This surprising-made-for-TV-testimony was the result of a hypnosis

session conducted by police officers.

Even if one does not believe that hypnosis is the equivalent of voodoo or  psychic

hotlines, certainly no one can deny that it raises serious concerns about the reliability of a

witnesses' testimony and the ability to confront the witness. The circumstances under which

Bargainer's testimony was hypnotically enhanced (i.e. a session conducted by police officers and

witnessed by police officers) raised serious concerns about the reliability of her identification.

---

[2] Although the State presented the testimony of several witnesses who had seen Flores in the company of Rick
Childs the night before Ms. Black's death, the State initially had no witnesses who observed Flores at Ms. Black's
residence the morning of the murder.   The four witnesses' testimonny was as follows:  Michelle Babbler, saw two
suspicious-looking white men get out of a Volkswagen.  (RR35.107-133)  However, Babbler could not make a
positive identification.  (RR35.113-114)  Babbler's eight-year-old son, Nathan Taylor also saw two men enter the
Black's house.  (RR35.141-142)   He could not make an identification.  Bobby Bargainer, the Blacks' neighbor,
noticed the Volkswagen but did not see anyone.  (RR35.167)    The fourth witness, Jill Bargainer, told the police
prior to trial that she could not make an identification.

[3] This testimony was given during the State's direct examination of Bargainer.

Additionally, confronting a witness who believes that her memory was hypnotically enhanced is difficult at best and impossible at worst. Despite Flores' argument that this testimony violated the procedural safeguard provided by Sixth Amendment's confrontation clause, the trial court allowed the testimony.

Defense counsel did not cross-examine Bargainer after the State's direct. Instead, he allowed the State to continue presenting its version of the case with almost no interruptions or input from the defense. On March 25th, the State rested its case in chief and the trial was adjourned for the next three days. When the trial resumed on March 29th, defense counsel did not give an opening statement. Defense counsel did not even mention the word opening statement or saying any words in the jury's presence that could be interpreted as an opening statement. Defense counsel's failure to give an opening statement at this point eliminates the possibility that his choice not to give an opening immediately after the State was not a strategic one – it was a lazy one.

Defense counsel not only failed to give an opening statement at the beginning of Flores' case in chief, he also failed to call as his first witness someone who could at least begin to defuse the steam the State's case had gathered over the first week of trial as defense counsel sat idly by. No, the first witness defense counsel called was Bargainer, the hypnotized witness. By calling Bargainer to the stand, defense counsel gave the jury a third opportunity to listen to the witness who had already provided the State with a surprising-made-for-TV-in-court-identification of Flores. Defense counsel called a eight more witnesses that day, many of which had testified during the State's case in chief. Then, on the same day, defense counsel rested.

Notwithstanding the ineffective assistance of Flores' counsel the State's case was pregnant with reasonable doubt. After all of the testimony concluded and all of the evidence was

submitted, there was not a single piece of physical evidence linking Flores' to the crime or the

crime scene. While there was some circumstantial evidence indicating that Flores may have been

present at the crime scene, the only direct evidence was Bargainer's in-court identification of

Flores which, according to her, was made possible by the hypnosis session conducted by police.

As a result, closing statements gave defense counsel the opportunity to redeem himself and

provide Flores with effective assistance of counsel for the first time during the trial.

Prior to defense counsel's closing statement, the trial court read the charge to the jury and

the State gave its initial closing statement.  The Court's charge to the jury included explicit

instructions indicating that the jury could find Flores guilty of capital murder through the law of

parties or the law of conspiracy.  These instructions, coupled with the lack of any actual evidence

linking Flores to this crime, led the State to rely on Flores' alleged presence at the crime scene as

a sufficient basis for finding him guilty of capital murder.  During its closing, the State implored

the jury that it did not need to actually prove that Flores killed Black, only that through the law

of parties he was somehow connected. The State's recognition of the flimsy nature of its capital

murder case against Flores emanated from its closing and reliance on the law of party

The State's closing argument, the court's charge to the jury, and the flimsy evidence

implicating Flores left defense counsel with plenty argue.  More importantly, these things left no

question that defense counsel needed to vigorously argue that the state failed to prove beyond a

reasonable doubt that Flores was present at the crime scene.  Instead, defense counsel –

consistent with his unprofessional and unconstitutional performance to that point in the trial –

doomed Flores to being found guilty by stating:

> The State will surely suggest to you that the reason [Flores] did all those things
> [burning the Volkswagon, attempting to escape, etc.] because he was guilty of
> murder. Well, let me suggest that a reasonable alternative in my view, and that is
> is [sic] that he knew he was in trouble and didn't want to go to the penitentiary for

murder he did not commit.  Sure, he did things that were stupid, violent.  ***Could it not also be true that he was doing those things because he was there at the scene at the time of the murder committed by Rick Childs; that he knew that the Volkswagen was the vehicle that they had gone over there in; that sooner or later the police were going to figure out who did it, who was there, who was involved? And yes, he engaged in those activities that he engaged in following the murder*** because he figured they were going to try to blame it on him.

(RR 39 at 67-68.) These statements by defense counsel were not simply a poor choice of words or a bad strategy.  No, these statements track all of the elements needed to find Flores' guilty based on the law of parties.  Specifically, defense counsel's statements indicated that he believed Flores was present when Childs committed the murder; that he believed Flores knew the Volkswagen was the vehicle *they* had gone over there in; and that he believed Flores knew that sooner or later the police were going to figure out who did it, who was there, and who was involved.

In light of these statements, it is difficult to imagine how the jury would not have felt compelled to find Flores guilty.  And, finding Flores guilty of capital murder is exactly what this jury did.

II.  Flores' Sentencing

The sentencing phase of Flores' trial was similar to the guilt phase of the trial.  The State provided numerous witness and passionately pled with the jury to have Flores' put to death. Meanwhile, defense counsel sat by passively, put forth very few witnesses, and then gave a closing statement that likely convinced the jury to find that Flores' should be executed. Undoubtedly, defense counsel's failure to put forth any mitigating evidence on Flores' behalf resulted from his failure to do any investigation into the existence of mitigating evidence.  And, the trial court continued to compound the problems Flores' faced from not having the benefit of the effective assistance of counsel by further depriving him of the important procedural safeguards guaranteed by the Eight Amendment.

At a capital sentencing hearing, mitigating evidence is of paramount importance. Contrary to the belief of many prosecutorial-minded people, mitigating evidence is important to more than just the defendant. The existence and consideration of mitigating evidence is important to the jury vested with deciding whether a defendant should live or die. It is important to the courts that must enter and uphold a death sentence. Most pertinently, it is important to the institution known as our criminal justice system, which has determined that it is acceptable for the government to kill someone sentenced to death provided that the sentence gave due consideration to mitigating circumstances. Further, mitigating evidence is often the last thing that can literally save a defendant's life. Put another, mitigating evidence is a matter of life and death.

Despite the importance of mitigating evidence to Flores' sentencing, the second issue in court's charge to the jury effectively prevented jurors from giving due consideration to mitigating evidence. This alone deprived Flores of a constitutionally required procedural safeguard. Similarly, the third issue of the court's charge to the jury relieved the State of its burden to prove beyond a reasonable doubt that Flores should be executed despite the mitigating evidence. Again, this alone deprived Flores of a constitutionally required procedural safeguard. These constitutional deficiencies in the court's charge to the jury along with the excessively vague accompanying explanations in the court's charge to the jury, left Flores without any constitutional required procedural safeguards to ensure he received a fair sentence.

In addition to being deprived of the procedural safeguards guaranteed by the Eighth Amendment, Flores continued to be deprived of the procedural safeguard guaranteed by the Sixth Amendment right to counsel. Apparently, defense counsel took the court's instruction to heart because he did not present, mention, or even allude to mitigating evidence during the

sentencing hearing.  Undoubtedly, defense counsel's failure to investigate the existence of

mitigating evidence played a role in his failure to present mitigating evidence at the hearing.  It

does not however, explain his failure to argue that the States' failure to prove that Flores rather

than Childs killed Black should be carefully considered when determining the appropriate

sentence.

The charge lacking important procedural safeguards, the absence of effective assistance

of counsel, and the State's enthusiastic pleas for the death penalty, led the jury to sentence Flores'

to death.

III. Flores' Appeal

As the discussion above indicates, the Flores' trial and sentencing was filled with strong

appealable issues, including: the trial court's complete the *Batson* hearing; ineffective assistance

of counsel during the guilt and penalty phase of  Flores' trial; the in-court identification made by

witness who the police had hypnotized; and a multitude of deficiencies in the court's charge to

the jury during the penalty phase of Flores' trial.  Each one of these issues was winnable and

posed a possibility of the conviction or the sentence being vacated.

Additionally, these issues could be easily found and appropriately raised on appeal by

constitutionally competent appellate counsel.  Constitutionally competent counsel would also be

aware that failing to raise many of these issues on appeal could have grave consequences on

Flores' ability to raise them latter.

Flores' was not however, appointed constitutionally competent appellate counsel.  Flores'

appellate counsel, like his trial counsel, failed to diligently pursue the properly made *Batson*

objection.  Flores' appellate counsel also failed to raise claims relating to the complete absence of

mitigating evidence, (presented to or considered by the jury), during the penalty phase of Flores'

trial  Similarly, Flores' appellate counsel failed to properly raise any of the viable issues relating

to the constitutionality of the court's charge to the jury.

Based on appellate counsel's unprofessional and unconstitutional representation of Flores, it is of little surprise that a State Bar of Texas' website indicates that appellate counsel, (Robert Abbott), is not currently eligible to practice law in Texas.[4]

Without considering any of these important and fundamental issues relating to the procedural safeguards guaranteed by the Constitution, Flores' direct appeal was denied.

IV. Flores' State Writ

Flores was appointed an attorney, Roy Greenwood, to prepare his state writ. Greenwood, in turn, requested that Larry Mitchell assist in preparation of the writ. In turn, Mitchell hired a disbarred attorney, Keith Jagmin, to assist in the investigation of the writ. Numerous letters exchanged among counsel, the trial court, and Flores indicate that the attorneys did not conduct any investigation of the writ and simply threw the claims together at the last minute. The attorneys accused each other of misconduct and inaction. Flores provided his attorneys with a list of witnesses who could have presented mitigating evidence at the punishment phase of trial. Flores also provided an extensive critique of his attorneys' proposed writ, which set out in detail the factual inaccuracies in the writ and also a list of additional claims that Flores wanted to pursue. Despite repeated efforts by Flores, Flores' habeas counsel failed to conduct a proper investigation and failed to correctly raise many genuine meritorious claims.

Ultimately, Judge Nelms, the trial court judge, permitted both Larry Mitchell and Roy Greenwood to withdraw from the case. Thereafter, Judge Nelms allowed entry of another attorney, Steven "Rocket" Rosen, who failed to file anything on behalf of Flores. In fact, Judge Nelms threatened Mr. Rosen with contempt of court charges when it became obvious that Mr.

---

[4] A screen shot of a the search results on the State Bar of Texas website indicating that Robert Abbott is not eligible to practice law in Texas is attached as Exhibit B.

Rosen had wholly failed to undertake any duties in regard to Flores. Only when threatened with contempt did Mr. Rosen bother to pick up the file in this case. (See Rosen letter to Nelms, dated March 26, 2001). Thereafter, Rosen failed to file any documents with the court and fulfill his obligations in relation to Flores.

Finally, a fourth attorney, Alex Calhoun began assisting Flores with his state writ proceedings. At this point, there was little Mr. Calhoun could do to protect Flores' rights and secure that all appropriate challenges were included in the state writ. Flores continually informed his counsel that their collective failure to include relevant and viable legal challenges, such as ineffective assistance of counsel at trial and on appeal, would subsequently bar Flores from raising these at the federal level. In essence, Flores tried desperately to communicate to each of his attorneys that counsel's continued failures would prejudice him in his later federal proceedings.

Thereafter, Flores wrote to the Texas Court of Criminal Appeals in an attempt to try and secure some minimal level of legal representation. In Flores' September 10, 2000, letter to the Texas Court of Criminal Appeals, Flores informed the court that he requested that appointed counsel investigate Flores' contentions relating to ineffective assistance of counsel – however, no investigation was ever conducted. A similar plea for investigative help with his state claims regarding ineffective assistance of counsel was also sent by Flores to the state habeas judge on September 10, 2000, asking that Judge Nelms "please appoint me new co-counsel that is competent and willing to do their job." Flores also pleaded: "Your Honor I have done all I possibly can to further my investigation. It is not my fault that these men did not do their job. Please help me solve this problem." (Flores letter to Nelms, dated Sept. 10, 2000). Flores, much like he the communications he sent directly to appointed counsel, desperately pled for those in a

position to secure compliance with the Texas statutory scheme – which unequivocally requires investigation in capital state habeas claims – to help preserve his claims for merits review.

Flores' pleas fell on deaf ears. As a result, state habeas counsel, like trial and appellate counsel, failed to raise the *Batson* issue. Additionally, state habeas counsel, like appellate counsel, failed to raise issues relating to the court's charge to the jury during the penalty phase of Flores' trial and the ineffective assistance of trial counsel throughout the case.   Accordingly, it is not surprising that state habeas counsel also failed to raise the Flores' strong claims that he received ineffective assistance of trial and appellate counsel.

Once again, the failure to raise the important and viable issues relating to the deprivation of Flores' constitutionally guaranteed procedural safeguards led to the denial of relief.

V.  <u>Summary of Flores' Journey through the State Criminal Justice System</u>

Flores' trial began with the State striking minorities from the jury pool and defense counsel making a prima faice *Batson* showing.  The trial court responded to this by initially providing the state with additional time to think of legitimate reasons for the strikes.  Then, the trial court abandoned the *Batson* hearing midstream, leaving Flores' with a jury that was selected with no regard for the procedural safeguards guaranteed by the Constitution.

The State never provided any physical evidence linking Flores to the shooting of Black. A crime to which Childs had already pled guilty.  The direct evidence allegedly placing Flores at the crime scene came from the testimony of a witness who initially told police she could not identify the person accompanying Childs.  After – and only after – being hypnotized by the **police**, this witness was suddenly able to make an in-court identification of Flores as the person accompanying Childs.

At the end of the trial, the State's case against Flores was weak and flimsy.  The State however, was given a helping hand from Flores' trial counsel who made statements indicating

that he believed Flores was there when Childs shot Black and then tried to cover up what defense counsel referred to as the crime *they* committed. Defense counsel's statements tracked the elements of capital murder based on the law of parties. These were the circumstances that led to Flores' being found guilty of capital murder.

The jury charge at the penalty phase of Flores' trial eviscerated the procedural safeguards guaranteed by the Eight Amendment. Meanwhile, trial counsel failed to investigate, present, or substantively discuss any mitigating evidence during the sentencing hearing. These were the circumstances that led to Flores' being sentenced to death.

Throughout the guilt and penalty phase of Flores' trial he received ineffective assistance of counsel. Defense counsel failed to vigorously pursue the *Batson* hearing, did not give any opening statement at any point during the trial, cross-examined very few witnesses, gave a closing statement that gave the jury no choice but to find Flores guilty, and then failed to present any mitigating evidence during the penalty phase of Flores' trial.

Counsel's ineffective assistance, the jury charge, and the *Batson* issue all cast serious doubt concerning the fairness of Flores trial and punishment. Each of these issues were apparent and easy to raise on appeal. Nonetheless, appellate counsel failed to raise any of these issues. Thereafter, state habeas counsel also failed to raise these issues, as well as the issues raised by Flores receiving ineffective assistance of appellate counsel.

These circumstances cast serious doubt on the result of Flores trial and sentence. Surely, a civilized society – especially one that touts itself as beacon to the rest of the world – cannot put someone to death without first addressing the substantive non-frivolous issues casting doubt on the legitimacy of the verdict and the fairness of the punishment.

## OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATIONS

For the reasons detailed below, Flores' objects to the Magistrate Judge's Findings &

Recommendations (hereinafter "*Magistrate's Findings*") and respectfully request that this Court grant Flores' Petition.  When considering Flores' objections, the role of federal habeas review, and the rights guaranteed by the Constitution, it is important to recognize the consequences of accepting the *Magistrate's Findings*.

For Flores, the consequence will be that the State of Texas will execute him. "Intravenous tubes attached to his arms will carry the instrument of death, a toxic fluid designed specifically for the purpose of killing human beings.  The witnesses, standing a few feet away, will behold [Flores], no longer a defendant, an appellant, or a petitioner, but a man, strapped to a gurney, and seconds away from extinction."[5]

For our society, the consequence will be a continued decline in our standards of decency, by confirming that our justice system places far greater importance on statutory procedural bars (over which many defendants have little control) than it places on the procedural safeguards guaranteed by the Constitution.  This consequence, at first glance, may seem minimal and trivial. The importance of avoiding this consequence however, becomes glaringly apparent when one considers the following statement made by the United States Supreme Court in a recent decision addressing the death penalty:

> Over time, from one generation to the next, the Constitution has come to earn the high respect and even, as Madison dared to hope, the veneration of the American people. See The Federalist No. 49, p. 314 (C. Rossiter ed.1961). The document sets forth, and rests upon, innovative principles original to the American experience, such as federalism; a proven balance in political mechanisms through separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and preserve human dignity. These doctrines and guarantees are central to the American experience and remain essential to our present-day self-definition and national identity. Not the least of the reasons we honor the Constitution, then, is because we know it to be our own. It does not lessen our fidelity to the Constitution or our pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores the centrality of those same rights within

---

[5] *Callins v. Collins*, 510 U.S. 1141, 1143 (1994) (Blackmun, J., dissenting).

our own heritage of freedom.

*Roper v. United States*, 543 U.S. 551, 578 (2005).

By simply considering the merits of Flores' constitutional claims, this Court can ensure that Flores is not deprived of "the doctrines and guarantees [which] are central to the American experience and remain essential our present day self-definition and national identity." *Id.* And, even if Flores' is ultimately sentenced to death, by given proper consideration to the merits of Flores' claims this Court can lend credence to the fairness of Flores' trial and sentencing.

The *Magistrate's Findings* fail to address the merits of Flores' constitutional claims. As a result, the *Magistrate's Findings* fail to give any assurance that Flores' trial and sentencing was either fair or constitutional. For this reason, and each of the specific reasons articulated below, Flores' objects to the *Magistrate's Findings*.

### Objection # 1

I.  The Magistrate Judge committed error by creating a rule that makes Petitioner's Sixth Amendment right to the effective assistance of trial and appellate counsel illusory.

The Magistrate Judge erred in finding that there is no federal constitutional right to the assistance of counsel during habeas proceedings because this interpretation of the law makes Petitioner's Sixth Amendment right to the effective assistance of trial and appellate counsel illusory. *Magistrate's Findings*, at 15.

In the landmark case *Gideon v. Wainright*, 372 U.S. 335 (1963), the Supreme Court reaffirmed the longstanding and irrefutable principle that the Sixth Amendment right to counsel in a criminal prosecution serves to safeguard the fundamental rights of the accused. *Id.* at 796; *see also Grosjean v. American Press Co.*, 297 U.S. 233, 243-44 (1936) ("We concluded that certain fundamental rights, safeguarded by the first eight amendments against federal action, were also safeguarded against state action by the due process of law clause of the Fourteenth

Amendment, and among them the fundamental right of the accused to the aid of counsel in a

criminal prosecution."). Of course, as the Supreme Court has recognized, the Sixth Amendment

right to counsel can only safeguard the fundamental rights of the accused when effective

assistance of counsel is provided. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("That

a person who happens to be a lawyer is present at trial alongside the accused, however, is not

enough to statisfy the constitutional command.. . .An accused is entitled to be assisted by an

attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is

fair."); *see also Evitts v. Lucey*, 469 U.S. 387, 395 (1985) ("Because the right to counsel is so

fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present

in name, is unable to assist the defendant to obtain a fair decision on the merits."). The

safeguards provided by Sixth Amendment right to effective assistance of counsel apply with

equal force to counsel's assistance at sentencing hearings, *see, e.g., Wiggins v. Smith*, 539 U.S.

510 (2003), and on appeal, *see, e.g., Evitts,* 469 U.S. 387.

Texas courts, like many state and federal courts, have determined that ineffective

assistance of trial counsel ("IATC") claims should typically be brought in a habeas proceeding

rather than on direct appeal. *See, e.g., Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex.Crim.App.

1999) ( noting that collateral attack, rather than direct appeal, typically provides the best vehicle

for bringing an ineffective assistance of counsel claim). Texas Courts and legal scholars have

explained that habeas proceedings provide the appropriate vehicle for addressing IATC claims

because these proceedings allow a record to be developed of pertinent facts that are inherently

absent from the trial record. *id. (citing George E. Dix and Robert O. Dawson,* 41 Texas Practice:

Criminal Practice and Procedure § 24.94 (1995) ("The record in appeal may well contain a less

than adequate inquiry into possible tactical reasons for various actions or omissions by counsel and may lack completely trial counsel's own explanations for his actions or inactions.")).

Habeas proceedings are more than just the best forum for addressing ineffective assistance of appellate counsel ("IAAC") claims – it is the only forum for addressing these claims. The reason for this is simple: appellate counsel obviously is not going to argue on appeal that they have failed to provide effective assistance of counsel and an IAAC claim would not be ripe until the appeal process has concluded.

A criminal defendant in Texas therefore, has only one real forum for ensuring that the Sixth Amendment right to effective trial and appellate counsel: habeas proceedings. The need for developing a record and a recognition of the fact that habeas proceedings typically provide the only forum for addressing ineffective assistance of counsel claims, has led the Texas Court of Criminal Appeals to hold that ineffective assistance of counsel claims can be brought in habeas proceedings regardless of whether the claim was raised on direct appeal. *See Oldham v. State*, 977 S.W.2d 354, 363  (Tex.Crim.App. 1998) (holding that the general doctrine governing the ability to bring claims that were either not raised on direct appeal or were denied on direct appeal does not apply to IATC claims); *See also Ex Parte Torres*, 943 S.W. 2d 469, 475 (Tex.Crim.App. 1997) (stating that because habeas proceedings provide the best forum for addressing IAC claims "we have held that, when direct appeal has not provided an adequate record to evaluate a claim which might be substantiated through additional evidence gathered in a habeas corpus proceeding, we will not apply the general doctrine that forbids raising a claim on habeas corpus after it was rejected on appeal").

The precedents of the Texas Court of Criminal Appeals and the United States Supreme Court, therefore, leave no doubt that: (1) the Sixth Amendment right to counsel provides an

indispensible safeguard to the fundamental of the accused; and (2) habeas proceedings provide the appropriate forum in the Texas for bringing ineffective assistance of counsel claims. Together, the right to effective assistance of counsel and the ability to enforce that right through habeas proceedings, provide a good foundation for ensuring that defendants are not deprived of the procedural safeguards guaranteed by the Constitution. This foundation provides the opportunity for constitutionally competent habeas counsel to build a strong record that either exposes the ineffective assistance of counsel a defendant received or alleviates doubts about the fairness of a defendant's trial. Conversely, the right to effective assistance of counsel and the ability to enforce that right through habeas proceedings is rendered completely meaningless when a defendant is represented by constitutionally incompetent habeas counsel.

Here, the *Magistrate's Findings* concluded that Flores was not entitled to constitutionally competent habeas counsel did just that – it rendered Flores' Sixth Amendment right to effective assistance of trial and appellate counsel meaningless. The Sixth Amendment right to counsel becomes completely illusory if defendants, in the state of Texas, are not entitled to the effective assistance of state habeas counsel. The absurdity and unconstitutionality of finding that defendants in Texas have no right to the effective assistance of habeas counsel can be easily seen by considering the illusory nature of the Fourth Amendment's protections prior to *Mapp v. Ohio*.

In *Wolf v. Colorado*, 338 U.S. 25 (1949), the Supreme Court held that the Fourth Amendment ban against unreasonable and warrantless searches was enforceable against the States but the Court declined to incorporate the corresponding exclusionary rule articulated in *Weeks v. United States*, 232 U.S. 383 (1914). Less than twelve years later, it became apparent that, without the exclusionary rule, the Fourth Amendment's protections against unreasonable searches and seizures by the state were nothing more than illusory protections. *See generally*

*Mapp v. Ohio*, 367 U.S. 643, 648-56 (1961).  Accordingly, the Court incorporated the

exclusionary rule to the states in *Mapp v. Ohio*, and explained that:

> Since the Fourth Amendment's right of privacy has been declared enforceable
> against the States through the Due Process Clause of the Fourteenth, it is
> enforceable against them by the same sanction of exclusion as is used against the
> Federal Government. Were it otherwise, then just as without the Weeks rule the
> assurance against unreasonable federal searches and seizures would be 'a form of
> words', valueless and undeserving of mention in a perpetual charter of inestimable
> human liberties, so too, without that rule the freedom from state invasions of
> privacy would be so epemeral and so neatly severed from its conceptual nexus
> with the freedom from all brutish means of coercing evidence as not to merit this
> Court's high regard as a freedom 'implicit in 'the concept of ordered liberty."

*Mapp*, 367 U.S. at 655.

Similarly, the Sixth Amendment right to effective assistance of counsel is nothing more

than a form of words, valueless and undeserving of mention in the Constitution if there is no real

and reliable means for ensuring that defendants are not deprived of this right.  This is precisely

the result that flows from the Magistrate Judge's determination that Flores did not have a

constitutional right to effective assistance of habeas counsel.  The Magistrate Judge erred in

making a finding that creates a rule with this absurd and unconstitutional result.  Further, the

*Magistrate's Findings* failed to recognize that the right to effective assistance of counsel during

habeas proceedings is part and parcel of the constitutional right to effective assistance of trial and

appellate counsel as it provides a procedural safeguard for the fundamental rights of the accused

– just like the exclusionary rule is part and parcel of the Fourth Amendment's protection against

unreasonable searches and seizures.

### Objection # 2

II. The Magistrate Judge committed error when he erroneously found that Petitioner's Due
Process claim alleging a protected right to counsel during state habeas proceedings was
governed solely by *Pennsylvania v. Finley* and not the proper authority protecting state
property rights, *Board of Regents of State College v. Roth*.

Petitioner objects to the Magistrate Judge's Findings on page 15 of his Findings and

Recommendations because the Court fails to fully consider the Due Process implications of the

State of Texas's statutory grant of a right to be represented by competent counsel. *See Board of*

*Regents of State College v. Roth*, 408 U.S. 564 (1972). *Roth* established that procedural due

process rights exist where a state creates – via statute – a liberty or property right. The Texas

statutory scheme set forth in TEX. CODE CRIM. PRO. ART. 11.071 SEC. 2(A).provides precisely

such a right because the State of Texas, via statute, guarantees state inmates sentenced to death

that they will be "represented by competent counsel unless the applicant has elected to proceed

pro se." In the instant case, Petitioner requested, and was granted, the appointment of counsel

pursuant to Article 11.071. Accordingly, and in reading the language relating to state habeas

proceedings in Texas, Petitioner should be considered as having either a cognizable liberty or

property interest in the appointment of competent counsel – one which he repeatedly and

aggressively attempted to assert to absolutely no avail. *Id.*

The record in this case is replete with communications between Petitioner and the state

trial judge regarding the need for counsel. It should be further noted, and Petitioner objects to

the Magistrate Judge's failure to consider this point, that two of Petitioner's counsel below were

disbarred in some fashion. Petitioner's appellate attorney, Mr. Robert Abbott was disbarred by

the State of Texas. Likewise, one of Petitioner's state habeas counsel, Mr. Stephen "Rocket"

Rosen has been sanctioned by the United States District Court for the Northern District of Texas.

Petitioner understands this sanction to effectively be tantamount to disbarment before this very

court.

Petitioner objects to the fact that the Magistrate Judge errantly dismissed this property

right by simply stating that "the performance of state habeas counsel is not judged by Sixth

Amendment standards." *Magistrate's Findings*, at 15. This finding fails to appreciate the Due

Process right being claimed. *See Roth*, 408 U.S. 564 (1972). The Magistrate Judge erred because the one paragraph dismissal fails to afford Petitioner appropriate Constitutional protection of the statutory scheme created by Texas to provide the very right that Petitioner seeks to assert, sought to receive and continues to demand be provided in pursuit of his Constitutional claims. But for the withholding of this statutory right, Petitioner would be permitted to present to this Court his full range of Constitutional claims, including numerous *Batson* challenges.

Petitioner further objects to the Magistrate Judge's ruling that the Texas statutory right to counsel does not "give rise to a federal due process claim." *Magistrate's Findings*, at 15. The Magistrate Judge's citation to *Pennsylvania v. Finley* is inapposite and never addressed Petitioner's contention that once the State of Texas has created a statutory right giving him both a liberty and property interest to competent counsel. Contrary to the Magistrate Judge's Findings, that statutorily created liberty and property right cannot be unilaterally withdrawn or ignored without any reference to the parameters of *Board of Regents of State College v. Roth*, 408 U.S. 564 (1972). The Supreme Court's holding in Finley does not address or in any way cover this unique situation where the State provides a statutory right to counsel and then wholly fails to provide such assistance. The Magistrate Judge's ruling on this issue is erroneous and Petitioner objects that no analysis has been conducted, as required, under *Roth*.

Under the Texas statutory scheme, Petitioner is entitled to a broad protection as enshrined in the Texas statute which promises that "[e]very provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." *See* TEX. CODE CRIM. PRO. ART. 11.04. Thus, in giving favorable construction to Petitioner's claim for competent counsel, this Court should find that the Texas scheme provides Flores with a protected liberty and property interest in the right to

competent counsel during state writ proceedings and that the Magistrate Judges findings to the

contrary are erroneous and should be reversed.

### Objection # 3

III.  The Magistrate Judge committed error by finding that "[a]lthough petitioner has a
statutory right under Texas law to be represented by 'competent counsel' on state habeas
review, the performance of state habeas counsel is not judged by Sixth Amendment
standards.

The Magistrate Judge erred in finding that Petitioner does not have a protected

Constitutional right to competent counsel as defined by reference to the Sixth Amendment.

*Magistrate's Findings* at 15. This erroneous finding caused Petitioner further harm in that the

Magistrate Judge, subsequent to finding no federal constitutional right to competent counsel,

wholly failed to consider the numerous issues contained in Petitioner's federal habeas writ

relating to Petitioner's failure to receive the competent counsel guaranteed by Texas Statute,

including serious and well-founded *Batson* claims that continue to go unheard by any Court due

solely to the failings of state habeas counsel and this ongoing Due Process violation.

The United States Supreme Court has long held that the right to counsel would be a

meaningless ritual if that right were not to include a concomitant right to the effective assistance

of counsel. *See Evitts v. Lucey*, 469 U.S. 387 (1985).  *Cf. Douglas v. California*, 372 U.S. 355

(1963)(reminding that without the right to counsel "[t]he indigent, where the record is unclear or

the errors are hidden, has only the right to a meaningless ritual, while the rich man has a

meaningful appeal").

Further, in the very case the Magistrate Judge cited to deny Petitioner such right,

*Coleman v. Thompson*, 501 U.S. 722 (1991), the Court, through Justice O'Connor, routinely used

the term "competent" and "effective" interchangeably when referencing the right to the effective

assistance of counsel. *Id.* at 754 (speaking of the right to be "represented by competent

counsel"). *See also Murray v. Giarratano*, 492 U.S. 1, 29 (Stevens, J., dissent). *Coleman*, whose only reference to a right to state habeas counsel was through dicta dealing with cause and prejudice for procedural default, does not create a Sixth Amendment barrier in this case or under Petitioner's circumstances.

The Magistrate Judge's suggestion that any promise of "competent counsel" by the State of Texas cannot be judged by Sixth Amendment standards is simply untenable in light of the numerous United States Supreme Court cases that interchangeably use the terms "competent" and "effective" in defining the right to counsel. *See, e.g., Evitts*, 469 U.S. at 387 (reminding that the promise that a criminal defendant has a right to counsel "would be a futile gesture unless it comprehended the right to the effective assistance of counsel"). Petitioner maintains that his protected liberty and property right to "competent counsel" ensures that he will receive something more than a "meaningless ritual" in attempting to present his Constitutional claims at the state court level. Because in Texas the first place that Petitioner could have raised his ineffective assistance of counsel claims – both for trial and appellate counsel (his disbarred attorney) – is at the state habeas level, the inexcusable performance of Petitioner's various state habeas counsel completely foreclosed any consideration on the merits of these claims. In light of Petitioner's statutory guarantee for competent counsel, the Sixth Amendment standard should absolutely control. *Cf. Burns v. Ohio*, 360 U.S. 252, 257 (1959)(explaining that "[o]nce the State chooses to establish [habeas] review in criminal cases, it may not foreclose indigents from access to any phase of that proceeding because of their poverty").

Further, the state trial judge was actively aware of Petitioner's requests for consideration of claims that Petitioner presented himself, pro se, to the court for consideration or preservation. The judge knew that state habeas counsel was falling below the statutory and Constitutional

guarantees and only threatened to hold state habeas counsel in contempt. The state judge did not ensure that Petitioner's many presented claims were preserved. Due solely to state habeas counsels' errors, most of these claims still have not been evaluated.

Unlike the Petitioner in *Martinez*, Petitioner's state habeas counsel was nearly held in contempt of court for refusal to even pick up the record or review Petitioner's claims. The "cruel joke" afforded Petitioner under the Texas statutory scheme should absolutely be evaluated under the controlling Sixth Amendment standards that apply once a right to counsel is found to exist. *Cf. Ex Parte Graves*, 70 S.W.3d 103, 130 (Tex. Crim. App. 2002) (Holcomb, J., dissenting). *See also Ex Parte Graves*, 70 S.W.3d at 118 (Price, J., dissenting) ("'Competent counsel' ought to require more than a human being with a law license and a pulse").

It is undeniable that a statutory right to "competent counsel" was guaranteed Petitioner. However, his various habeas counsel were far from competent, verging on contemptuous. As Petitioner has a discernable right to counsel, the Sixth Amendment guarantees the effective assistance of counsel should be controlling. The Magistrate Judge's ruling on this point was in error.

### Objection # 4

IV. <u>The Magistrate Judge committed error when he found that there is no constitutional right to the assistance of counsel during habeas proceedings, particularly where the first opportunity to present many substantive claims of Constitutional error is on habeas review and not direct appeal.</u>

The Magistrate Judge erred when he relied on *Coleman* and *Finely* to foreclose Petitioner's requested relief. The Magistrate Judge further erred in finding that there is no federal constitutional right to the assistance of counsel during habeas proceedings. *Magistrate's Findings*, at 15. Contrary to the Magistrate Judge's reference to *Coleman* and *Finley*, the United States Supreme Court has left open the question regarding a right to effective appointed counsel

where "state collateral review is the first place that a state criminal defendant can present a

particular challenge to his conviction." *Coleman v. Thompson*, 501 U.S. at 755. *See also*

*Daniels v. United States*, 532 U.S. 347 (2001)(Rehnquist, C.J., concurring). Further, habeas

proceedings are a vital part of the criminal prosecution. The State of Texas has recognized this

right through its statutory scheme in 11.071. Particularly in Texas where the Sixth Amendment

right to the effective assistance of counsel can only be vindicated in state habeas proceedings, the

right to counsel is paramount.

The Magistrate Judge erred in finding no right to the assistance of counsel in capital

habeas proceedings. The United States Supreme Court has never directly addressed the issue of

whether death row inmates are constitutionally entitled to receive the effective assistance of

counsel during state writ proceedings. *See* Eric M. Freedman, *Giarratano is a Scarecrow: The*

*Right to Counsel in State Capital Post-conviction Proceedings,* 91 Cornell L. Rev. 1079 (2006).

The only decision directly addressing this question is a plurality opinion that cannot be relied

upon to foreclose Petitioner relief. *Murray v. Giarratano,* 492 U.S. 1 (1989). And, in

considering *Murray*, courts cannot ignore Justice Kennedy's concurring opinion that begins: "[i]t

cannot be denied that collateral relief proceedings are a central part of the review process for

petitioners sentenced to death." *Id.* at 14. (Kennedy, J., concurring). Justice Kennedy next

reminds that "a substantial proportion of these prisoners succeed in having their death sentences

vacated in habeas proceedings." *Id.* (Kennedy, J., concurring). The "substantial proportion"

Justice Kennedy references are found more clearly stated by Justice Stevens in dissent. *Id.* at 23.

(Stevens, J., dissenting). Justice Stevens reminds:

> There is, however, significant evidence that in capital cases what is ordinarily
> considered direct review does not sufficient safeguard against miscarriages of
> justice to warrant this presumption of finality. Federal habeas courts granted
> relief in only 0.25% to 7% of noncapital cases in recent years; in striking contrast,

the success rate in capital case ranged from 60% to 70%. Such a high incidence
of uncorrected error demonstrates that the meaningful appellate review necessary
in a capital case extends beyond the direct appellate process.

*Id.* at 23-24 (Stevens, J., dissenting).

Likewise, the United States Supreme Court has shown much greater sensitivity to the

right to counsel in capital cases. *See Powell v. Alabama*, 287 U.S. 45 (1932) (first establishing a

Due Process right to counsel for indigent capital defendants). Such right is particularly

imperative as the passage of the Antiterrorism and Effective Death Penalty radically restructured

the nature of federal habeas review – putting a heightened emphasis on state proceedings.

Without the assistance of capable or competent counsel during state writ proceedings, state death

row inmates will not be able to fairly or fully present their viable federal claims. *See Murray*,

492 U.S. at 25 (Stevens, J., dissenting) (noting that "therefore, postconviction proceedings are

key to meaningful appellate review of capital cases"). And, as many of the means of overturning

state convictions can only be raised during state writ proceedings – in Texas state habeas is the

regular place to challenge ineffective assistance of counsel -- it is no longer acceptable simply to

say that state appellate challenges adequately protect capital convicts. Unlike other state cases

involving ineffectiveness challenges, cases involving capital convicts are irreversible and

require, both legally and morally, additional protections.

The Magistrate Judge's findings are flawed because the only place in Texas to assert

Sixth Amendment claims based on trial attorneys performance is state habeas. Failure to find

that a right to habeas counsel exists will completely eradicate the right of Texas capital

defendants to assert their Sixth Amendment rights guaranteed by *Gideon v. Wainright*, 372 U.S.

335 (1963), *Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362

(2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and, *Rompilla v. Beard*, 545 U.S. 374 (2005).

Despite the Magistrate Judge's findings, *Coleman* clearly leaves this as an open question. *Coleman v. Thompson*, 501 U.S. at 755.

The Magistrate Judge erred in finding no federally protected right to the assistance of counsel on the first state habeas corpus guaranteed as a matter of right. The question of whether an indigent capital convict is Constitutionally entitled to the effective assistance of counsel in his first state writ application where he is first able to assert constitutional deficiencies in his conviction and sentence remains an open question. *See Coleman v. Thompson*, 501 U.S. at 755. The Magistrate Judge's failure to acknowledge this fact was error. And, this error continues to result in prejudice to Petitioner.

The promise of *Williams v. Taylor*, *Wiggins v. Smith* and *Rompilla v. Beard* should be incorporated into the habeas context. For only with the assistance of investigation will viable claims ever be uncovered and presented on behalf of capital convicts. To assume that no right to investigate lies inherent in state habeas proceedings is to deprive hundreds of death row inmates the privilege of the Great Writ. And, in the State of Texas, a statutory right to investigation clearly exists and should be embodied under a Due Process protection. TEX. CODE CRIM. PRO. ART. 11.071, SEC. 3(A).

The Magistrate Judge erred in relying solely on *Coleman* and *Finley* to resolve this issue because *Evitts v. Lucy* is the more appropriate authority. *See Evitts v. Lucey*, 469 U.S. 387 (1985). In reviewing the applicability of *Evitts v. Lucey* to the issue at hand, it bears noting several important component of Petitioner's claim. First, in Texas, death row convicts are statutorily entitled to receive the aid of "competent counsel." That phrase, when interpreted by the United States Supreme Court, has ALWAYS meant the effective assistance of counsel as defined by *Strickland v. Washington*. *Evitts v. Lucey*, 469 U.S. 387 (1985). *See also Coleman v.*

*Thompson*, 501 U.S. at 754 (O'Connor, J., plurality)(speaking of the right to be "represented by competent counsel") and *Murray v. Giarratano*, 492 U.S. 1, 29 (Stevens, J., dissent).  Harkening back to the genesis of the right to counsel, the *Evitts* court reminded that "Gideon rested on the 'obvious truth' that lawyers are 'necessities, not luxuries' in our adversarial system of criminal justice."  *Id.* at 394.

Further, the United States Supreme Court has consistently held that "if a State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demand of Due Process and Equal Protection."  *Id.* at 393.  The same should be true if a State has created habeas review as an integral part of the system for finally adjudicating the guilt or innocence of a defendant.  *Murray*, 492 U.S. at 25 (Stevens, J.,  dissenting)(noting that "postconviction proceedings are key to meaningful appellate review of capital cases").  In Texas, appellate courts do not readily receive challenges to the effective assistance of counsel at trial – or, obviously, on appeal – and, instead, segregate those claims to habeas review.  Thus, *Coleman* is not controlling.  The reasons that *Evitts* extended the right to effective assistance of counsel on appeal apply with equal force to the first habeas challenge for Texas death row inmates.  As the *Evitts* court noted, the United States Supreme Court has "made clear, the guarantee of counsel 'cannot be satisfied by mere formal appointment.'"  *Id.* at 395.

Petitioner objects to the Magistrate Judge's failure to properly consider or evaluate the application of *Evitts* to this still unresolved issue.

Judge Nelms had actual knowledge that Flores' counsel were not protecting his interests or rights during the state habeas proceedings.  Judge Nelms actually intervened in the case to try to "right the ship."  However, as set forth above, the subsequent appointment of "Rocket" Rosen

only further damaged Flores' chances of receiving legitimate federal review of his claims. Rosen was dilatory in moving to pick up the files turned over by Flores' first counsel and, thereafter, never actually filed anything on Flores' behalf.  Rosen has since been sanctioned by the United States District Court for the Northern District of Texas and, as Petitioner's counsel understands, can no longer practice before the Northern District.

The United States Constitution assures state death row inmates that the privilege of the "writ of habeas corpus shall not be suspended. . . .," yet in this case, for all practical purposes due to counsel's many, many failings, the writ has indeed been suspended for Flores. *Evitts* not *Coleman* is the proper guiding precedent.

A cursory review of the Supreme Court's death penalty jurisprudence during the past 10 years underscores the need for the effective assistance of counsel during state writ proceedings. *See Terry Williams v. Taylor*, 529 U.S. 362 (2000); *Michael Williams v. Taylor*, 529 U.S. 420 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003). The majority of death penalty cases that have been overturned as invalid or as violating the Constitution were held so during habeas corpus proceedings – not during direct appellate proceedings. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Miller-El v. Cockrell*, 537 U.S. 322 (2003); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Roper v. Simmons*, 543 U.S. 551; *Panetti v. Quaterman*, 551 U.S. 930 (2007). The United States Supreme Court recently expanded the right to counsel to include information provided during plea negotiations in *Padilla v. Kentucky*,130 S. Ct. 1473 (2009).  And, the United States Supreme Court is currently considering expanding its decision in Padilla in *Lafler v. Cooper* and *Missouri v. Frye*.  Further, the United States Supreme Court is currently considering providing a constitutional right to counsel during civil contempt hearings which only fortifies Petitioner's claim of entitlement. *See Turner v. Price*.  The Magistrate Judge's failure to consider these

pending cases is objectionable and resulted in an erroneous decision denying Petitioner's claims. Petitioner objects to the Magistrate Judges failure to consider these current trends and pending cases as buttressing his claimed right to effective counsel during habeas proceedings.  Contrary to the Magistrate Judge's Findings on page 15, neither *Coleman* nor *Finley* definitely resolve this issue.

The Magistrate Judge committed error when he found that no right exists based on *Coleman* and *Finley*.  Petitioner objects to these findings because the issue presented by Petitioner, a death row inmate whose only opportunity is to present his many constitutional claims regarding the assistance of counsel is limited to a state habeas presentation, is a case of first impression and should be considered in light of evolving standards regarding the effective assistance of counsel. *See Coleman v. Thompson*, 501 U.S. at 755.

The Magistrate Judge committed reversible error when he failed to evaluate, consider, cite or reference any of Petitioner's arguments and authorities relating to recent United States Supreme Court death penalty jurisprudence and its potential role in establishing a constitutional right to the assistance of counsel during state habeas proceedings including *Williams*, *Wiggins*, *Rompilla*, *Miller-El*, *Roper*, *Panetti*, and *Padilla*.  The Magistrate Judge's refusal to consider any of these authorities foreclosed a proper consideration of the expanding rights of death row convicts and the manner in which these cases contribute to the finding of a constitutional right to counsel during habeas proceedings.

The role of habeas corpus in preserving Constitutional rights is vital.  Without ensuring that state death row inmates receive competent counsel, the right to raise these Constitutional challenges becomes chimerical.  For these reasons, Petitioner objects to the Magistrate Judge's Findings on page 15 that prematurely foreclose this right without any consideration of modern

habeas and death penalty jurisprudence.

**Objection # 5**

V. <u>The Magistrate Judge committed error when he failed to evaluate or rule on Petitioner's</u>
<u>claim that his Due Process rights were violated when the trial court failed to complete the</u>
<u>*Batson* hearing as begun and required by *Batson v. Kentucky.*</u>

The Magistrate Judge erred when he wholly failed to address or otherwise consider

Petitioner's timely asserted complain that he was denied Due Process when the trial court

abandoned the *Batson* hearing that was properly invoked and begun following Petitioner's timely

objection.  Petitioner's federal habeas clearly sets forth this still unaddressed claim.  The

Magistrate Judge committed error when he failed to consider the following allegations in any

fashion:

Prior to the start of trial in this case, Judge Nelms and counsel conducted

individual voir dire of the jury panel.  In exercising its peremptory strikes, the State of Texas

struck minority members from the jury panel.  Flores' trial counsel realized that these strikes

posed a constitutional dilemma and petitioned the trial court for a *Batson* hearing.  *Batson v.*

*Kentucky*, 476 U.S. 79 (1986).  The following day, apparently convinced that Flores' had

demonstrated the requisite *prima facie* case pursuant to *Batson*, the court began hearing evidence

on Flores' claim that the State had unconstitutionally struck jurors based on race.

As recently as March 20, 2008, the United States Supreme Court again addressed the

issue of invidious race discrimination in jury selection.  *Snyder v. Louisiana*, 552 U.S. 472

(2008).  Justice Alito, writing for the *Snyder* majority, reminded that *Batson* demands a three-

part inquiry when a *Batson* issue is properly preserved at trial.  *Id.* at 3.

> *Batson* provides a three-step process for a trial court to use in adjudicating a claim
> that a peremptory challenge was based on race:
>
> "First, a defendant must make a prima facie showing that a peremptory challenge

has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."

*Id. (citing Miller-El v. Dretke).* Justice Alito further admonished that "[t]he trial court plays a pivotal role in evaluating *Batson* claims". *Id.* In Flores' case, the trial court, inexplicably, abandoned its "pivotal role" *AFTER* it determined that Flores' had established a *prima facie* case of race discrimination.

*After* Flores' trial counsel timely and properly interposed a *Batson* objection, Judge Nelms determined that the state would be required to provide a race-neutral reason for exercising its peremptory strikes against minority panel members. Thereafter, the trial court ordered the state to explain its peremptory strikes. Then, curiously – and in clear violation of *Batson* -- the trial court recessed the hearing, permitting the State additional time to provide its race neutral reasons for striking the minority members of the jury panel.

As Justice Alito recently explained, "[i]n this situation, the court *must* evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* This language is mandatory – the "court MUST evaluate" the prosecutor's reasons and assess its reasoning in light of *Batson*. Here, Judge Nelms abdicated his duty. As a result, Flores was denied due process and to promise of equal protection enshrined in *Batson*.

The Magistrate Judge erred when he passed on issuing any ruling on this claim. Unlike some of the other claims that are tied to Petitioner's right to counsel claims, this claim is a freestanding claim pursuant to Due Process and should have been considered and granted. Because the Magistrate Judge did not address this claim, he committed error. And, for the reasons set forth in this Objection, this Court should find that Petitioner has clearly stated a Due

Process violation under *Batson*.

## Objection # 6

VI. <u>The Magistrate Judge erred by finding that there is no evidence the prosecution team knew or should have known about impeachment evidence regarding a key witness at the time of trial and therefore, should have disclosed it pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).</u>

The Magistrate Judge erred in finding that there is no evidence the prosecution team knew or should have known about impeachment evidence regarding a key witness at the time of trial and therefore, should have disclosed it pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) *Magistrate's Findings*, at 12. The Magistrate Judge's findings err on this claim in two ways. First, it fails to distinguish between cases in which the prosecution does not have any reason to believe that strong impeachment evidence about a key witness that is not part of the prosecution team exists; and cases like this one where the prosecution team does have reason to believe that strong impeachment evidence about a key witness that is not part of the prosecution team exists. *Magistrate's Findings*, at 11-12. And second, it finds that because a relevant – possibly even exculpatory – memo written by the witness a year before trial did not surface for another seven years that it there is simply no evidence that the prosecution team would have been aware of the memo. *Magistrate's Findings* at 12. In light of all the circumstantial evidence indicating the prosecution team was – at best – willfully blind to the impeachment evidence regarding a key witness, this finding is factually incorrect. Moreover, inherent in this finding is the proposition that *Brady* does not apply if the prosecution team can successfully hide impeachment evidence for numerous years.

**Objection # 7**

VII.     The Magistrate Judge committed error by finding that Jill Bargainer's in-court identification of Flores allegedly made possible by a hypnosis session conducted by the police was admissible and by finding that Petitioner did not overcome the "presumption" that the habeas judge's legal conclusion and finding that he (also the trial judge) properly admitted the testimony at trial was correct.

The Magistrate Judge erred by finding that the admission of Bargainer's identification testimony which was hypnotically enhanced by the police did not violate Flores Fourteenth Amendment right to due process and his Sixth Amendment right to confrontation. *Magistrate's Findings* at 12-15. While the *Magistrate's Findings* correctly state the general facts and circumstances surrounding Bargainer's identification testimony, it fails to appropriately discuss or consider the inherently biased, prejudiced, and tainted circumstances surrounding Bargainer's hypnosis.

Bargainer lived across the street from the victim in this case. Despite seeing Childs and his unidentified companion entering the Blacks home, Bargainer did not call the police or investigate. Rather than take a moment to consider the implications of these suspicious actions, Bargainer proceeded with her daily routine. Surely, the possibility that Black would not have been killed if she had only taken a moment to assure herself that everything was ok, crossed Bargainer's mind. Undoubtedly, it was this feeling of guilt along with the despair that she felt over losing a neighbor that led Bargainer to go to the police station the morning of the murder in an attempt to help find the murders. Additionally, these feelings likely prevented Bargainer from feeling as though she had done enough by positively identifying Childs.

In an attempt to do more, Bargainer apparently made the spontaneous decision to request hypnosis from the police. Bargainer's claim and the trial court's findings that she – not the police or prosecution – requested that the police place her under hypnosis is incredibly curious. Who gave her the idea that hypnosis could give her the ability to identify a man that she could not

identify hours after seeing him? And, why would she have any reason to believe that the police could hypnotize her? The notion that Bargainer approached the police and requested that they hypnotize her without the police or prosecution ever suggesting that she be hypnotized by the police is unbelievable.

Bargainer's "story" about her request to be hypnotized and the feelings of guilt she surely harbored cast doubt on the reliability of any post-hypnosis testimony. But the doubt that these circumstances cast on the reliability of her testimony, is minimal compared to the doubt that is cast on her testimony by the fact that the police are the ones that conducted the hypnosis and the timing of the police run hypnosis session. There are many self-evident reasons that a testimony should not be permitted from a witness who allegedly has their memory enhanced as a result of a police officer hypnotizing them. And, there far more self-evident reasons that such testimony should not be permitted when the police conduct the hypnosis session after a suspect – who has fled from and assaulted police – has been arrested.

Due to the extreme facts and circumstances surrounding Bargainer's police conducted hypnosis session, there is no Supreme Court case law directly on point with the due process issue the admission of her testimony raises in this case. But, the obvious due process violation that arises from admitting her testimony in light of these extreme facts and circumstances, makes this case comparable to *Caperton v. A.T. Massey Coal Co.*, 129 S.Ct. 2252 (2009).

In *Caperton*, Massey Coal was found guilty in a civil lawsuit and ordered to pay sum of $50 million dollars. After this verdict was entered but before Massey Coal's appeal made it to the West Virginia Supreme Court, state elections were held. *Id.* at 2259. In the elections, Brent Benjamin ran for Justice McGraw's seat on the West Virginia Supreme Court. During the campaign, Massey Coal's CEO contributed nearly $2.5 million dollars to the 527 organization

opposing McGraw and supporting Benjamin, and another $500,000 on independent expenditures for Benjamin's campaign.[6] As a result, Benjamin was elected by a slim margin. Thereafter, Benjamin provided the crucial vote in 3-2 decision that reversed the $50 million verdict against Massey Coal.

Based on the extreme facts and circumstances of *Caperton*, the Supreme Court found that the Constitution required Benjamin's recusal from the case. *Id*. at 2265. The Court however, was careful to point out that actual bias or prejudice on the part of a judge was not required to find that the Due Process Clause is violated when recusal is refused. *Id*. Rather, the proper constitutional inquiry is whether "[t]here are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable.'" *Id*. at 2260 (*quoting Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Additionally, *Caperton* reminds judges that considerations of human weakness and psychological tendencies must be carefully considered to ensure that the Due Process Clause is not violated. *Id*. at 2263.

These principles and considerations have always been at the heart of the Due Process Clause. And, these principles and considerations are every bit as applicable to the issues in this case as to the issues in *Caperton*. Application of these principles and consideration of human weakness, psychological tendencies, and the things that experience teaches led to the conclusion that Bargainer's in court identification testimony allegedly prompted by the police conducted hypnosis session should never have been admitted into evidence. The Magistrate Judge committed error by failing to consider these things.

Similarly, the Magistrate Judge committed error by finding that the state habeas judge's

---

[6] $3 million in contributions were more than the total amount spent by all other Benjamin supporters and three times the amount spent by Benjamin's own committee. *Id*.

factual findings and legal conclusion relating to the admission of Bargainer's testimony should be given a presumption of correctness. Surely, when Congress provided the presumptions afforded to state review of issues arising at trial it was based on the reasonable assumption that a judge other than the trial judge would be the one determining whether the trial judge's admission of evidence was erroneous. Here, the habeas judge's and the trial judge were the same person. Accordingly, the habeas judge had little difficulty finding that trial judge correctly allowed Bargainer's identification testimony. And, it is not at all surprising that the habeas judge support this conclusion with his own findings of fact.

In sum, Petitioner objects to the *Magistrate's Findings* that the admission of Bargainer's identification testimony did not violate the Due Process Clause of the Fourteenth Amendment or the Sixth Amendment right to confront witnesses.

### Objection # 8

VIII.     <u>The Magistrate Judge committed error by failing to consider the merits of Petitioner's claim that the "10-12 Rule" violated the Due Process Clause of the Fourteenth Amendment and Eighth Amendment's guarantee that procedural safeguards will be stringently followed before sentencing a defendant to death.</u>

The Magistrate Judge erred by finding that Petitioner's claims relating to the constitutionality of the "10-12 Rule" is procedurally barred from federal habeas review. *Magistrate's Findings*, at 5. As the Magistrate Judge correctly pointed out, claims that the state court has found to be procedurally defaulted may be considered by a federal court if the petitioner can demonstrate the existence of either one of the following circumstances: "[1] the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or [2] demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here,

Flores can demonstrate the existence of both these circumstances, though he only need to demonstrate the existence of one.

First, Flores' has demonstrated remarkably good cause for failing to raise this issue on direct appeal – he was denied effective assistance of appellate counsel. Robert Abbott was appointed as Flores' appellate counsel. This appointment was in name and theory only, as Abbott completely abandoned Flores and his professional responsibility to uphold the Flores' constitutional rights.[7] Abbott failed to communicate with Flores and he failed to properly raise a number of issues on appeal, including issues that many constitutionally competent attorneys would consider "dead-bang winners." The grossly ineffective assistance of appellate counsel provides cause for the failure to raise this issue on appeal as counsel was the only means by which Flores could file an appeal.[8]

As a result of Texas' "10-12" rule, Flores was deprived of important procedural safeguards required by the Eighth Amendment when the State is seeking to punish the accused by taking his life through execution.

The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. State-sanctioned deprivation of life is one of the most sobering and irreversible powers any State can exercise. The Supreme Court has affirmed on numerous occasions that the penalty of death is qualitatively different from a sentence of imprisonment. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 n. 15,(1981); *Gardner v. Florida*, 430 U.S. 349, 357,(1977) (plurality opinion). *See also Furman v.*

---

[7] Based on a good faith belief, Flores submits that the unprofessional and unconstitutional manner in which Robert Abbott handled his appeal is indicative of the type of actions that likely led to his current ineligibility to practice law in Texas. (Ex. B.)

[8] Imprisonment, coupled with the lack of a legal education, would make it extremely difficult for anyone to file an appeal. Moreover, Flores would ask that this Court take judicial notice of the fact that the Texas courts of appeals will not accept pro se filings from prisoners who are represented by counsel, therefore Flores was completely prevented from doing anything to ensure that all issues were appropriately raised on appeal.

*Georgia*, 408 U.S. 238, 306,(1972) (Stewart, J., concurring). This qualitative difference

engenders a corresponding difference in the need for assurance in the determination that death is

the appropriate punishment in a specific case. *See Woodson v. North Carolina*, 428 U.S. 280

(1976) (plurality opinion). In *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the Court

stated that "the qualitative difference of death from all other punishments requires a

correspondingly greater degree of scrutiny of the capital sentencing determination." *See id.* at

999 n. 9. *See also Sawyer v. Smith,* 497 U.S. 227 (1990)*; Ford v. Wainwright*, 477 U.S. 399, 411

(1986) (Marshall, J., plurality opinion) (stating, "In capital proceedings generally, this Court has

demanded that fact-finding procedures aspire to a heightened standard of reliability. . . . This

especial concern is a natural consequence of the knowledge that execution is the most

irremediable and unfathomable of penalties; that death is different"); *Ake v. Oklahoma*, 470 U.S.

68, 87 (1985) (Burger, C. J., concurring in judgment) (stating, "In capital cases the finality of the

sentence imposed warrants protections that may or may not be required in other cases.");

*Barefoot v. Estelle*, 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting) (stating that, *Woodson*'s

concern for assuring heightened reliability in the capital sentencing determination "is as firmly

established as any in our Eighth Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420,

443 (1980) (Burger, C.J., dissenting) (stating, "[I]n capital cases we must see to it that the jury

has rendered its decision with meticulous care"); *Gardner v. Florida*, 430 U.S. 349, 357-358

(1977) (Stevens, J., plurality opinion) (stating, "From the point of view of the defendant, it is

different in both its severity and its finality. From the point of view of society, the action of the

sovereign in taking the life of one of its citizens also differs dramatically from any other

legitimate state action. It is of vital importance to the defendant and to the community that any

decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

The Supreme Court recognizes that the jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). *See Jones v. United States*, 527 U.S. 373 (1999). The Court applies a single standard for reviewing instructions, asking, "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyd v. California*, 494 U.S. 370, 380 (1990)).

The Eighth Amendment requires that the jury not be misled in the role it plays in the sentencing decision. *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985) (plurality opinion). Inaccurate information proffered to the jury renders the sentencing proceeding so unreliable that the proceeding violated the Eighth Amendment. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 305,(1976).

Further, a component of heightened reliability is the Eighth Amendment and Due Process command that the jury be capable of a reasoned moral judgment about whether death, rather than a lesser sentence, ought to be imposed. *See Simmons*, 512 U.S. at 172. Part and parcel of this requirement is the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasonable determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), and the invalidation of "procedural rules that tend to diminish the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).

In this case, that correspondingly high requirement of reliability dictates finding the

Texas jury scheme as applied to Flores is unconstitutional. Under Texas law, the prosecution can secure the death penalty only if the jurors answer the future dangerousness issue in the affirmative and the mitigation issue unanimously in the negative. Thus, if even one juror determines to answer any of these issues differently, Flores would, as a matter of law, be sentenced to life imprisonment.

The instructions, however, do not inform the jury of this procedure and result. Instead, they affirmatively mislead the jurors by stating, *inaccurately*, that ten jurors must agree to an answer that will result in life imprisonment. The instructions effectively provide the jury with a false statement of Texas law.

The several instructions that informed the jury that ten votes were essential for imposition of life imprisonment inaccurately stated Texas law and affirmatively misled the jurors. Each individual juror knew, from the instructions, that his or her single vote could not determine the outcome. Rather, that juror must convince at least nine others to join the decision.

Consequently, each juror's responsibility for the ultimate decision was undermined. Each juror could take solace in the fact that his or her single decision would have only minimal (1/10 or 1/12) effect on the ultimate decision. Thus, the instructions unconstitutionally minimized each juror's responsibility for the ultimate sentence. *Romano,* 512 U.S. at 8; *Beck,* 447 U.S. at 638; *Lockett,* 438 U.S. at 604.

The inaccuracy in the instructions and their probable effect on the jurors so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. *See Sawyer v. Smith,* 497 U.S. 227, 243-44 (1990) (observing that the *Caldwell* rule was added to the guarantee in *Donnelly  v. DeChristoforo,* 416 U.S. 637 (1974), of due process protection against fundamental unfairness). *See also Darden v. Wainwright,* 477

U.S. 168, 178-81 (1986). The jurors were seriously and unconstitutionally constrained from imposing a sentence of life imprisonment. An instruction that required the votes of 10 jurors seriously impeded the capacity of any single juror to vote for life, as was his or her right under the law. *See Romano*, 512 U.S. at 8.

The instructions further violate the tenant of fundamental fairness that is the bedrock of due process. The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Betts v. Brady*, 316 U.S. 455 (1942); *Tumey v. Ohio*, 273 U.S. 510 (1927). *See Estes v. Texas*, 381 U.S. 532 (1965). *Cf. Griffin v. Illinois*, 351 U.S. 12 (1956). Flores was not granted this requisite opportunity of fundamental fairness. Instead, he was sentenced to death by a jury that improperly was charged on the effect of their votes. Accordingly, Flores was prejudiced by the this violation of the Eighth Amendment to the United States Constitution. By demonstrating cause for failing to raise this issue on appeal and actual prejudice as a result of the alleged violation of federal law, Flores is entitled to federal review of this claim.

Additionally, Flores is entitled to federal review of his claim because he can demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. As previously discussed and as this Court is aware, the decision to allow the state to kill another human being through execution is not to be taken lightly. Before sanctioning the state to take the life of individual, it is imperative that the Constitutional guarantees that are "essential to our present-day self-definition and national identity" have been afforded to the accused. *Roper v. United States*, 543 U.S. 551, 578 (2005). Here, the failure to consider Flores' claim that the "10-12" rule is unconstitutional will result in Flores being executed without a single court ever having considered whether the "10-12" rule, that was a key component of the instructions given

to jury who sentenced Flores to death sentence, complied with the Constitution. The cruel irony of this result is that whether Flores was afforded the procedural safeguards guaranteed by the Constitution will not be considered by a single court based on statutorily created procedural bars.

### Objection # 9

IX. <u>The Magistrate Judge committed error by finding Petitioner's other claims involving the jury instructions on punishment to be "plainly meritless."</u>

The Magistrate Judge erred in finding that Petitioner's two other claims involving the jury instruction on punishment to be plainly meritless. *Magistrate's Findings* 6-7. Flores' other claims involving the jury instruction on punishment were: (1) the third special issue special issue of the charge to the jury during the penalty phase of Flores' trial is unconstitutional because it does not require the state to prove beyond a reasonable doubt that the defendant should be sentenced to death; and (2) Petitioner's claim that, as whole, the mitigation instruction is excessively vague, thereby resulting in unconstitutional death sentences. In light of the Eighth Amendment and Supreme Court precedents interpreting the Eighth Amendment, it is difficult to understand how these claims could be considered "plainly meritless."

It is generally true that there is no Supreme Court precedent explicitly stating that the state must prove the absence of mitigating circumstances beyond a reasonable doubt. There is however, a wealth of Supreme Court precedents explicitly stating that when the existence of a particular fact must be found before a imposing a particular sentence, then that state must prove the existence of that fact beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895). From

this presumption of innocence arose *Winship*'s fundamental precept: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). *See Sandstrom v. Montana*, 442 U.S. 510 (1979); *Patterson v. New York*, 432 U.S. 197, 210 (1977). The sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). "[R]eliance on the 'reasonable doubt' standard among common-law jurisdictions 'reflects a profound judgment about the way in which law should be enforced and justice administered.'" *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (citing *Winship*, 397 U.S. at 361-62) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)).

The *Winship* principle extends to requiring the State to bear the burden of proving beyond a reasonable doubt all elements that result in imposition of a penalty of death: "Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999). The United States Supreme Court recently reaffirmed this principle in *Apprendi* and *Ring*. As stated in *Ring*, "Capital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589 (2002).

In Texas, the legislature has conditioned the ability to sentence a defendant to death – an increase from life imprisonment to the maximum punishment – on finding that there are no

mitigating circumstances.  In the United States of America, the Eighth Amendment conditions the ability to put a defendant to death – an increase from life imprisonment to the maximum punishment – on finding that there are no  mitigating circumstances.  This evidences that both the Texas legislature and the early federal legislature conditioned the ability to sentence someone to death on finding that mitigating circumstances do not exist.  Accordingly, it is anything but "plainly meritless" to make the claim that the state must prove beyond a reasonable that mitigating circumstances do not exist.

The important role that consideration of mitigating circumstances plays in providing the procedural safeguards guaranteed by the Eighth Amendment cannot be understated. The fundamental respect for humanity underlying the Eighth Amendment, [mandates the] . . . consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio,* 438 U.S. 586 (1978); *Roberts (Harry) v. Louisiana,* 431 U.S. 633 (1977); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325 (1976).  Evidence about a defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems may be less culpable than defendants who have no such excuses. *California v. Brown,* 479 U.S. at 538, 545 (1987) (O'Connor, J., concurring). This is accomplished only through a process that requires the sentencer to consider in fixing the ultimate punishment of death, the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976).    The *Lockett* principle "is the product of considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of

the individual. *California v. Brown,* 479 U.S. at 562. The underlying principle in *Lockett* and *Eddings* is that punishment should be directly related to the personal culpability of the criminal defendant. *Penry v. Lynaugh,* 492 U.S. 302 (1989). Thus, jury instructions must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to that evidence in rendering its decision." *Id.* at 321. Furthermore, an individual juror must be free to consider a mitigating factor, regardless of whether other members of the jury agree as to its existence. *Mills v. Maryland,* 486 U.S. 367 (1988). *See McKoy v. North Carolina,* 494 U.S. 433 (1990) (stating each juror must be permitted to consider and give effect to mitigating evidence). In other words, it is not enough "simply to allow the defendant to present mitigating evidence to the sentencer, rather there must not be any impediment through evidentiary rules, jury instructions or prosecutorial argument to the sentencer's full consideration and ability to give effect to mitigating evidence." *Penry*, 492 U.S. at 327.

Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness -- such as a history of positive character traits, kindness shown toward children, or artistic talent. Nonetheless, the judge and prosecutor limited its discussion of mitigation to negative factors (RR4.120; RR16.86; RR18.26, 52; RR20.27; RR26.32; RR31.29; RR32.36-37) such as physical abuse, retardation and substance abuse issues, and one positive factor (RR4.191-192, 256-257; RR9.48-49; RR32.112): whether the Applicant had been an honor student. Although the statutory *Penry* special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," article 37.071, § 2(e), the statute's limited definition of "mitigating evidence" violates the Eighth and Fourteenth Amendments to the United States Constitution. U.S. CONST. AMENDS. VIII, XIV.

Cumulatively, the instructions submitted at the punishment phase of Flores' trial were arbitrary and capricious in violation of the Eighth Amendment and the Due Process Clause. Flores' sentence of death was "wantonly and freakishly" applied, and, consequently, is constitutionally deficient under federal law as interpreted by the Supreme Court.

**Objection # 10**

X. <u>The Magistrate Judge committed error by finding Petitioner's other claims involving the jury instructions on punishment to barred by *Teague*</u>

The Magistrate Judge erred in finding that Petitioner's other claims involving the jury instruction on punishment would be barred by *Teague*. *Magistrate's Findings* 6-7. As stated above, Flores' other claims involving the jury instruction on punishment were: (1) the third special issue special issue of the charge to the jury during the penalty phase of Flores' trial is unconstitutional because it does not require the state to prove beyond a reasonable doubt that the defendant should be sentenced to death; and (2) Petitioner's claim that, as whole, the mitigation instruction is excessively vague, thereby resulting in unconstitutional death sentences.

The *Magistrate's Findings* failed to consider or address the Supreme Court's holding in *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007). In *Abdul-Kabir*, the Court held that Texas' instructions on punishment in capital cases – many parts of which remain unchanged – were unconstitutional. *Id*. at 262-64. Relying on its continuously evolving precedents interpreting the Eighth Amendment and emphasizing the magnitude of the decision to execute a human being, the Court addressed the application of its recent decisions to the federal habeas petitioner in that case. *Id*. Ultimately, the Court found that it the federal habeas petitioner must be granted relief and that *Teague* did not prevent this result. *Id*. In reaching this decision, the Court stated: "Our cases following *Lockett v. Ohio*, 438 U.S. 586 (1978), have made clear that when the jury is not permitted to give meaningful effect or a "reasoned moral response" to a defendant's mitigating

evidence – because it is forbidden from doing so by statute or a judicial interpretation of the statute – the sentencing process is fatally flawed." *Id.* at 264.

As *Abdul-Kabir* makes clear, the Eighth Amendment's protections must be vigorously enforced when it is a matter of life and death. Moreover, courts must follow the lead of the Supreme Court and recognize that the procedural bars of *Teague* do not trump the Eighth Amendment. The Magistrate Judge erred by failing to follow the Supreme Court's lead and by failing to consider *Abdul-Kabir*.

## **CONCLUSION**

In this case, there can be little question that Flores has not been afforded many of his constitutionally guaranteed rights. As a result, the corresponding procedural safeguards of these rights were not in place to ensure that Flores was given a fair trial, a fair punishment, a fair appeal, or a fair state habeas review. Respondent, the State, has not even attempted to argue that Flores was actually afforded many of these procedural safeguards. Instead, Respondent argues that Flores is procedurally barred from seeking relief for the deprivation of these procedural safeguards. The result of accepting Respondent's argument is that Flores' will be put to death without one single court ever considering whether he was deprived of the procedural safeguards guaranteed to him by the Constitution. The cruel irony and utter absurdity of this result, as discussed in detail above, can be seen from the circumstances of Flores' trial, sentencing, appeal, and state habeas proceedings.

For these and the above stated reasons, Petitioner respectfully objects to the above stated findings and conclusions as well as the ultimate conclusion of the *Magistrate's Findings* that Petitioner's writ of habeas corpus should be denied. *Magistrate's Findings*, at 16.

Respectfully submitted,


_____/s/Bruce Anton_____
Bruce Anton
Texas State Bar No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax

ATTORNEY FOR PETITIONER
/s/ Bruce Anton_____
BRUCE ANTON




## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April, 2011, a true and correct copy of the above and foregoing Motion to Extend the Deadline to File Objections to the Magistrate Judge's Findings and Recommendations was delivered to the Attorney General's Office, P.O. Box 12548, Austin, Texas 78711-2548.



/s/ Bruce Anton_____
BRUCE ANTON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES DON FLORES,                    §
                                       §
            Petitioner,                §
                                       §
v.                                     §          3:07-CV-00413-M
                                       §
RICK THALER, Director                  §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,    §
                                       §
            Respondent.                §

---

# PETITIONER'S EXHIBITS

---

# EXHIBIT
# A

No. F98-02133-N

| | | |
|---|---|---|
| **STATE OF TEXAS** | [] | IN THE 195TH JUDICIAL |
| | [] | |
| **VS.** | [] | DISTRICT COURT, |
| | [] | |
| **CHARLES DON FLORES** | [] | DALLAS COUNTY, TEXAS |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

### Introduction

By your verdict in this case you have found the defendant, Charles Don Flores guilty of the offense of capital murder, alleged to have been committed on or about the 29th day of January, 1998, in Dallas County, Texas. It now becomes your duty to determine, from all the evidence in the case, the answers to certain questions called "special issues."

### Mandatory Punishment For Capital Murder

The mandatory punishment for the offense of capital murder is death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

### Instructions Regarding Special Issue Number 1

In deliberating on the issues submitted in special issue number 1, the jury shall consider all evidence admitted at the guilt or innocence and

punishment stages of the trial, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty

The jury shall answer special issue number 1 "yes" or "no." The presumption is that the answer to special issue number 1 is "no" and the burden of proof is on the State to prove beyond a reasonable doubt that the answer should be "yes." The jury may not answer special issue number 1 "yes" unless the jury agrees unanimously on its answer and may not answer special issue number 1 "no" unless ten (10) or more jurors agree. If any juror has a reasonable doubt as to issue 1, his or her answer should be "no." Members of the jury need not agree on what particular evidence supports a "no" answer to special issue number 1.

Only in the event the jury's answer to special issue number 1 is "yes" should you proceed to answer special issue number 2. If your answer to special issue number 1 is "no," or if fewer than ten (10) jurors agree on an answer of "no," you must not answer special issues 2 or 3.

## Instructions Regarding Special Issue Number 2

If the jury's answer to special issue number 1 is "yes," you will proceed to answer special issue number 2.

In deliberating on the issues submitted in special issue number 2, the jury shall consider all evidence admitted at the guilt or innocence and punishment stages of the trial, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

The jury shall answer special issue number 2 "yes" or "no." The presumption is that the answer to special issue number 2 is "no" and the burden of proof is on the State to prove beyond a reasonable doubt that the answer should be "yes." The jury may not answer special issue number 2 "yes" unless the jury agrees unanimously on its answer and may not answer "no" unless ten (10) or more jurors agree. If any juror has a reasonable doubt as to issue 2, his or her answer should be "no." Members of the jury need not agree on what particular evidence supports a "no" answer to special issue number 2.

Only in the event the jury's answers to special issues 1 and 2 are "yes" should you proceed to answer special issue number 3. If your answer to special issue number 2 is "no," or if fewer than ten (10) jurors agree on an answer of "no," you should not answer special issue 3.

## Instructions Regarding Special Issue Number 3

If the jury's answer to special issue number 2 is "yes," you will proceed to answer special issue number 3. There is no presumption regarding the answer to this special issue and neither the State nor the defense has a burden of proof. In answering this issue, the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

The jury shall answer special issue number 3 "yes" or "no." Only by unanimous verdict may the jury answer "no" to this special issue and it may not be answered "yes" unless ten (10) or more jurors agree. Jurors need not agree on what particular evidence supports a "yes" finding.

## Proof Beyond a Reasonable Doubt

Special issues numbers 1 and 2 require the State to prove beyond a reasonable doubt that the answer to such issues is "yes." Regarding reasonable doubt, you are instructed that a reasonable doubt is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

4

Proof beyond a reasonable doubt must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

### Definition of Intentional

A person acts *intentionally* or *with intent*, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

### Extraneous Offenses

If any evidence was introduced in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment in this case, or of other acts or transactions, you cannot consider such other offenses, acts, or transactions, if any, unless you first find beyond a reasonable doubt that the defendant committed such other offenses, acts, or transactions, if any. If you do not so find and believe from the evidence, or if you have a reasonable doubt thereof, you will not consider such evidence for any purpose whatsoever.

### Defendant's Right to Remain Silent

A defendant may testify in his own behalf if he wishes to do so; however, in the event he elects not to testify, that fact cannot be taken as a circumstance against him and no presumption arises from it. In this case, the defendant has elected not to testify and you are instructed that you cannot

and must not refer or allude to that fact in any way during your deliberations or take it into consideration for any purpose whatsoever.

## Closing Instructions

In arriving at an answer to any special issue submitted, you must not reach your decision by drawing lots or by any other method of chance, but only by thoughtful deliberation and a full, fair, and free exchange of opinions. Nor are you to be swayed by sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling in considering all the evidence before you and in answering the special issues.

No one has any authority to communicate with you except the bailiffs who have you in charge. You may communicate with the court in writing through the bailiff, but you should not attempt to talk to the bailiff, the attorneys, the court, or anyone else concerning any question you may have about the law or the evidence.

During your deliberations you must not consider, discuss, or relate any matters not in evidence before you. Nor should you mention or consider any personal knowledge or information you may have about any fact or person connected with the case, which is not shown by the evidence.

After argument of counsel, you will retire and consider your answers to the special issues submitted to you. Your foreman will preside over your deliberations and will vote with you on the answers to those special issues.

You are the exclusive judge of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony, but you are bound to receive the law from the court, which is herein given you, and be governed thereby.

JOHN NELMS
Judge
195th Judicial District Court

## Special Issue Number 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Charles Don Flores, would commit criminal acts of violence that would constitute a continuing threat to society?

### Jury's Answer to Special Issue Number 1

We, the jury, find beyond a reasonable that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and we unanimously find the answer to special issue number 1 to be "yes"


FOREMAN

*OR*

We, the jury, with ten or more members of the jury concurring and agreeing, find that there is not a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and we find the answer to special issue number 1 to be "no."


FOREMAN

*OR*

We, the jury, being unable to unanimously answer special issue number 1 "yes" or, with ten or more jurors agreeing, to answer it "no," are unable to return a verdict on this issue.

FOREMAN

*Only if the jury has unanimously determined that the answer to special issue number 1 is "yes" shall it proceed to answer special issue 2.*

## Special Issue Number 2

Do you find from the evidence beyond a reasonable doubt that the defendant, Charles Don Flores, actually caused the death of the deceased, Elizabeth Black, or, if he did not actually cause her death, that he intended to kill Elizabeth Black or another, or anticipated that a human life would be taken?

### Jury's Answer to Special Issue 2

We, the jury, find beyond a reasonable doubt that the defendant actually caused the death of the deceased or that, if he did not actually cause

9

the death of the deceased, he intended to kill the deceased or another, or anticipated that a human life would be taken, and we unanimously find the answer to special issue 2 to be "yes."

FOREMAN

*OR*

We, the jury, with ten or more members of the jury concurring and agreeing, find that the defendant did not actually cause the death of the deceased, did not intend to kill the deceased or another, and did not anticipate that a human life would be taken. We therefore find that the answer to special issue number 2 to be "no."

*OR*

We, the jury, being unable to unanimously answer special issue number 2 "yes" or, with ten or more jurors agreeing, to answer it "no," are unable to return a verdict on this issue.

FOREMAN

10

*Only if the jury has unanimously determined that the answer to special issue number 2 is "yes" shall it proceed to answer special issue 3.*

## Special Issue Number 3

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

### Jury's Answer to Special Issue 3

We, the jury, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and his personal moral culpability, find that there is not a sufficient mitigating circumstance or circumstances to warrant that a sentence of life

imprisonment rather than a death sentence be imposed, and we unanimously find the answer to special issue 3 to be "no."

FOREMAN

*OR*

We, the jury, with ten or more members of the jury concurring and agreeing, find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. We therefore find the answer to special issue number 3 to be "yes."

FOREMAN

*OR*

We, the jury, being unable to unanimously answer special issue number 3 "yes" or, with ten or more jurors agreeing, to answer it "no," are unable to return a verdict on this issue.

FOREMAN

12

# EXHIBIT
# B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES DON FLORES,           §
                              §
           Petitioner,        §
v.                            §           3:07-CV-00413-M
                              §
RICK THALER, Director         §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
                              §
           Respondent.        §

## EXPLANATION OF EXHIBIT B

As stated in Petitioner's Objections, Exhibit B is a screen shot of the results from a search

of Texas attorneys named Robert Abbott.  When these search results are viewed online, a green

circle icon is displayed next to the name Robert Lee Abbott[1] (who was not Flores's appellate

counsel) and a red circle icon is displayed next to the name Robert Patrick Abbott.  The meaning

of these status icons is provided just above the information for these attorneys.  When these

search results are viewed online a different colored circle icons appear next to the different

statuses provided.  According to this icon key, a green circle icon signifies that the attorney is

eligible to practice and a red circle icon signifies that the attorney is not eligible to practice.  The

red icon next to the name of Flores' appellate counsel, Robert Patrick Abbott,  therefore indicates

that he is not eligible to practice law in Texas.

For some reason unbeknownst to Petitioner's current counsel, the printed screen shot of

these search results does not display the colored circle icons next to the attorneys names or next

to the meaning of each icon in the icon key.  Nonetheless, Petitioner has attached the screen shot

as Exhibit B because the screen shot does provide evidence of the search being conducted and it

---

[1] Out of an abundance of caution, Petitioner's counsel has redacted the information relating to Robert Lee Abbott
from this exhibit.

gives the Court the basis of for stating that Flores' appellate counsel is no longer eligible to

practice law in Texas. Petitioner's counsel conducted this search by going to the following web

address:

http://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsourc

e/MemberDirectory/Search_form_client_main.cfm

Once at this website, Petitioner's counsel entered Flores' the first and last name of Flores'

appellate counsel in the appropriate boxes, clicked submit, and the printed the search results.

The document that was printed is attached hereto as Exhibit B.

State Bar of Texas | Home                                                    Page 1 of 2

**Search Results**
You may re-sort your search results with the "sort by" menu below.  |  Return to Search

Results for **First Name:** Robert **Last Name:** Abbott

| **Status Icons:** | Eligible to Practice | Not Eligible to Practice | Inactive | Deceased | **SORT BY:** Last Name |
|---|---|---|---|---|---|

**Robert Lee Abbott**
Robert L. Abbott, F

**Primary Practice Location:** 1

**Practice Areas:** R

{ VIEW FULL PROFILE }
{ VIEW FIRM WEBSITE }
{ SEND AN EMAIL }

**RETURN TO SEARCH**

**Robert Patrick Abbott**
120 S Denton Tap Rd Ste 450C 188Coppell, TX  75019-0000

{ VIEW FULL PROFILE }

**Primary Practice Location:**
COPPELL, TX

**Practice Areas:**
Appellate, Criminal

The Online Membership Directory provides basic information about Attorneys licensed to practice in Texas. Attorney profile information is provided as a public service by the State Bar of Texas as outlined in Section 81.115 of the Texas Government Code. The information contained herein is provided "as is" with no warranty of any kind, express or implied. Neither the State Bar of Texas, nor its Board of Directors, nor any employee thereof may be held responsible for the accuracy of the data. Much of the information has been provided by the attorney and is required to be reviewed and updated by the attorney annually. Texas grievance/disciplinary information will not appear on the profile until a final determination is reached. Access to this site is authorized for public use only. Any unauthorized use of this system is subject to both civil and criminal penalties. This does not constitute a certified lawyer referral service.

State Bar of Texas | Home